**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SHARON EUL, | ) | |
| and STEPHEN KNOX, SR., | ) | |
| on behalf of themselves and a class, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 15-cv-7755 |
| | ) | |
| | ) | Honorable Ruben Castillo |
| v. | ) | Magistrate Judge Maria Valdez |
| | ) | |
| TRANSWORLD SYSTEMS, INC., successor | ) | |
| to NCO FINANCIAL SYSTEMS, INC.; | ) | |
| NCO FINANCIAL SYSTEMS, INC.; and | ) | |
| BLITT AND GAINES, P.C., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT – CLASS ACTION

## INTRODUCTION

1.       Plaintiffs Sharon Eul and Stephen Knox, Sr. bring this action to secure redress from unlawful credit and collection practices engaged in by defendants Transworld Systems, Inc. ("Transworld"), successor to NCO Financial Systems, Inc., NCO Financial Systems, Inc. ("NCO") and Blitt and Gaines, P.C. ("B&G").   Plaintiffs allege violation of the Fair Debt Collection Practices Act, 15 U.S.C. §1692 et seq. ("FDCPA"), Illinois Consumer Fraud Act, 815 ILCS 505/2 ("ICFA") and Illinois Collection Agency Act, 225 ILCS 425/1 et seq. ("ICAA") .

## VENUE AND JURISDICTION

2.       This Court has jurisdiction under 15 U.S.C. §1692k (FDCPA), 28  U.S.C. §1331 and 28 U.S.C. §1337.

3.       Venue and personal jurisdiction in this District are proper because:

   a.       Defendants' collection actions and conduct impacted plaintiffs within this District;

   b.       Defendants do or transact business within this District.

1

    c.        Defendant Blitt and Gaines, P.C. is located within this District.

    d.        Defendant NCO has a registered agent and office within this District.

    e.        Defendant Transworld has a registered agent and office within this District.

**PARTIES**

**Plaintiffs**

4.        Plaintiff Sharon Eul lives in the Northern District of Illinois.

5.        Plaintiff Stephen Knox, Sr., lives in the Northern District of Illinois.

**Transworld and NCO Financial Systems, Inc.**

6.        Defendant Transworld Systems, Inc. ("Transworld"), is a corporation chartered under California law with offices at 507 Prudential Road, Horsham, PA 19044. It is successor to NCO Financial Systems, Inc. ("NCO"), also located at 507 Prudential Road, Horsham, PA 19044. It does business in Illinois. Its registered agent and office is CT Corporation System, 208 S. LaSalle Street, Suite 814, Chicago, IL 60604.

7.        Transworld is engaged in the business of a collection agency, using the mails and telephone to collect consumer debts originally owed to others.

8.        Transworld holds a collection agency license from the state of Illinois.

9.        Transworld is a debt collector as defined in the FDCPA.

10.        Transworld is the successor to NCO Financial Systems, Inc., ("NCO").

11.        NCO is a Pennsylvania corporation with offices at 507 Prudential Road, Horsham, PA 19044. It does business in Illinois. Its registered agent and office is CT Corporation System, 208 S. LaSalle Street, Suite 814, Chicago, IL 60604.

12.        NCO is engaged in the business of a collection agency, using the mails and telephone to collect consumer debts originally owed to others.

13.        Transworld's predecessor NCO represented on its web site that it has an "Attorney Network" for filing suits on debts (http://www.ncogroup.com/Services/

2

Agency_Attorney_Network.html): "We manage a nationwide network through leading-edge technology and the expertise needed to achieve results." The debts handled through the network include "student loans".

14.    In the annual report on Form 10-K filed by NCO's then-parent with the Securities and Exchange Commission for the fiscal year ended December 31, 2010, at original page 6, NCO represents that it operates "Attorney Network Services" through which NCO "coordinate[s] and implement[s] legal collection solutions undertaken on behalf of our clients through the management of nationwide legal resources specializing in collection litigation. Our collection support staff manages the attorney relationships and facilitates the transfer of necessary documentation."

15.    NCO and Transworld were related entities. *United States v. Expert Global Solutions, Inc., formerly known as NCO Group, Inc., NCO Financial Systems, Inc., ALW Sourcing, LLC, Transworld Systems Inc.*, 3:13cv2611 (N.D.Tex.).

16.    Transworld and NCO are debt collectors as defined in the FDCPA.

## Blitt and Gaines, P.C.

17.    Defendant Blitt and Gaines, P.C. ("B&G"), is a law firm organized as an Illinois professional corporation, with principal offices at 661 Glenn Avenue, Wheeling, IL 60090.

18.    Defendant B&G is engaged in the business of using the mails and telephone to collect consumer debts originally owed to others.

19.    B&G is a debt collector as defined in the FDCPA.

## Relationship Between B&G and Transworld/NCO

20.    On information and belief, B&G is part of NCO's "Attorney Network," and the alleged debts of plaintiffs were handled through the "Attorney Network."

21.    On information and belief, based on affidavits and evidence in *Williams v. NCO Group, Inc.*, 10cv761 (C.D.Cal.), NCO selects counsel, communicates with counsel, and instructs counsel, and the nominal plaintiff in each case does not select, communicate with or

3

instruct counsel.

22.    NCO directs network law firms to not communicate with the nominal plaintiffs:

NCO will interact directly with the Client. In some instances, attorneys may interact directly with the Client only after a request is made through NCO and the Client approves. Only in urgent situations, the firm, and a Client may make contact providing that NCO has also been informed of the situation. If a Client initiates contact with an Attorney Firm directly, the firm is responsible, for the purposes of inventory control and tracking, to notify NCO of the communication.

In essence, the Attorney Firm's first point of contact is NCO. All statements, notices, information, etc. will go through NCO. (Attorney Firm SOP v.2.1)

23.    Another portion of the SOP v. 2.1 (4.2.1) states that "All communications regarding accounts will be conducted between the Attorney Firm and NCO only." On information and belief, subsequent versions of the SOP were consistent.

24.    Network firms are expressly informed that they are "required to follow NCO's Network Attorney Standard Operating Procedures."

25.    Both NCO and network firms are paid on commission.

26.    NCO grades network firms in Attorney Report Cards based on "key performance indices" geared to the speed with which judgments are obtained and collected. The indices include such metrics as "Payer Rates," "Suit Rate," "Service Rates," "Judgment Rates" and "Spin" or "Liquidation Rates."

27.    On information and belief, all acts complained of herein were taken by B&G on behalf of Transworld and its predecessor NCO, as its authorized agents.

28.    The complaints and attachments were form documents, regularly used by B&G.

29.    NCO has previously been sued for the actions of network attorneys, e.g., *Williams v. NCO Group, Inc.*, 10cv761 (C.D.Cal.).

30.    Transworld and its predecessor NCO regularly engaged in and expressly or tacitly authorized deceptive and unfair conduct in connection with the collection of debts, as shown by the following:

a.    One of the NCO employees that signed affidavits for National Collegiate cases, Chandra Alphabet, signed an agreement with the Georgia Bar to

4

cease and desist from engaging in the unauthorized practice of law in March 2013;

b. On July 9, 2013, NCO and related entities entered into a consent judgment in *United States v. Expert Global Solutions, Inc., formerly known as NCO Group, Inc., NCO Financial Systems, Inc., ALW Sourcing, LLC, Transworld Systems Inc.*, 3:13cv2611 (N.D.Tex.), agreeing to injunctive relief and to pay $3.2 million in penalties for improper debt collection practices involving harassment and abuse.

c. In February 2012, the Attorneys General of 19 states entered into a settlement with NCO Financial Systems, Inc. to resolve allegations of deceptive and unfair debt collection practices. The states involved were Alaska, Arkansas, Idaho, Illinois, Iowa, Kentucky, Louisiana, Michigan, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, Vermont, and Wisconsin. Pursuant to this settlement, NCO Financial Systems, Inc. agreed to pay $575,000 to the 19 states for consumer protection enforcement efforts and an additional $50,000 for each participating state to refund consumers with valid claims.

d. In 2010-2012, NCO Financial Systems, Inc., signed a series of consent orders with the Minnesota Department of Commerce, involving such conduct as hiring unfit persons.

e. In November 2010, NCO Financial Systems, Inc., signed a consent order with the Arizona Department of Financial Institutions involving, among other things, unauthorized practice of law.

f. In January 2006, NCO Financial Systems, Inc., entered into a settlement with the Pennsylvania Attorney General to resolve numerous claims of using false, deceptive, or misleading representations or means and harassment in connection with the collection of debts.

g. In 2004, NCO Group Inc., settled Federal Trade Commission charges that it reported inaccurate information about debtors accounts to credit reporting agencies and paid $1.5 million in civil penalties.

## FACTS

### National Collegiate Trusts

31.     Among the debts that NCO collected and Transworld now collects are private student loans allegedly owed to a large number of "National Collegiate Trust" entities.

32.     The "National Collegiate Trusts" claim to be Delaware statutory trusts.

33.     The "National Collegiate Trusts" have no employees.

34.     The "National Collegiate Trusts" do have a corporate trustee.

35.     All acts at issue in this matter that were performed by or on behalf of the "National Collegiate Trusts" were actually performed by Transworld, or attorneys employed by / Transworld.

36.     NCO claimed to be servicing agent of the "National Collegiate Trusts."

37.     Subsequent to certain corporate changes involving NCO and Transworld, Transworld claimed to be servicing agent of the "National Collegiate Trusts" and took over prosecution of lawsuits on behalf of the "National Collegiate Trusts."

38.     Initially, as of 2013-2014, NCO claimed to be servicing agent of the "National Collegiate Trusts."

39.     Subsequent to certain corporate changes involving NCO and Transworld, Transworld claimed to be servicing agent of the "National Collegiate Trusts." On information and belief, the changeover occurred about January 1, 2015.

40.     A press release issued in July 2014 stated:

Expert Global Solutions (EGS), a global leader in the Business Process Outsourcing (BPO) industry and parent company of ARM giant NCO Group, announced Monday that it has entered into an agreement to sell certain segments of its ARM business to private equity firm Platinum Equity. Financial terms of the pending transaction were not disclosed.

The proposed sale of Transworld Systems, Inc. comprises several business segments within EGS' ARM business: Transworld Systems, Education, Attorney Network, Healthcare Bad Debt, Government, and U.S.-based Third Party Collections. Once the transaction is completed the business is expected to operate as Transworld Systems, Inc. (TSI) going forward. . . . (http://www.insidearm.com/daily/debt-collection-news/ debt-collection/nco-parent-company-selling-transworld-systems-divesting-third-party-coll ection-unit/)

41.     Included as an Exhibit to Appendix A is the affidavit filed in the Eul collection lawsuit brought in the name of the "National Collegiate Trusts," in which NCO claims to be its servicing agent.

42.     The affidavit included as an Exhibit to Appendix B is substantially identical, but is dated later and filed in the "National Collegiate" lawsuit brought against plaintiff Knox, in which TSI claims to be the servicing agent.

43.     The same personnel, practices, and form documents, were employed by NCO and TSI in collecting the "National Collegiate" debts before and after the changeover from NCO to Transworld.

## Facts Relating to Plaintiff Eul

44.     On January 3, 2007, Plaintiff Eul co-signed a private student loan with JPMorgan Chase Bank, N.A. for the benefit of one Jason Dodd, a student who worked in Plaintiff Eul's office. A copy of the contract is attached as Exhibit A to Appendix A.

45.     The contract was purportedly assigned to National Collegiate Funding, LLC, who then purportedly assigned the contract to National Collegiate Student Loan Trust 2007-1. (Appendix A, Collection Complaint and Affidavit).

46.     NCO Financial Systems, Inc.  is then purported "servicer and designated Custodian of Records" for National Collegiate Student Loan Trust 2007-1.  (Appendix A)

47.     On information and belief, Jason Dodd defaulted on his student loan debt on or about August 16, 2012, without the knowledge of Plaintiff Eul.

48.     On or about September 2, 2014, defendant Blitt and Gaines, P.C., acting at the direction of defendant NCO, filed a collection lawsuit in the First Municipal District of the Circuit Court of Cook County against plaintiff Sharon Eul and Jason Dodds.

49.     Attached to the lawsuit was an affidavit purported executed by an employee of NCO. The affidavit bears the indicia of a "robosigned" affidavit, in that the name of the affiant is rubber-stamped in a blank.

50.     The collection lawsuit and affidavit assert that Plaintiff Knox is liable for the amounts sought under the contract.

51.     A copy of the complaint, summons and related documents is attached as Appendix A.

52.     Plaintiff Eul was required to pay an appearance fee, and pay and retain a lawyer in order to defend the action.

53.     In the lawsuit, Plaintiff Eul, was alleged to be the cosigner of Jason Dodds.

## Facts Related to Plaintiff Knox

54.     On or about August 2, 2007, Plaintiff Knox co-signed a private student loan with JP Morgan Chase Bank, N.A., for the benefit of his son Stephen R. Knox, Jr.  A copy of the contact is included in Appendix B.

55.     The contract was purportedly assigned National Collegiate Funding, LLC, who in turn, purportedly assigned the loan to National Collegiate Student Loan Trust 2007-3.  (Appendix B, Collection Complaint and Affidavit).

56.     TSI then became the purported "servicer and designated Custodian of Records" for National Collegiate Student Loan Trust 2007-1.  *Id.*

57.     On information and belief, Stephen R. Knox, Jr. defaulted on his student loan debt on or about September 4, 2012, without the knowledge of Plaintiff Knox.

58.     On July 2, 2015, Transworld  through Blitt, caused a collection lawsuit to be filed against plaintiff Knox to collect the private student loan, *National Collegiate Student Loan Trust 2007-3 v. Stephen Knox, Sr., and Stephen R. Knox, Jr.,* 2015 AR 893 (Cir. Ct of DuPage Co.) .

59.     Attached to the lawsuit was an affidavit purportedly executed by an employee of TSI.  The affidavit bears the indicia of a "robosigned" affidavit, in that the name of the affiant is rubber-stamped in a blank.

60.     The collection lawsuit and affidavit assert that Plaintiff Knox is liable for the amounts sought under the contract.

61.     A copy of the complaint, affidavit, summons, and related documents is attached as Appendix B.

62.     Plaintiff Knox was required to pay an appearance fee and pay and retain a lawyer to defend the case.

63.     The lawsuit filed against Plaintiff Knox nonsuited on Oct. 27, 2015.

64.     The affidavits filed by employees of Transworld in the lawsuits are identical in

form to the affidavits filed by employees of NCO.

65.     In all of the affidavits, the affiant claims that his or her employer is the servicing

agent of the "National Collegiate Trust."

66.     In the lawsuit, Stephen Knox, Sr., was alleged to be the cosigner of Stephen R.

Knox, Jr.

### Facts Common to All Plaintiffs

67.     Illinois law prohibits treating a delinquent debt as the debt of a cosigner unless

prior written notice and a demand to pay is given to the cosigner.  Section 2S of the Illinois

Consumer Fraud Act ("ICFA"), 815 ILCS 505/2S, provides:

> Sec.2S.  No person may...take any collection action regarding a consigner of an obligation unless prior thereto, such person has notified the cosigner by first class mail that the primary obligor has become delinquent or defaulted on the loan, that the cosigner is responsible for the payment of the obligation and that the cosigner must, within 15 days from the date such notice was sent, either pay the amount due under the obligation or make arrangements for payment of the obligation...
>
>     ***
>
> Any person violating this Section commits an unlawful practice within the meaning of this Act and, in addition, is liable in a civil action for actual damages of up to $250 plus reasonable attorney's fees.

68.     At no time did Defendants provide either of the Plaintiffs the notice required by

Section 2S.

69.     A gratuitous surety, such as plaintiffs, is " released when his risk is increased *or*

*he is deprived of the opportunity to protect himself by reason of the fact that the creditor refuses*

*or fails to do some act required by the surety and which it is his duty to perform*, or does some

positive injurious act of interference."   *Watkins Products, Inc. v. Walter,* 11 Ill.App.3d 417, 420,

296 N.E.2d 859 (5th Dist. 1973) (emphasis added).

70.     It is the policy and practice of Defendants to file, or cause to be filed, a lawsuit

naming a cosigner as a defendant, when the co-signer had been discharged as a result of not

providing the notice required by Section 2S.

71.     The affidavit in <u>Appendix A</u> states that "This lawsuit concerns an unpaid loan or

loans owed by defendant JASON DODDS and defendant SHARON EUL to Plaintiff. Specifically Defendants entered into an education loan agreement at Defendants' special instance and request....Defendants have failed, refused, and/or neglected to pay the balance or balances pursuant to the agreed terms."

72.    The affidavit included in Appendix A further states that "I reviewed the education loan records as business records described in this affidavit regarding account number xxxxx3383/001-001000.  No payment has been made since 08/16/2012.  After all payments, credits and offsets have been applied, defendant JASON DODDS and defendant SHAROL EUL owe the principal sum of $26,900.58, together with accrued interest in the amount of $2,857.70, totaling the sum of $29,758.28 as of 6/24/2014."

73.    The affidavit in Appendix B states that "This lawsuit concerns an unpaid loan or loans owed by defendant STEPHEN KNOX to Plaintiff.  Specifically, Defendant entered into an education loan agreement at Defendant's special instance and request....Defendant has failed, refused, and/or neglected to pay the balance or balances pursuant to the agreed terms."

74.    The affidavit included in Appendix B further states that "I reviewed the education loan records as business records described in this affidavit regarding account number xxxxx7231-001-PHEA.  No payment has been made since 09/04/2012.  After all payments, credits and offsets have been applied, defendant STEPHEN KNOX owes the principal sum of $27,915.09, together with accrued interest in the amount of $3,378.88, totaling the sum of $31,293.97 as of 4/7/2015."

### COUNT I -- CLASS FAIR DEBT COLLECTION PRACTICES ACT

75.    Plaintiffs incorporate paragraphs 1-74.

76.    This claim is against all defendants.

77.    Defendants failed to provide Plaintiffs the notice required by 815 ILCS 505/2S.

78.    Defendants engaged in unfair and deceptive acts and practices, in violation of 15 U.S.C. §§1692e and 1692f, by filing lawsuits they were specifically prohibited

from bringing because of their failure to afford the consumer the proper notice of default and opportunity to repay the debt.

Section 1692e provides:

**§ 1692e. False or misleading representations**

**A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:**

**(2) The false representation of–**

**(A) the character, amount, or legal status of any debt; . . .**

**(5) The threat to take any action that cannot legally be taken or that is not intended to be taken.**

**(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. . . .**

79.     Section 1692f provides:

**§ 1692f. Unfair practices**

**A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. . . .**

80.     The alleged debt was sent to Blitt and Gaines, P.C. by NCO.

81.     On information and belief, Blitt and Gaines, P.C. is part of NCO's "Attorney Network," and the alleged debts of plaintiffs were handled through the "Attorney Network."

82.     On information and belief, based on affidavits and evidence in *Williams v. NCO Group, Inc.*, 10cv761 (C.D.Cal.), NCO selects counsel, communicates with counsel, and instructs counsel, and the nominal plaintiff in each case does not select, communicate with or instruct counsel.

83.     NCO directs network law firms to not communicate with the nominal plaintiffs:

NCO will interact directly with the Client. In some instances, attorneys may interact directly with the Client only after a request is made through NCO and the Client approves. Only in urgent situations, the firm, and a Client may make contact providing that NCO has also been informed of the situation. If a Client initiates contact with an Attorney Firm directly, the firm is responsible, for the purposes of inventory control and

11

tracking, to notify NCO of the communication.

In essence, the Attorney Firm's first point of contact is NCO. All statements, notices, information, etc. will go through NCO. (Attorney Firm SOP v.2.1)

84. Another portion of the SOP v. 2.1 (4.2.1) states that "All communications regarding accounts will be conducted between the Attorney Firm and NCO only." On information and belief, subsequent versions of the SOP were consistent.

85. Network firms are expressly informed that they are "required to follow NCO's Network Attorney Standard Operating Procedures."

86. Both NCO and network firms are paid on commission.

87. NCO grades network firms in Attorney Report Cards based on "key performance indices" geared to the speed with which judgments are obtained and collected. The indices include such metrics as "Payer Rates," "Suit Rate," "Service Rates," "Judgment Rates" and "Spin" or "Liquidation Rates."

88. On information and belief, all acts complained of herein were taken by Blitt and Gaines, P.C. on behalf of NCO, as its authorized agent.

89. NCO has previously been sued for the conduct of state court collection matters by network attorneys, e.g., *Williams v. NCO Group, Inc.*, 10cv761 (C.D.Cal.), and either reviews their actions or chooses not to inform itself of problems in that regard.

90. NCO's regularly engages in and expressly or tacitly authorizes deceptive and unfair conduct in connection with the collection of debts, as shown by the following:

      a.     On July 9, 2013, NCO and related entities entered into a consent judgment in *United States v. Expert Global Solutions, Inc., formerly known as NCO Group, Inc., NCO Financial Systems, Inc., ALW Sourcing, LLC, Transworld Systems Inc.*, 3:13cv2611 (N.D.Tex.), agreeing to injunctive relief and to pay $3.2 million in penalties for improper debt collection practices involving harassment and abuse.

      b.     In February 2012, the Attorneys General of 19 states entered into a

12

settlement with NCO Financial Systems, Inc. to resolve allegations of deceptive and unfair debt collection practices. The states involved were Alaska, Arkansas, Idaho, Illinois, Iowa, Kentucky, Louisiana, Michigan, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, Vermont, and Wisconsin. Pursuant to this settlement, NCO Financial Systems, Inc. agreed to pay $575,000 to the 19 states for consumer protection enforcement efforts and an additional $50,000 for each participating state to refund consumers with valid claims.

c. In 2010-2012, NCO Financial Systems, Inc., signed a series of consent orders with the Minnesota Department of Commerce, involving such conduct as hiring unfit persons.

d. In November 2010, NCO Financial Systems, Inc., signed a consent order with the Arizona Department of Financial Institutions involving, among other things, unauthorized practice of law.

e. In January 2006, NCO Financial Systems, Inc., entered into a settlement with the Pennsylvania Attorney General to resolve numerous claims of using false, deceptive, or misleading representations or means and harassment in connection with the collection of debts.

f. In 2004, NCO Group Inc., settled Federal Trade Commission charges that it reported inaccurate information about debtors accounts to credit reporting agencies and paid $1.5 million in civil penalties.

## CLASS ALLEGATIONS

91. Plaintiffs brings this claim on behalf of a class and subclass, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3).

92. The class consists of (a) all individuals in Illinois, (b) against whom a collection

complaint was filed, (c) on a student loan contract (d) in the name of a National Collegiate entity (e) which lawsuit names as a defendant, a person which, based on defendants' records, signed the student loan contract as a cosigner, (f) where defendants cannot produce the notice described by 815 ILCS 505/2S as having been sent to the cosigner prior to the date of the filing of the collection lawsuit, (e) which collection lawsuit was filed on or after a date one year prior to the filing of this action and on or before a date 20 days after the filing of this action.

93.     The subclass consists of class members where the debt was sent to Blitt and Gaines, P.C., by NCO.

94.     The class and subclass are so numerous that joinder of all members is not practicable. On information and belief, there are more than 35 class members.

95.     Many of the lawsuits filed by Blitt and Gaines, P.C., are based on student loans where there are frequently two or more purported obligors (e.g., parent and child). Many of the debts, including many or all of the student loans, are sent to Blitt and Gaines, P.C., by NCO.

96.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

   a.     Whether Blitt and Gaines, P.C., has a practice of suing cosigners without providing proper notice of the default prior to filing suit.

   b.     Whether such practice violates the ICFA.

97.     Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

98.     Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and ICFA and FDCPA litigation.

99.     A class action is superior for the fair and efficient adjudication of this matter, in that:

   a.     Individual actions are not economically feasible.

14

      b.      Members of the class are likely to be unaware of their rights;

      c.      Congress intended class actions to be the principal enforcement mechanism under the FDCPA.

WHEREFORE, the Court should enter judgment in favor of plaintiffs and the class members and against defendants for:

      i.      Statutory damages ($1,000 per plaintiff per alleged debt and the lesser of $500,000 or 1% of each defendant's net worth for the class);

      ii.      Attorney's fees, litigation expenses and costs of suit;

      iii.      Such other and further relief as the Court deems proper.

## COUNT II -- ILLINOIS CONSUMER FRAUD ACT

100.    Plaintiffs incorporate paragraphs 1-74.

101.    This claim is brought against Defendants NCO and Transworld.

102.    Defendants engaged in unfair and deceptive acts and practices, in violation of 815 ILCS 505/2 and 2S, when they filed a lawsuit against Plaintiffs to collect a student loan that they co-signed for someone else.

103.    Defendants engaged in such conduct in the course of trade and commerce.

104.    Defendants engaged in such conduct for the purpose of depriving plaintiffs and the class members of their money.

105.    Plaintiffs suffered damages as a result of having to retain an attorney and file an appearance in order to defend the action.

106.    815 ILCS 505/2S provides for a recovery of up to $250 as an actual damage which eliminates the need to establish actual damages. *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006).

## CLASS ALLEGATIONS

107.    Plaintiffs bring this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and

15

23(b)(3).

108.    The class consists of (a) all individuals in Illinois, (b) against whom NCO or Transworld filed, or caused to be filed, a collection complaint, (c) which lawsuit names as a defendant, a person which, based on defendants' records, signed the student loan contract as a cosigner, (d) where defendants cannot produce the notice described by 815 ILCS 505/2S as having been sent to the cosigner prior to the date of the filing of the collection lawsuit, (e) which collection lawsuit was filed  on or after a date three years prior to the filing of this action and on or before a date 20 days after the filing of this action.

109.    The class is so numerous that joinder of all members is not practicable. On information and belief, there are more than 40 class members.

110.    Many of the lawsuits filed by Blitt and Gaines, P.C., are based on student where there are frequently two or more purported obligors (e.g., parent and child).  Many of the debts, including many or all of the student loans, are sent to Blitt and Gaines, P.C., by NCO.

111.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members.  The predominant common questions are:

    a.    Whether NCO and Transworld, has a practice of suing cosigners without providing proper notice of the default prior to filing suit.

    b.    Whether such practice violates the ICFA.

112.    Plaintiffs' claims are typical of the claims of the class members.  All are based on the same factual and legal theories.

113.    Plaintiffs will fairly and adequately represent the class members.  Plaintiffs have retained counsel experienced in class actions and ICFA and FDCPA litigation.

114.    A class action is superior for the fair and efficient adjudication of this matter, in that:

    a.    Individual actions are not economically feasible.

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and the classes and against the Defendants for:

(1) Appropriate actual and punitive damages;

(2) Attorney's fees, litigation expenses and costs of suit;

(3) An injunction restraining further violations of Section 2S;

(4) Such other or further relief as the Court deems proper.

## COUNT III – ILLINOIS COLLECTION AGENCY ACT

115. Plaintiffs incorporate paragraphs 1-74.

116. This claim is against NCO and Transworld.

117. Defendant is a "collection agency" as defined in the ICAA.

118. Defendant violated the following provisions of 225 ILCS 425/9:

. . . (20) Attempting or threatening to enforce a right or remedy with knowledge or reason to know that the right or remedy does not exist. . . .

. . . (26) Misrepresenting the amount of the claim or debt alleged to be owed.

119. A private right of action exists for violation of the ICAA. *Sherman v. Field Clinic*, 74 Ill. App. 3d 21, 392 N.E.2d 154 (1st Dist. 1979); *Grant-Hall v. Cavalry Portfolio Servs., LLC*, 856 F. Supp. 2d 929, 940 (N.D. Ill. 2012).

## CLASS ALLEGATIONS

120. Plaintiffs bring this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3).

121. The class consists of (a) all individuals in Illinois, (b) against whom NCO or Transworld filed, or caused to be filed, a collection complaint, (c) which lawsuit names as a defendant, a person which, based on defendants' records, signed the student loan contract as a cosigner, (d) where defendants cannot produce the notice described by 815 ILCS 505/2S as having been sent to the cosigner prior to the date of the filing of the collection lawsuit, (e) which collection lawsuit was filed on or after a date five years prior to the filing of this action and on or

before a date 20 days after the filing of this action.

122. The class is so numerous that joinder of all members is not practicable. On information and belief, there are more than 40 class members.

123. Many of the lawsuits filed by Blitt and Gaines, P.C., are based on student where there are frequently two or more purported obligors (e.g., parent and child). Many of the debts, including many or all of the student loans, are sent to Blitt and Gaines, P.C., by NCO.

124. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

      a.    Whether NCO and Transworld, has a practice of suing cosigners without providing proper notice of the default prior to filing suit.

      b.    Whether such practice violates the ICFA.

125. Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

126. Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and ICFA and FDCPA litigation.

127. A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.    Individual actions are not economically feasible.

      b.    Members of the class are likely to be unaware of their rights;

      c.    Congress intended class actions to be the principal enforcement mechanism under the FDCPA.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and the classes and against the Defendants for:

      (1)    Appropriate actual and punitive damages;

      (2)    Attorney's fees, litigation expenses and costs of suit;

18

(3)    An injunction restraining further violations of Section 2S;

(4)    Such other or further relief as the Court deems proper.

s/Daniel A. Edelman
Daniel A. Edelman



Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER
        & GOODWIN, L.L.C.
20 S. Clark Street, Suite 1500
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

## CERTIFICATE OF SERVICE

I, Daniel A. Edelman, hereby certify that on December 30, 2015, I caused to be filed the foregoing documents via the CM/ECF System and sent a true and accurate copy via electronic mail to the following parties:

Morgan Ian Marcus (mmarcus@sessions.legal)
Daniel W. Pisani (dpisani@sessions-law.biz)
Jason L. Santos (jsantos@hinshawlaw.com)
David M. Schultz (dschultz@hinshawlaw.com)
James K. Schultz (jschultz@sessions-law.biz)
Bryan C. Shartle (bshartle@sessions-law.biz)
Todd P. Stelter (tstelter@hinshawlaw.com)


/s/Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER
& GOODWIN, LLC
20 South Clark Street, Suite 1500
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

## NOTICE OF LIEN AND ASSIGNMENT

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.   All rights relating to attorney's fees have been assigned to counsel.


s/Daniel A. Edelman
Daniel A. Edelman

## DOCUMENT PRESERVATION DEMAND

Plaintiffs hereby demand that each defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to plaintiffs, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with any plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If defendant is aware of any third party that has possession, custody, or control of any such materials, plaintiffs demand that defendants request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the defendants.

s/Daniel A. Edelman
Daniel A. Edelman