**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SHARON EUL et.al. | ) | |
| on behalf of plaintiffs and a class, | ) | |
| | ) | 15-cv-7755 |
| Plaintiffs, | ) | |
| | ) | Honorable Ruben Castillo |
| vs. | ) | Magistrate Judge Maria Valdez |
| | ) | |
| TRANSWORLD SYSTEMS INC. et.al. | ) | |
| Defendant. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFFS' CONSOLIDATED COMPLAINT**

## I.    INTRODUCTION

Defendants have improperly subjected thousands of consumers to illegally filed, illegally managed, usurious and out of statute lawsuits.  Upon encountering minimal opposition, defendants quickly dropped their suits.  In addition, defendants sent misleading letters to consumers which obscured the true owners of the consumers' debts.

Plaintiffs attack the very filing and maintenance of the lawsuits.  The Seventh Circuit has clearly supported claims based upon the improper filing of complaints. *Phillips v. Asset Acceptance*, 736 F.3d 1076 (7th Cir. 2013).  The claims in this lawsuit are not attacks on pleading procedure, as defendants attempt to make them out to be.  Plaintiffs' complaint amply lays out the broad picture of defendants' improper collection activities in support of their specific claims.

Usury Claims

Defendants' motion should be denied because it improperly asks the court to ignore the well pled allegations of plaintiffs' complaint.  Plaintiffs clearly pled that the loans in question

1

were not originated by a bank but by a non-bank entity masquerading under a national bank's name.  As such, all of defendants' arguments, which are predicated on the loans having been originated by a national bank, must fail.

<u>Statute of Limitation Claim</u>

Defendants' argument asks the Court to ignore the contents of the documents upon which the state court collection claims were premised.  Throughout their motion, defendants state in conclusory fashion that their documents contained all the necessary terms to make a contract and ignore the language within the documents, quoted at length in the complaint, which clearly indicated that no certain amount loaned or term of repayment was agreed to by plaintiffs in the "loan request/credit agreement."  Defendants attempt to construe a loan application as a written contract.  The statute of limitations for oral contracts in 735 ILCS 5/13-205 clearly applies and defendants' motion should be denied.

<u>8a-1 Claims</u>

Plaintiffs' claims in Counts V, VI, VII, and VIII are premised on TSI/NCO's exclusive control of collection litigation in direct violation of the Illinois Collection Agency Act ("ICAA"). The appellate courts of Illinois have found an implied private right of action in ICAA in *Sherman v. Field Clinic*, 74 Ill.App.3d 21 (1st Dist. 1979), the Illinois Supreme Court has favorably cited *Sherman*, and courts in the Northern District of Illinois, as recently as March 2016, have agreed that "[a federal district court] may deviate from *Sherman* only if there are persuasive indications that the [state supreme court] would decide the [issue] differently.  There are no such persuasive indications." *Galvan v. NCO Fin. Sys. Inc.* No. 11 C 3918, 2016 WL 792009 (N.D.Ill. Mar. 1, 2016)(quoting *McLaughlin v. LVNV Funding, LLC*, 871 F. Supp.2d 796, 800 (N.D.Ill. 2013). Defendants blatantly violated Illinois law by controlling collection litigation in place of the true

creditor and ICAA permits consumers to hold them accountable for the damage caused to the consumer. Defendants' motion should be denied.

Credit Reporting Claims

Defendants' motion betrays a failure to read plaintiffs' complaint. Plaintiff Rocco clearly alleges that she disputed the claims against her by filing an answer and affirmative defenses denying she owed a debt to the state court plaintiff and TSI/NCO failed to report the dispute to the credit bureaus. Defendants motion should be denied.

Defendants' position as to plaintiff Afuang suggests that a principal holds no responsibility for knowing information provided to their agents. Such a conclusion is the opposite of Seventh Circuit precedent. Defendants' position apparently asks that the Court ignore plaintiffs' extensive allegations that the law firms acted as agents of TSI/NCO. Defendants motion should be denied

Cosigner Claims

As amply described in plaintiffs' complaint, defendants TSI, NCO, Blitt and WWR all participated in bringing claims against co-signer plaintiffs who had been discharged from liability due to the failure of anyone to send notice to them prior to taking collection actions against them. Plaintiffs clearly stated a claim for violation of the Illinois Consumer Fraud Act ('ICFA") by alleging a specific violation of 2S and by fully stating a claim for unfair practice under the ICFA, including actual damages in the form of appearance fees and fees for the defense of the state court collection actions. Defendants motion should be denied.

Name of Creditor Claim

Plaintiff O'Neill stated a claim against TSI for falsely and misleadingly providing a creditor name in its letters which was entirely incorrect. TSI would have the court ignore that

O'Neill may have made payments but all along, TSI was refusing to provide her with information as to whom it was turning over the payments. Even a sophisticated party like plaintiffs' counsel remains, to this day, confused as to which creditor(s?) received the payments made by O'Neill. Defendants' position asks the Court to bless its unilateral choice to withhold key information from consumers and their motion must be denied.

## II.    STATEMENT OF FACTS

As a preliminary matter, defendants' motion improperly states about each loan that "the loan was disbursed." (Memorandum in Support of Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint ("Memo. MTD Cons. Compl.") p. 5-10). There is *nothing* in plaintiffs' complaint that admits that any loans were disbursed to plaintiffs and on a motion to dismiss, it is entirely inappropriate for defendants to suggest otherwise.

### a.    Collection Agency Defendants

NCO is a collection agency which performed collection activities for a group of entities referred to here as "National Collegiate Trust" entities. (Consolidated Complaint ("Cons. Compl.") ¶21, 25. Transworld Systems Inc. ("TSI") is the successor to NCO. (Cons. Compl. ¶20). TSI and NCO will be collectively referred to as "TSI/NCO."

### b.    "Rent-a-Charter" Scheme

The plaintiffs (with the exception of O'Neill) were sued to collect alleged student loan funds. (Cons. Compl. ¶79, 97, 100, 118, 126, 153, 171, 181). All the suits were voluntarily dismissed when they were defended. (Cons. Compl. ¶79, 113, 116, 123, 131, 151, 186). The loans were purportedly originated by various banks. (Cons. Compl. ¶81). The lending program was actually devised and implemented by First Marblehead, a non-bank entity, which contracted with the banks to "rent their charters" and use the bank name to market loans. (Cons. Compl.

¶82-87). All credit decisions at the origination of the loans and terms of the loans were made by First Marblehead. (Cons. Compl. ¶84, 85). Subsequent to the making of the loans, the loans were to be sold by prior agreement to one of the "National Collegiate Trust" entities. (Cons. Compl. ¶84, 88). The nominal originating bank did not retain any interest in the loans. (Cons. Compl. ¶88).

c. Control of State Court Collection Lawsuits

The lawsuits were filed and maintained by the law firms Blitt and Gaines ("Blitt") and Weltman, Weinberg and Reis ("WWR"). (Cons. Compl. ¶67). Blitt and WWR were part of an "Attorney Network" maintained first by NCO, and later by TSI. (Cons. Compl. ¶67). TSI/NCO selected counsel, communicated with counsel and instructed counsel in all the cases filed against plaintiffs. (Cons. Compl. ¶67, 69). Counsel in the "Attorney Network" were instructed not to communicate with the "National Collegiate Trust" entities. (Cons. Compl. ¶70, 71). Cases were filed on a large-scale basis, including hundreds of cases every month. (Cons. Compl. ¶149).

None of the lawsuits filed against plaintiffs were lawfully authorized by a "National Collegiate Trust" entity. (Cons. Compl. ¶122). All actions taken in the lawsuits were entirely controlled by TSI/NCO. (Cons. Compl. ¶137-139). TSI/NCO's actions violated section 8a-1 of the Illinois Collection Agency Act, 225 ILCS 425/8a-1, which requires that authorization of litigation and all material decisions with respect to litigation be made by the owner of a claim not a collection agency retained by the owner. (Cons. Compl. ¶140). TSI/NCO's control of the conduct of the litigation interferes or entirely negates the professional relationship between the attorney and the creditor and makes the filling and prosecution of the lawsuits unlawful. (Cons. Compl. ¶143). Blitt and WWR knowingly filed cases without the approval of the "National Collegiate Trust" entities and without communicating with the "National Collegiate Trust"

entities. (Cons. Compl. ¶67, 69).  Plaintiffs were damaged because they were required to pay an appearance fee and attorneys fees, they were required to spend time and money defending litigation which Illinois law prohibits from being brought, and the wrongfully-filed lawsuits are matters of public record, harming the plaintiffs' creditworthiness. (Cons. Compl. ¶152).

d.  Usurious Interest Rates

The loans allegedly made to plaintiffs Clark, Thomas, Herrera, Gnesin, Hill, McCool, Timbario, Gruber and Afuang had a variable rate formula that produced a rate in excess of the 9% maximum under Illinois law, 815 ILCS 205/4 or the 8% maximum under Ohio law, Ohio R.C. §1343.01. (Cons. Compl. ¶80, 132).

e.  Filings Beyond the Statute of Limitations

The suit filed against plaintiff Rosen was filed more than seven years after Rosen's last payment on the loan. (Cons. Compl. ¶98).  The suit filed against plaintiff Patel was filed more than 6 years after Patel's last payment on the loan. (Cons. Compl. ¶100, 101).  The documents which Rosen and Patel were sued upon were not "written contracts" but loan applications. (Cons. Compl. ¶104).  The documents included extensive language stating that the amount loaned would be determined at a later time, and the repayment schedule would be determined at a later time. (Cons. Compl. ¶106-109).  As a result, the applicable statute of limitations was five years. (Cons. Compl. ¶111).  Two state court judges have agreed. (Cons. Compl. ¶111, Appx. 20, 21). The suit filed against Castano was also untimely. (Cons. Compl. ¶125).  Plaintiffs sustained actual damages when they were forced to defend improperly filed lawsuits.

f.  Failure to Report Disputes to Credit Bureaus

Suit was filed against plaintiff Rocco in December 2014. (Cons. Compl. ¶153). Plaintiff appeared and filed answers disputing the debt. (Cons. Compl. ¶156).  Nevertheless, TSI reported

two of the debts to Transunion and possibly other credit bureaus without noting that the debts were disputed. (Cons. Compl. ¶157). It is the policy and practice of Transworld to report disputed debts to credit bureaus without reporting that they are disputed. (Cons. Compl. ¶160). Rocco's credit was damaged by the report. (Cons. Compl. ¶166). Plaintiff Afuang, by counsel, notified collection counsel that he disputed the debt which TSI sought to collect. (Cons. Compl. ¶133). Nevertheless, TSI reported the debt without noting that the debt was disputed. Cons. Compl. ¶134, 135).

g. Maintenance of Lawsuits against Cosigners in Violation of Illinois Law

Plaintiffs Eul and Knox co-signed loan applications for the benefit of others. (Cons. Compl. ¶167, 177). Neither Eul nor Knox received notice that the student for whom they had co-signed had defaulted on their student loan debt. (Cons. Compl. ¶170, 180, 191). Illinois law prohibits treating a delinquent debt as the debt of a cosigner unless prior written notice and a demand to pay is given to the cosigner. (Cons. Compl. ¶190). A gratuitous surety, such as plaintiffs Eul and Knox, is "released when his risk is increased or he is deprived of the opportunity to protect himself by reason of the fact that the creditor refuses or fails to do some act….which it is his duty to perform." (Cons. Compl. ¶192). TSI/NCO filed and maintained lawsuits against Eul and Knox even though plaintiffs were discharged as a result of not being provided the notice required by Illinois law. (Cons. Compl. ¶193).

h. False and Misleading Statements in Collection Letters

Plaintiff O'Neill received letters from TSI related to debt collection. (Cons. Compl. ¶198-207). The letters stated that the creditor was "National Collegiate Trust." *Id.* The letters failed to state which "National Collegiate Trust" entity or entities owned O'Neill's debt. (Cons. Compl. ¶281-86).

## III.    STANDARD OF REVIEW

Rule 8(a) of the Federal Rules of Civil Procedure requires that a complaint contain a "short and plain statement of the claim showing that the plaintiff is entitled to relief."  This "short and plain statement" must be enough "'to give the defendant fair notice of what ….claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-557 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level….on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555.  The Court did "not require heightened fact pleading of specifics," but did demand that the complaint contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  *See also George v. Smith*, 507 F.3d 605, 608 (7th Cir. 2007).

A plaintiff is "not required to prove [his] case in [his] complaint, even in the post-*Twombly* and *Iqbal* environment: the Federal Rules still follow a notice-pleading regime, and they do not 'impose a probability requirement on the plaintiffs.'" *Motorola, Inc. v. Lemko Corp.*, No. 08 C 5427, 2010 WL 960348, at *3 (N.D. Ill. Mar. 15, 2010), quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).  Rather, a plaintiff need only provide sufficient plausible facts to put a defendant on notice of his claims.  *Brooks*, 578 F.3d at 581. "Even after *Twombly*, courts must still approach motions under Rule 12(b)(6) by 'constru[ing] the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in her favor.'" *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2008).  "A plaintiff need not prove her case in the complaint, "but merely show facts "beyond simple conjecture that the plaintiff is entitled to relief." *Wilson v. AT&T Inc.*, 1:09cv58, 2010 WL

987737 at *1 (S.D.Ind. Mar. 12, 2010). "[T]he changes that *Twombly* and its progeny have brought to the standard of review from Rule 12 motions has not changed the liberal notice pleading standard of the federal rules." *Wilson*, 2010 WL 987737 at *5.

"[A] plaintiff is not required to plead facts in the complaint to anticipate and defeat affirmative defenses." Dismissal on the basis of an affirmative defense is appropriate only in the rare case where a plaintiff's complaint admits all of the elements of an affirmative defense. *Independent Trust Corp. Stewart Information Services Corp.*, 665 F.3d 930,935 (7th Cir. 2012).

There is no requirement that every fact that must ultimately be proven be alleged in a complaint:

> We have distinguished notice pleading from evidentiary proof by stressing that "[f]acts that substantiate the claim ultimately must be put into evidence, but the rule 'plaintiff needs to prove Fact Y' does not imply 'plaintiff must allege Fact Y at the outset.'" *Vincent v. City Colleges of Chicago*, 485 F.3d 919, 923-34 (7th Cir. 2007). Further, we have admonished that "[a]ny district judge (for that matter, any defendant) tempted to write 'this complaint is deficient because it does not contain…' should stop and think: What rule of law requires a complaint to contain that allegation?" *Doe v. Smith*, 429 F.3d 706, 708 (7th Cir. 2005).

*Lang v. TCF National Bank*, 249 Fed.Appx. 464, 466 (7th Cir. Sept. 21 2007). *Accord*, *Huber v. Trans Union, LLC*, 4:11cv139-SEB-DML, 2012 WL 3045686, *4 (S.D.Ind. July 25, 2012); *Hornbeck Offshore Transp., LLC v. United States*, 563 F.Supp.2d 205, 216 (D.D.C. 2008).

## IV.     INTEREST RATE WAS NOT PERMISSIBLE

### a.   Defendants' Motion Improperly Asserts Matters Contrary to the Complaint

Defendants persistently violate the principles governing motions to dismiss throughout their motion papers. For instance, attached to Plaintiffs' complaint are various state court pleadings with loan documents attached, which loan documents plaintiffs allege were a sham as the loans were in fact made by a non-bank. Defendants assert that the Court should take judicial notice of the truth of the recitals in the same loan documents as to who is responsible for the

loans, even though plaintiffs allege that these are false representations. There is no basis for this. *Carroll v. Yates, supra*, 362 F.3d 984 (7th Cir. 2004).

Nor is there any basis for defendants to in effect request that the Court take judicial notice of the truth of recitals in other such documents attached to defendants' filings in the state courts. Federal Rule of Evidence 201 provides that, when requested by a party, a court "shall" take judicial notice of a fact that is "not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b), (d). The ***existence*** of the statement may fall within the category of "not subject to reasonable dispute." However, it does not follow that the ***contents*** of the statement are not merely true, but "not subject to reasonable dispute." *General Elec. Capital/Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081-84 (7th Cir. 1997); *Opoka v. INS*, 94 F.3d 392, 394 (7th Cir. 2006); *In re BP P.L.C. Securities Litigation*, MDL No. 10–md–2185, 2013 WL 487011, *9, CCH Fed. Sec. L. Rep. P97, 282 (S.D.Tex., Feb. 6, 2013); *United States v. Southern California Edison Co.*, 300 F.Supp.2d 964, 974-976 (E.D.Cal. 2004).

> b. Identical "Rent a Charter" Allegations Have Withstood Motions to Dismiss

*Ubaldi v. SLM Corp.*, 852 F.Supp.2d 1190 (N.D.Cal. 2012), is directly in point. The court denied a motion to dismiss a complaint which alleged that a private student lender had violated California usury law in making loans to California residents, and could not shield itself by paying an out-of-state national bank a small fee to lend its name to the transactions as nominal "originator." The scheme was described as follows in the complaint:

> Sallie Mae "Private Education Loans" are loans made by Sallie Mae to students to pay for the students' cost of education, including tuition, fees, and associated costs and living expenses, commonly known and marketed by such Sallie Mae brand names as CEC Signature Loans. FAC ¶ 2. Plaintiff alleges that on June 24, 2003, she took out a CEC Signature Loan in the amount of $22,765, which she used to pay for her education at the California Culinary Academy in San Francisco, California. FAC

10

¶ 44 & Ex. 1. The Stillwater National Bank and Trust Company ("Stillwater"), a national bank located in Stillwater, Oklahoma, is identified as the lender on Plaintiff's application form. FAC ¶ 37; RJN Exs. A, B; FAC ¶ 44 & Ex. 3. However, Plaintiff alleges that the loan was actually made by Sallie Mae, pursuant to a forward purchase commitment agreement with Stillwater National Bank intended to disguise Sallie Mae's role as the de facto lender. FAC ¶ 44. The "CEC Loan Application" listed Sallie Mae's name and telephone number prominently on the top of the form, and directed Plaintiff to "Mail application to: Sallie Mae Servicing" in Panama City, Florida." FAC ¶ 46. Defendant does not appear to dispute that Sallie Mae at all times has serviced Plaintiff's loan. Mot. at 3 (citing FAC ¶ 44).

The defendants in *Ubaldi* made exactly the same argument in favor of dismissal as the defendants in this case:

Defendant contends that because Stillwater National Bank, located in Oklahoma, is identified as the lender on the loan documents, Section 85 expressly preempts Plaintiff's state law claims. Mot. at 5 (citing *Marquette Nat'l Bank v. First of Omaha Serv. Corp.,* 439 U.S. 299, 313–14 (1978) (holding that Section 85 of NBA permits national bank to charge out-of-state credit card customers an interest rate authorized by law of its home state)). Defendant argues that the NBA was "enacted to establish a national banking system, free from excessive state regulation," Mot. at 4, and that "[u]niform rules limiting the liability of national banks and prescribing exclusive remedies for their overcharges are an integral part of a banking system that needed protection from 'possible unfriendly State legislation.' " *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 10–11 (2003) (citation omitted). See *Marquette*, 439 U.S. at 313–14 (recognizing that "the plain language of § 85 provides that the bank may charge 'on any loan' the rate 'allowed' by the state" in which the bank is located). Plaintiff "does not dispute that § 85 encompasses late charges." Opp. at 9 n. 2. Plaintiff also concedes that Section 85 preempts state laws that limit the amount of interest, including late charges, that may be charged on loans made by a national bank. Opp. at 11–12 ("This provision preempts contrary state laws only as applied to national banks and loans 'made' by national banks."). However, Plaintiff disputes that her loan was "made" by a national bank, Stillwater, within the meaning of Section 85, arguing instead that Sallie Mae made the loan pursuant to a forward purchase commitment agreement with Stillwater, such that Sallie Mae, not Stillwater, is the de facto actual lender. FAC ¶¶ 36, 38. Plaintiff argues that because Sallie Mae is not a national bank, the NBA does not preempt Plaintiff's claims. Thus, the issue of whether Section 85 expressly preempts Plaintiff's claims turns on whether the imprimatur of a national bank on the loan documents automatically triggers preemption, foreclosing inquiry into the real nature of the loan, or whether the debtor may invoke the protection of state consumer laws if she proves that the actual lender in substance is not a national bank. (852 F.Supp.2d at 1194-95)

Rejecting this argument, the court held that "where a plaintiff has alleged that a national bank is the lender in name only, courts have generally looked to the real nature of the loan to determine whether a non-bank entity is the *de facto* lender." (852 F.Supp.2d at 1201)

A later decision reaffirmed the court's holding, and also refused to give effect to a choice of law clause in the loan agreements, because California requires that there be a substantial relationship between the chosen law and the transaction, and the location of a bank that merely lent its name to the transaction was not sufficient. *Ubaldi v. SLM Corp.*, C 11-1320, 2013 WL 4015776 (N.D.Cal., Aug. 5, 2013).

Rent-a-charter allegations were also found sufficient in *Terry v. Community Bank of Northern Virginia,* 255 F.Supp.2d 817, 822 (W.D.Tenn. 2003). There, plaintiffs alleged that non-bank FRC had rented the charter of CBNV for the purpose of evading usury restrictions and was the *de facto* lender. The plaintiffs alleged that RFP had a pre-purchase agreement with CBNV to buy the loan. The court sustained plaintiffs' allegations against a 12(b)(6) motion.

Illinois courts, like those of California and Tennessee, have consistently held that for purposes of determining whether usury exists, the substance and not the form of transactions controls. *Grove v. Chicago Title & Trust Co.,* 25 Ill.App.2d 402, 166 N.E.2d 630 (1st Dist. 1960); *Mills v. State Nat. Bank*, 28 Ill.App.3d 830, 329 N.E.2d 255, 258 (1st Dist. 1975) ("Courts will not countenance an evasion of the usury statute and accordingly will look to the substance and not the form of a transaction."); *Hunter v. Hatch*, 45 Ill. 178, 182 (1867) ("If this change in the form was intended as a device to cover usury, it must fail, as courts of equity regard the substance and not the form of agreements assumed to evade the usury laws."). Accord, *Cashback Catalog Sales, Inc. v. Price*, 102 F.Supp.2d 1375, 1379 -80 (S.D.Ga. 2000); *Juergens v. Urban Title Services, Inc*., 246 F.R.D. 4, 16 (D.D.C. 2007); *Chen v. Bell-Smith*, 768

F.Supp.2d 121, 145 (D.D.C. 2011). This includes the insertion of a sham party to avoid what would otherwise be a usurious consumer loan. *Verson v. Hardt*, 107 Ill.App.2d 480, 246 N.E.2d 461 (2d Dist. 1969); *Gibraltar Corp. v. Flobudd Antiques, Inc.,* 131 Ill.App.2d 545, 269 N.E.2d 515 (1st Dist. 1971). None of the cases defendants cite hold that a "rent a charter" scheme must be taken at face value by the courts.

      c.   Defendants' Cases Are Not On Point

### 1. **Cases involving purchases of debts by debt buyers**

Most of the cases defendants cite hold that a debt buyer that purchases, after default, a loan that was made by a lender with a bank charter or lending license may continue to collect the same rate of interest. *Olvera v. Blitt & Gaines*, 03 C 6717, 2004 WL 887372 (N.D.Ill., April 26, 2004); *Dawson v. Bureaus, Inc.*, 04 C 1911, 2004 WL 2921871 (N.D.Ill., Dec. 14, 2014); *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285 (7th Cir. 2005); *PRA III, LLC v. Hund*, 364 Ill.App.3d 378, 846 N.E.2d 965 (3d Dist. 2006); *Munoz v. Pipestone Financial, LLC*, 513 F.Supp.2d 1076 (D.Minn. 2007). There was no issue about a "rent a charter" scheme in any of these cases, nor could there be. The original lenders had made the credit decisions and borne the risk of credit loss. It was only after the risk materialized - generally after a credit relationship lasting years - that the loan was sold to a debt buyer. *Munoz*, 513 F.Supp.2d at 1077 ("After using the Account for approximately seven years, Munoz defaulted"). These cases are simply not on point as to whether a "rent a charter" scheme should be disregarded.

### 2. *Hudson v. ACE*

In another case cited by defendants, *Hudson v. ACE Cash Express*, No. IP 01-1336-C H/S, 2002 WL 1205060 (S.D.Ind., May 30, 2002), the loan was found lawful only because the bank had retained an interest in the loan while transferring only a portion to a payday lender.

The court relied on the retained interest in upholding the transaction. *Id.* at *7. The case settled

after an appeal had been filed. *See Purdie v. Ace Cash Express, Inc.*, No. Civ.A. 301CV1754L,

2003 WL 22976611 (N.D.Tex. Dec. 11, 2003). Thus, even the lender recognized that the

decision was doubtful. Other decisions involving the same issues were contrary, finding *Hudson*

to elevate form over substance. *Bankwest, Inc. v. Baker*, 324 F.Supp.2d 1333, 1351 and n. 17

(N.D.Ga. 2004), appeal dismissed as moot, 446 F.3d 1358 (11th Cir. 2006); *BankWest, Inc. v.*

*Oxendine*, 598 S.E.2d 343, 348 (Ga.App. 2004); *see also, Goleta National Bank v. O'Donnell*,

239 F.Supp.2d 745 (S.D.Ohio 2002).

*Ubaldi* specifically distinguished *Hudson* on the ground that the lender in *Hudson* had a

retained interest in the loans at all times. *Ubaldi,* 852 F. Supp at 1201-2 ("unlike *Hudson*, it is

not clear whether or to what extent [the bank] retained any significant stake in or control over

Plaintiff's loan.").

Subsequently, federal regulators prohibited banks from renting their charters to payday

lenders by holding that the bank was fully responsible for the program even if the loans were

transferred to a third party. (FDIC Financial Institution Letters, FIL 14-2005, Guidelines for

Payday Lending (Revised November 2015) [Appendix A]). For example, the bank would be

held responsible for the very high credit default rate on the payday loans. This made "rent a

charter" payday loan schemes infeasible. One major charter-renter, First Bank of Delaware, was

ordered to cease and desist from associating with payday lenders. (FDIC orders, 07-256b, 07-

257k [Appendix B]). There are no such programs today.

### 3. *Krispin v. May Dept. Stores*

Defendants also rely heavily on *Krispin v. May Department Stores*, 218 F.3d 919 (8th

Cir.2000), where May Department Stores Company ("May Stores"), a non-national bank entity,

issued credit cards to the plaintiffs. 218 F.3d at 921. By agreement, those credit card accounts were governed by Missouri law, which limits delinquency fees to $10. *Id.* Subsequently, May Stores notified the plaintiffs that the accounts had been assigned and transferred to May National Bank of Arizona ("May Bank"), a national bank and wholly-owned subsidiary of May Stores, and that May Bank would charge delinquency fees of up to "$15, or as allowed by law." *Id*. Although May Stores had transferred all authority over the terms and operations of the accounts to May Bank, it subsequently purchased May Bank's receivables and maintained a role in account collection. *Id*. at 923. The plaintiffs brought suit under Missouri law against May Stores after being charged $15 delinquency fees. *Id.* at 922. May Stores argued that the plaintiffs' state-law claims were preempted by the National Bank Act because the assignment and transfer of the accounts to May Bank "was fully effective to cause the bank, and not the store, to be the originator of [the plaintiffs'] accounts subsequent to that time." *Id.* at 923. The court agreed:

> [T]he store's purchase of the bank's receivables does not diminish the fact that it is now the bank, and not the store, that issues credit, processes and services customer accounts, and sets such terms as interest and late fees. Thus, although we recognize that the NBA governs only national banks, in these circumstances we agree with the district court that it makes sense to look to the originating entity (the bank), and not the ongoing assignee (the store), in determining whether the NBA applies.

*Id*. at 924 (internal citation omitted).

In *Ubaldi v. SLM Corp., supra*, 852 F. Supp. 2d 1190, 1200 (N.D. Cal. 2012), the court rejected the same analysis of *Krispin* advanced by defendants here and instead correctly noted the importance of both the affiliate relationship between the bank and non-bank in *Krispin*, and the fact that the bank in *Krispin* had assigned only the account receivables, but remained otherwise involved in the account:

Defendant counters that the Court should look to the "originating entity (the bank), and not the ongoing assignee," in determining whether the NBA [National Bank Act] applies to the student loans, citing *Krispin v. May Dept. Stores*, 218 F.3d 919, 924 (8th Cir. 2000). *Krispin* . . . held that class actions brought in state court against a department store company by holders of department store credit cards were subject to complete preemption by the NBA, making removal proper. There, the national bank that issued the credit extensions on the store credit cards was a wholly owned subsidiary of the store. In other words, in *Krispin,* the store had a very close corporate relationship with the bank, unlike Stillwater and Sallie Mae here. Furthermore, *Krispin* noted that after the store made a valid assignment to the bank in 1996 of the credit accounts that it originally issued, "the store's purchase of the bank's receivables does not diminish the fact that it is now the bank, and not the store, that issues credit, processes and services customer accounts, and sets such terms as interest and late fees." *Id.* at 924. The court recognized "that the NBA governs only national banks," but "*in these circumstances* we agree with the district court that it makes sense to look to the originating entity (the bank), and not the ongoing assignee (the store), in determining whether the NBA applies." *Id.* (emphasis added) (citation omitted). "Accordingly, for purposes of deciding the legality of the late fees charged to appellants' credit accounts, we find that the *real party in interest* is the bank, not the store." *Id.*. . . . The *Krispin* court relied, in part, on the fact that the bank was responsible for issuing credit, processing and servicing customer accounts, and setting terms such as interest and late fees, 218 F.3d at 924, whereas Plaintiff here alleges that Sallie Mae exerts such control and ownership of the student loans at issue.

*Ubaldi*, 852 F. Supp. 2d at 1200-1201 (N.D. Cal. 2012)(emphasis in original).

In *Krispin,* when the national bank's receivables were purchased by May Stores, the national bank retained ownership of the accounts, leading the court to conclude that "the real party in interest is the bank." *Id.* Unlike *Krispin*, Chase Bank has not retained any interest in plaintiffs' accounts.

Indeed, the Eighth Circuit in *Krispin* was explicit that it was not holding, more generally, that one was to look to the original creditor's entitlement to National Bank Act preemption of state usury laws in all cases of assignment. Rather, after listing various ways in which the national bank continued to control the accounts postassignment (including continuing to "issue[] credit, process[] and service[] customer accounts, and set[] such terms as interest and late fees"),

the Court stated that "[a]lthough we recognize that the NBA governs only national banks, in these circumstances we agree with the district court that it makes sense to look to the originating entity (the bank), and not the ongoing assignee (the store), in determining whether the NBA applies." *Ubaldi*, (emphasis added).

### 4. *Sawyer v. Bill Me Later*

Similarly misplaced is defendants' reliance on *Sawyer v. Bill Me Later, Inc*., 23 F.Supp.3d 1359 (D.Utah. 2014), a case where the bank retained a legal interest in the accounts, having assigned only the receivables – just as in *Krispin*.   Bill Me Later, a non-bank, offered a service whereby Paypal customers could finance purchases.  The customer signed up for a loan with CIT Bank, which was "the lender in the financing and . . . the owner of the account."  The court emphasized that the bank retained a legal interest in the account, assigning only receivables to the non-bank."  Subsequently, "WebBank acquired all of CIT Bank's rights to this lending program and became the owner of all existing accounts."   The court disagreed that this arrangement was akin to a rent-a-charter scheme.

### 5. *FDIC v. Lattimore Land*

Defendants also cite *Federal Deposit Ins. Corp. v. Lattimore Land Corp.*, 656 F.2d 139 (5th Cir. 1981).  On May 24, 1974, Lattimore Land Corporation made a real estate note for $1,450,000 payable to Hamilton Mortgage Corporation. Seventeen months later, on October 25, 1975, Hamilton Mortgage assigned a 91.48% interest in the note to the Hamilton National Bank. On February 16, 1976, the Comptroller of the Currency declared the Bank to be insolvent and the FDIC purchased the 91.48% interest in the note.  Subsequently, the FDIC purchased the rest of the note.  In the FDIC's action to enforce the note, the borrowers argued that the note violated the National Bank Act, which was allegedly applicable because of Hamilton National Bank's

acceptance of a partial assignment of the note. Pointing out "the obligors do not claim that the bank either discounted the note *or was the lender*," the Court of Appeals held that the loan from Hamilton was governed by Georgia law, under which it was lawful, and that "the note, initially non-usurious, remains so." (656 F.2d at 149, emphasis added).

For defendants to cite a case which expressly did *not* involve a claim that a supposed assignee was actually a lender in disguise as applicable to a case such as the present, which alleges precisely such a scheme, illustrates the weakness of their position.

The complaint in this case specifically alleges that the only consideration the bank received was a fee and that it retained no economic interest whatever in the loans. Those allegations are sufficient to require that the loan be treated as one made by the National Collegiate trusts, which have no exemption from Illinois usury law. None of the cases cited by defendants holds that such allegations fail to state a claim.

> d. Reliance on Ohio Law is Misplaced

Plaintiffs' rent-a-charter allegations also defeat application of Ohio law. *Ubaldi v. SLM Corp.*, *supra,* C 11-1320, 2013 WL 4015776 (N.D.Cal., Aug. 5, 2013). Illinois courts hold that a choice of law clause is not valid unless there is a "reasonable relationship" between the chosen law and the substance of the transaction. *Potomac Leasing Co. v. Chuck's Pub, Inc.,* 156 Ill.App.3d 755, 759-60, 509 N.E.2d 751 (2d Dist. 1987) ("there must be some relationship between the chosen forum and the parties or the transaction. . . . The purpose of this requirement is to preclude parties from arbitrarily selecting the laws of some jurisdiction which has no relationship to the matter in controversy"); *Apperson v. Ampad Corp.,* 641 F.Supp. 747, 752 (N.D.Ill. 1986); *Amajua Development LLC v. Warner*, 411 F.Supp.2d 941, 948 (N.D.Ill. 2006). A federal court exercising diversity or supplemental jurisdiction must apply the choice-of-law

rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496

(1941); *Midwest Grain Prods. of Ill., Inc. v. Productization, Inc.*, 228 F.3d 784, 787 (7th

Cir.2000); *Pucci v. Litwin*, 828 F.Supp. 1285 (N.D.Ill. 1993).

Defendants' attempt to invoke Ohio law fails because the choice of law clause is

ineffective if there was a rent a charter scheme, as alleged. *Ubaldi v. SLM Corp.*, *supra,* C 11-

1320, 2013 WL 4015776 (N.D.Cal., Aug. 5, 2013). Here, the only party with any connection

whatever with the state of Ohio is the bank whose charter was rented. The address listed on each

loan application was an Illinois address. (Cons. Compl., Appendices 5-14, 16, 17). Defendants

have connections with Delaware and Pennsylvania, but not Ohio.

Defendant's argument that the maximum rate under Ohio law was 25% also assumes,

contrary to the complaint, that the loans were in fact made by a bank. A non-bank lender can

only charge 8% under Ohio law. Ohio R.C. 1343.01.

Finally, defendants' invocation of an exemption under Ohio law for demand loans on the

ground that when Transworld and NCO became involved the loans were allegedly in default and

had been accelerated is frivolous because the loans were not payable on demand when made.

　　　　e.　Defendants' Invocation of Delaware Law is Misguided

Defendants assert that the law of Delaware applies to Afuang's loan. This assertion is

incorrect. Based upon the documents attached to the Consolidated Complaint and the assertions

made in the Complaint, there is no reason to believe that Delaware law applies to Afuang's loan.

As indicated by Appendix 28, Afuang resided in Chicago at the time that he signed the Loan

Request/Credit Agreement. In fact, examination of the full four pages of the loan application

indicates that the application proposed that the law of an entirely different state apply to any

agreement.

## V.    <u>LIMITATION PERIOD IS FIVE YEARS</u>

      a.  <u>The Transaction Sued Upon is Not a Contract Wholly in Writing As Necessary for the 10-year Statute of Limitations to Apply</u>

Under 735 ILCS 5/13-206, for there to be a "written contract" the writing be must be "complete," in that it identifies the parties; states the date of the agreement; contains the signatures of the parties; and sets forth all terms of the parties' agreement. *Brown v. Goodman,* 147 Ill.App.3d 935, 940, 498 N.E.2d 854 (1st Dist. 1986); *Clark v. Western Union Telegraph Co.*, 141 Ill.App.3d 174, 176, 490 N.E.2d 36 (1st Dist. 1986); *Weaver v. Watson*, 130 Ill. App. 3d 563, 567, 474 N.E.2d 759, 762 (5th Dist. 1984); *Munsterman v. Illinois Agricultural Auditing Association*, 106 Ill.App.3d 237, 238-39, 435 N.E.2d 923, 925 (3d Dist. 1982); *Baird & Warner, Inc. v. Addison Industrial Park, Inc.*, 70 Ill.App.3d 59, 73, 387 N.E.2d 831, 838 (1st Dist. 1979). "The test for whether a contract is written under the statute of limitations in Illinois is <u>not</u> whether the contract meets the requirements of the Statute of Frauds, but whether all essential terms of the contract, including the identity of the parties, are in writing and can be ascertained from the written instrument itself." *Brown v. Goodman, supra*, 147 Ill. App. 3d at 940-41. In the case of a loan, the material terms include the making of the loan, the amount of the loan, the interest rate of the loan and the mode of repayment. *See Champaign Nat. Bank v. Landers Seed Co. Inc.*, 165 Ill.App.3d 1090, 1094, 519 N.E.2d 957 (4th Dist. 1988) *and McEarlean v. Union Nat. Bank of Chicago*, 90 Ill.App.3d 1141, 1146 415 N.E.2d (1st Dist. 1980)(describing the terms necessary in a loan document).

The documents sued upon in these cases (Cons. Compl. Appx. 19) are entitled "Loan Request/Credit Agreement." At least two state court judges have concluded that the documents are not written contracts. (Cons. Compl. Appx. 20, 21)

The Loan Request/Credit Agreement does not promise to loan a specified amount of money on specified terms. Rather, it lists on the first page (Cons. Compl. Appx. 19) a "loan amount requested." It then proceeds to state on the second page (Cons. Compl. Appx. 19) that the loan may not be made at all and if it is, the actual loan amount may differ:

B. LOAN; DISCLOSURE STATEMENT:

1. By signing this Credit Agreement, and submitting it to you, I am requesting that you make this loan to me in an amount equal to the Loan Amount Requested plus any Loan Origination Fee described in Paragraph F of this Credit Agreement. *When you receive my signed Application, you are not agreeing to lend me money. You have the right not to make a loan or lend an amount less than the Loan Amount Requested.* I agree to accept an amount less than the Loan Amount Requested and to repay that portion of the Loan Amount Requested that you actually lend to me. (emphasis added)

Such disclaimers prevent the documents containing them from being enforceable loan agreements until some further agreement is made. *In re Absolute Resource Corp.*, 76 F.Supp.2d 723, 733 (N.D.Tex. 1999) (statement that "This letter is not a commitment to undertake this financing" prevents it from constituting a contract). *A fortiori*, a document containing such a disclaimer prevents it from being one where "all essential terms of the contract, including the identity of the parties, are in writing and can be ascertained from the written instrument itself."

The actual amount of the loan in this case, and the consumer's acceptance of the terms actually offered, depends on a later course of dealing. The second page of the Loan Request/Credit Agreement, paragraph B (Cons. Compl. Appx. 19) explains how the consumer manifests acceptance of the credit terms to be offered in response to the application:

2. If you decide to make a loan to me, you will mail me a disbursement check (the "Disbursement Check") and a statement disclosing certain information about the loan in accordance with the federal Truth-in-Lending Act (the "Disclosure Statement"). You have a right to disburse my Disbursement Check through an agent. At your option, you will make the Disbursement Check payable to the School or co-payable to me and the

School. In addition to other information, *the Disclosure Statement will tell me the amount of my disbursement and the amount of the Loan Origination Fee.* The Disclosure Statement is part of this Credit Agreement. *Upon receipt of the Disclosure Statement, I will review the Disclosure Statement and notify you in writing if I have any questions. My endorsement of the Disbursement Check or allowing the loan proceeds to be used by or on behalf of the Borrower without objection will acknowledge receipt of the Disclosure Statement and my agreement to be legally bound by this Credit Agreement.*

3. If I am not satisfied with the terms of my loan as disclosed in the Disclosure Statement, I may cancel my loan. To cancel my loan, I will give you a written cancellation notice, together with my unused Disbursement Check or, if I have already endorsed and delivered the Disbursement Check to the School, a good check, payable to you in the full amount of the Disbursement Check. In any event, I cannot cancel more than ten (10) days after I receive the Disclosure Statement. If I give notice of cancellation but do not comply with the requirements of this Paragraph B.3, this Credit Agreement will not be canceled and I will be in default of this Credit Agreement. (See Paragraph I.) (Emphasis added)

The "Note Disclosure Statement" (one example is in Appx. 27 to the Cons. Compl.) does not bear any signature. The Disclosure Statement for the Castano loan, for example, is dated June 14, 2004, 22 days after the May 23, 2004 date of the "Loan Request/Credit Agreement." (Cons. Compl. Appx. 27)

The "loan origination fee" is described in paragraph F of the "Loan Request/Credit Agreement" on pages 2-3 (Cons. Compl. Appx. 19), which states that it is dependent on the amount of credit extended:

F. LOAN ORIGINATION FEE: You may charge me an Origination Fee. If you charge me, at the time you issue any disbursement to me, or on my behalf, you may add the Origination Fee to my loan amount. The dollar amount of any Loan Origination Fee will be determined by multiplying the sum of the Loan Origination Fee and the Loan Amount Requested, to the extent advanced to me, times the Loan Origination Fee Percentage shown on the first page of the credit agreement.

The terms on which the loan is to be repaid are also not determinable from the "Loan Request/Credit Agreement." Page 2 of the document (Cons. Compl. Appx. 19) contains the following statements on that subject:

E. TERMS OF REPAYMENT:

1.   Deferment Period- If I have elected the "Interest Only" repayment option or the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of the Credit Agreement) you will send me statements during the Deferment Period (showing the total outstanding principal balance of my loan and the interest that has accrued on my loan)...If I have elected the "Full Deferral" repayment option, I may, but am not required to make payments during the Deferment period.  You will add any interest that I do not pay during the Deferment Period to the principal balance, as described in paragraph D.3.

2.   Repayment Period- During the Repayment Period, you will send me monthly statements that show the amounts of minimum monthly payments and the payment due dates.  You reserve the right to send monthly statements or coupon books to either the Borrower or Cosigner.  I will make consecutive monthly payments in amounts at least equal to such minimum monthly payments by the applicable payment due dates until I have paid all of the principal and interest and any other charges I may owe under this Credit Agreement.  If my loan is in paid-ahead status, I may but will not be required to make monthly payments.

3.   Repayment Terms- My Monthly Payment Amount will be established based on the rules in this Credit Agreement when my Repayment Period begins. My monthly payment amount will be recalculated (a) once each year prior to the anniversary of the Repayment Date, (b) if the Variable Rate changes between anniversaries of the Repayment Date to the extent that the Monthly Payment Amount would not pay in full the accrued monthly interest on my loan, (c) following any subsequent deferment or forbearance period or (d) following any request by the Borrower to the servicer to change the monthly payment due date (each of which events is a new "Repayment Date"). *As of any Repayment Date, my Monthly Payment Amount will be recalculated. My new Monthly Payment Amount will be disclosed to me by the servicer.* The new Monthly Payment Amount will equal the amount necessary to pay in full, over the number of months remaining in the Repayment Period, the amount I owe in equal monthly installments of principal and interest at the Variable Rate in effect at the time of the calculation. I understand that this may result in a reduction or increase in my monthly payment as calculated as of each Repayment Date. I understand that during the Repayment Period the servicer may change the monthly payment due date of future payments to a later date for the convenience of the servicer in processing payments or in order to coordinate the due dates of all of my loans processed by the servicer. . . .   (Emphasis added)

Nothing in these statements allows one to determine the payment schedule from

the document.   Rather, it "will be established" or "will be recalculated" or "will be disclosed" in

the future.

In *Portfolio Acquisitions, LLC v. Feltman*, 391 Ill. App. 3d 642; 909 N.E.2d 876

(1st Dist. 2009), the Illinois Appellate Court held that a bank credit card is not a contract wholly in writing within the meaning of 735 ILCS 5/13-206 and was therefore governed by the five-year limitations period of 735 ILCS 5/13-205. The court reasoned:

> Illinois courts follow a strict interpretation of the meaning of a written agreement for purposes of the statute of limitations. *Brown v. Goodman*, 147 Ill.App.3d 935, 939, 498 N.E.2d 854 (1st Dist.1986). A contract will only be deemed written if parties are identified and all the essential terms are in writing and ascertainable from the instrument itself. If resort to parol evidence is necessary to identify the parties or essential terms, the contract is considered an oral contract for purposes of the statute of limitations. *Brown,* 147 Ill.App.3d at 939, 498 N.E.2d 854. (391 Ill.App.3d at 647)

The Appellate Court in *Feltman* then concluded that "the issuance of a credit card and cardholder agreement is a standing offer to extend credit that may be revoked at any time. . . When the cardholder makes a purchase, the bank advances funds to the merchant and this arrangement constitutes a loan between the bank and cardholder. . . . Therefore, each time the credit card is used, a separate contract is formed between the cardholder and bank. . . ." (391 Ill.App.3d at 649, citing *Garber v. Harris Trust & Savings Bank*, 104 Ill.App.3d 675, 679, 432 N.E.2d 1309 (1st Dist. 1982).

The *Feltman* court agreed with the consumer that a written request for credit that is accepted by conduct or other documents is not a written contract for limitations purposes because parol evidence is necessary to show offer, acceptance, and what the terms are (391 Ill.App.3d at 651):

> Defendant maintains that the documents attached to plaintiff's complaint may be part of a contract, but they do not provide all the essential elements within the four corners of a document. Defendant argues that plaintiff admits that under *Garber*, the application form attached to the complaint is not a contract but it is a request to extend credit. Under *Garber*, no mutuality of obligation is formed until the cardholder accepts the card issuer's extension of credit by making a purchase. Defendant asserts that the application does not indicate if a credit card was issued or identify the terms of the agreement. As for the terms and conditions attached to the complaint, defendant notes that there is no indication that she agreed to them or that they applied to her alleged account. . . .

> [T]here is no dispute here that a contract is in existence, only whether a written contract exists. Even assuming the documents attached by plaintiff were in order, parol evidence would still be required to show all essential terms and conditions of the contract. Parol evidence would also be required to show the relationship between the parties and demonstrate defendant's receipt and acceptance of the essential terms. . . .Accordingly, the contract at issue is considered to be an oral contract for purposes of the statute of limitations and the five-year period of section 13–205 applies.

Exactly the same reasoning applies to the documents involved in this case. The only contractual document bearing the consumer's signature is the "Loan Request/Credit Agreement." That document expressly states that it is merely an application, ***not*** an agreement to extend credit. The "Loan Request/Credit Agreement" provides that "acceptance" of the credit offer made in response to the request – which may be rejected, or approved in a lesser amount than requested – is by use of the credit or failure to object to the proposed terms, just as in the case of a credit card. Furthermore, the "Loan Request/Credit Agreement" expressly contemplates that the duration of the loan and repayment terms will be determined later.

This is not a case where there is a "complete" writing, that identifies the parties, states the date of the agreement; contains the signatures of the parties; and sets forth all terms of the parties' agreement. *Brown v. Goodman,* 147 Ill.App.3d 935, 940, 498 N.E.2d 854 (1st Dist. 1986). "The test for whether a contract is written under the statute of limitations in Illinois is *not* whether the contract meets the requirements of the Statute of Frauds, but whether all essential terms of the contract, including the identity of the parties, are in writing and can be ascertained from the written instrument itself." *Id.* at 940-41 (emphasis added). Here, that is clearly not the case, and the five-year statute applies.

    b.   <u>The Document Sued Upon is Not a Promissory Note</u>

The document sued upon in the underlying state court actions is neither a promissory note nor a contract in writing. The very citations provided by defendants fail to support their position.

Two state judges have agreed that the loan request/credit agreement signed by plaintiffs was not a written contract. (Cons. Compl. Appx. 20, 21). "There are a number of essential terms missing from the 'Note' attached to the Amended Complaint – most glaringly, the loan amount. Because parol evidence would be needed to establish these missing terms, the five-year statute of limitations applicable to oral contracts applies rather than the ten-year statute applicable to written contracts." (Cons. Compl. Appx. 20).

As defendants accurately suggest, "any form of expression containing an absolute promise to pay a certain amount, at a time certain, constitutes a promissory note." *Bank of Peru v. Farnsworth*, 18 Ill. 563, 565 (1857). The "loan request/credit agreement" signed by plaintiffs, which formed the basis of the state court collection actions, contains neither a "certain amount" nor a "time certain."

The document is clearly an application, not a contract. The loan request/credit agreement states "*if* you agree to make a loan to me, you will mail me….the Disclosure statement…..[which] will tell me the amount of my disbursement." *Id.* (emphasis added). This language makes it clear that the agreement signed by plaintiffs did not contain a promise to pay a certain amount. Rather, plaintiffs did not know the amount which they would receive and be obligated to pay back until they received the Disclosure Statement and check, which was sent several days or weeks after the loan request/credit agreement was signed. (Cons. Compl. Appx. 2, 5-17, 27-28, 33, 37-38). Instead, the consumer promised only to pay the "principal sum of the Loan Amount Requested….*to the extent that it is advanced to me or paid on my behalf.*" (Cons. Compl. ¶107)(emphasis added). Elsewhere in the document, the consumers "agree to accept an amount less than the Loan Amount Requested." *Id.* Further, the consumer could reject the loan before receiving the check or within 10 days of receiving the disclosure statement.

At trial, the debt holder would have been required to rely on parol evidence in the form of the Disclosure Statement and a cancelled check or testimony that the debtor allowed the money to be used without objection to prove that a loan had been processed at all or the amount which plaintiffs were actually obligated to pay. Defendants' motion fails to address the fact that the amount owed was uncertain and their motion should be denied on that basis alone.

The application also failed to address a "time certain" when payment would be due. The application provides, "if I have elected the "Immediate Repayment" option…my first payment will be 30-60 days after the disbursement of my loan" and goes to on make similarly vague provisions for other repayment options. (Cons. Compl. Appx. 19). The consumer would not know until he received the Disclosure Statement when he could be expected to begin or end repayment of the debt. It is also unclear if the date on the Disclosure Statement is a contract term or an estimated repayment date. The debt holder would have been required to rely on parol evidence to prove the time when plaintiff was obligated to begin payment.

Finally, defendants incorrectly reference "the documents attached to the state court complaints" in making the point that the agreements provide for absolute and unconditional repayment. (Memo. MTD Cons. Compl. p. 10). In fact, the documents attached to the state court complaint do not provide for repayment at all, and merely indicate that the undersigned agrees to the terms and obligations of a loan request/credit agreement which is not included with the complaint. An example of the full documents was attached as Appendix 19 to the Consolidated Complaint and became available to plaintiffs only through discovery.

    c.   The Document Sued Upon is Not a Written Contract Within the Meaning of 735 ILCS 5/13-206

The loan request/credit agreement, which was the only document signed by plaintiffs, does not meet the definition of a written contract under 735 ILCS 5/13-206. The loan

request/credit agreement does not contain the essential terms in its writing and the essential terms are not ascertainable from the document itself.

The loan request/credit agreement merely contains a "requested" loan amount. Paragraph B of the loan request/credit agreement expressly states that the lender is not "agreeing to lend me money [and has] the right not to make a loan or lend an amount less than the Loan Amount Requested." (Cons. Compl. ¶107). The document is an application, not a contract, and analysis of the parties' subsequent course of dealing is necessary to determine whether there ever was an agreement reached and what the contractual terms were.

Defendants cite *Steinberg v. Chicago Medical School*, 69 Ill.2d 320 (1977) but it is not clear how defendants believe *Steinberg* supports their position. The *Steinberg* court found that a plaintiff had stated a cause of action for breach of contract, but was silent on whether the contract was written. *Id.* at 331-332. Whether there was a written contract was not an issue before the *Steinberg* court.

*Portfolio Acquisitions LLC v. Feltman* addressed the reasons why *Harris Trust & Sav. Bank v. McCray*, 21 Ill. App.3d 605 (1st Dist. 1974) did not actually stand for the proposition that an action for a contract to loan money has a statutory period of 10 years. The *Portfolio* court rejected defendants' interpretation of *Harris*, noting that the *Harris* court was not presented with the issue of whether a 5 year or 10 year statute of limitations applied. *Portfolio* at 652. The *Harris* Court's ruling focused solely on the whether the UCC limitations period applied. *Id.* *Harris* has no relevance to the issue presented here.

> d. The Loan Request/Credit Agreement Does Not Meet the Requirements of "Other Evidence of Indebtedness" for Purposes of 735 ILCS 5/13-206

The loan request/credit agreement does not qualify as "other evidence of indebtedness." As defendants accurately quote, a document will qualify as other evidence of indebtedness as

long as one need not resort to parol evidence to establish essential terms of the agreement. *Toth v. Mansell*, 207 Ill. App.3d 665, 669-70 (1st Dist. 1990). However, parol evidence is absolutely necessary to establish the essential terms of any agreement between plaintiffs and the debt holder.

The essential terms of a promise to pay are: "(1) the parties to the agreement, (2) the nature of the transaction, (3) the amount in question, and (4) at least a reasonable implication of an intention to repay the debt." *Kranzler v. Saltzman*, 407 Ill. App. 3d 24, 28 (1st Dist. 2011). Here, the only document signed by the plaintiffs, the loan request/credit agreement, fails entirely at identifying "the amount in question."[1] It is necessary to resort to parol evidence, in the form of the check accepted by plaintiffs, to establish the essential term of the amount. Though defendants never explicitly state this, they appear to be implying that the Disclosure Statement is part of the contract. This is incorrect. On the face of the Disclosure Statement, it is dated several days or weeks after plaintiffs signed the loan request/credit agreement. Plaintiffs were not in possession of the Disclosure Statement when they signed the loan request/credit agreement. When they signed the loan request/credit agreement, by its very terms, plaintiffs did not know the amount they would receive and be expected to repay, and they awaited the determination of the loaning entity. The loan request/credit agreement was merely an application and did not obligate the plaintiffs to repay any specific amount.

*Kranzler* is clearly distinguishable. The memo at issue in *Kranzler*, though simple, contained the parties to the agreement, the nature of the transaction, the amount in question and reasonably implied an intention to repay the debt. *Id.* at 29. The loan request/credit agreement

---

[1] Defendants also suggest that the documents attached to the complaint establish the nature of the transaction as a "promissory note" but the "loan request/credit agreement" never contains the words "promissory note." It is not clear what defendants are referring to. (Memo. MTD Cons. Compl. 12)

fails the test because, unlike the memo in *Kranzler*, it does not include the amount in question or the repayment schedule.  To understand the essential terms of the agreement between plaintiffs and the lending entity requires the Disclosure Statement, which was provided days after the loan request/credit agreement was signed, and a cancelled check.  The length of the document is not determinative of whether a document is a "written contract" but five pages of verbiage that state that a lender may make a loan of unknown amount to be repaid on terms to be determined is not a "written contract."

      e.   <u>Plaintiffs' Claims Are Not Based on Allegations That the State Court Complaint Attachments Were Improper or Incomplete</u>

Defendants' suggestion that plaintiffs' claims are based upon attachments to the state court complaint is a red herring.  The Consolidated Complaint suggests nothing about the fact that the full agreement was not attached to the state complaints, though defendants' failure to attach the full agreement was certainly misleading.  A claim that defendants had no right to bring the suit because the statute of limitations had expired stands regardless of the attachments to the state complaint.  Plaintiffs' claim survives if the defendants had attached nothing, and it survives if the defendants had attached the full loan request/credit agreement. The claim has nothing to do with pleading procedure.

The cases cited by defendants are distinguishable.  In *Harold v. Christopher C. Steel & Peters & Steel, LLC*, 773 F.3d 884 (7th Cir. 2014), the court determined that Harold had no claim because he had no loss independent of the suit's outcome.  *Id.* at 886.  The Court contrasted Harold with the plaintiffs in *Suesz v. Med-1 Solutions, LLC,* 757 F.3d 636 (7th Cir. 2014) who sustained injury outside of the suit's outcome.  The plaintiffs here are more similar to the *Suesz* plaintiffs, because they were required to expend sums to file appearances, hire defense attorneys, and travel to defend cases that were impermissibly filed and which they should not have had to

defend at all. *See also Phillips v. Asset Acceptance*, 736 F.3d 1076 (7th Cir. 2013). In *Beler v. Blatt, Hassenmiller, Leibsker & Moore, LLC*, 480 F. 3d 470 (7th Cir. 2007), the issue before the Court was whether the documents filed in state court were clear or confusing. That is simply not the question here. It is not the content of the complaint which plaintiffs are attacking, but defendants' representation that it had a right to recover on its claim, regardless of the content of the complaint. As the *Beler* Court said, "a rule against trickery differs from a command to use plain English and write at a sixth-grade level." *Id.* at 473. A representation that recovery is available when it is not clearly falls within the category of "trickery." Filing a time barred complaint is an FDCPA violation. *Phillips* at 1079. The other cases cited by defendants similarly relate to procedural failures by state court plaintiffs, not to pursuit of cases which are out of statute.

Defendants suggest that *Krawczyk v. Centurion Capital Corp.*, 2009 WL 395458 (N.D. Ill. 2009) "logically forecloses upon plaintiff's claim" but they fail to expand on their faulty "logic." In fact, *Krawczyk*'s holding that a debt collector need not possess the underlying credit card agreement prior to filing a state court collection lawsuit has no applicability here, where the document supporting plaintiffs' claims was uncovered in the process of discovery, upon "request for more information or details about [state court] plaintiff's claim." *Id.* at *10. Finally, *Washington v. North Star Capital Acquisition, LLC*, 2008 WL 4280139 (N.D. Ill. 2008), was also based upon a claim that the attachments to the state court complaint were deficient. The instant claim says nothing about the attachments to the complaint, and is premised on the actual agreement between plaintiffs and the principals of defendants.

## VI. ILLINOIS COURTS HOLD THAT FAILURE TO COMPLY WITH ICAA ENTITLES CONSUMERS TO RELIEF

Plaintiffs seek to hold TSI/NCO accountable for their improper and illegal control of collection lawsuits, to the detriment of plaintiffs. The ICAA protects consumers from the unscrupulous behavior of collection agencies, including the maintenance of collection actions without input from the actual creditor. The common law rule against intermediaries between a client and attorney as well as the statutory enactment of 8a-1 is not intended to protect the client or the attorney, but the party attacked by an improperly filed and directed lawsuit – ie the plaintiffs.

### a. Defendants Are Subject to Liability Under the FDCPA

All defendants in this case are subject to liability under the FDCPA. Counts V applies equally against B & G and WWR because the attorney litigation privilege under state law does not protect attorneys from liability under federal law. Many courts have applied the FDCPA to attorneys. *Janetos v. Fulton Friedman & Gullace, LLP*, 2016 WL 1382174 (7th Cir. April 7, 2016); *Miljkovic v. Shafritz and Dinkin, P.A.*, 791 F.3d 1291 (11th Cir. 2015); *Hemmingsen v. Messerli & Kramer, P.A.*, 674 F.3d 814 (2012); *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939 (9th Cir. 2011); *Sayyed v. Wolpoff & Abramson*, 485 F.3d 226 (4th Cir. 2007); *Todd v. Weltman, Weinberg & Reis Co.*, 434 F.3d 432 (6th Cir. 2006); *CFPB v. Frederick J. Hanna & Associates, P.C.*, 114 F.Supp.3d 1342, 1351 (N.D.Ga. 2015)("To be clear, the practice-of-law exclusion does not apply to FDCPA claims.").

In their motion, defendants again misrepresent the nature of plaintiffs' complaint. Plaintiffs' claims are not based on a pleading procedure issue but rather on a substantive prohibition on filing and control of suits by a collection agency such as TSI/NCO. (Cons. Compl. ¶247)("A collection agency shall not take any action that in fact or in appearance interferes with

the professional relationship between the attorney and the creditor").  At no point in their complaint do plaintiffs indicate that their claim is based on TSI/NCOs violation of a notice requirement or a signature on a collection complaint.  Plaintiffs claim is based on their allegations that TSI/NCO entirely controlled the litigation with no involvement by the creditor.

Since plaintiffs' complaint is premised on a substantive violation of the prohibition on collectors interfering with the relationship between the creditor and the attorney, defendants' citations to cases which found that there could be no FDCPA claim based upon a failure to attach sufficient documents to the state court complaint are inapposite.

Claims of inappropriate filing are not equivalent to the claims of pleading procedure which *Bentrud* found to be unactionable under the FDCPA.  Threatening to take or taking action which constitutes the unauthorized practice of law, such as when a collection agency files suit in its own name to collect a debt when not permitted to do so under state law, have been found to be in violation of the FDCPA.  *Poirier v. Alco Collections, Inc.*, 107 F.3d 347  (5th Cir. 1997)*;  Marchant v. U.S. Collections, Inc.,* 12 F.Supp. 2d 1001 (D.Ariz. 1998); *Kolker v. Duke City Collection Agency*, 750 F.Supp.468, 469 (D.N.M. 1990). *Foster v. D.B.S. Collection Agency*, 463 F.Supp.2d 783, 803 (S.D. Ohio 2006).  The violations alleged here, including filing and controlling cases when TSI/NCO was specifically prohibited from doing so, are not violations of pleading procedure but more akin to the unauthorized practice of law.  For further detail, see Section (V)(e), *supra*.

Plaintiffs clearly alleged the ways in which defendants violated §1692e in the Consolidated Complaint at paragraph 242. (Cons. Compl. ¶242).  Plaintiffs identified that misrepresentations were made by defendants when they directed to be filed complaints that purported to be authorized by "National Collegiate" trusts, when they caused to be requested the

entry of judgment in such complaints and thereby misleadingly implied that they were entitled to collect and when they misrepresented the legal status of the debts. *Id.* Defendants have no need to guess which of their actions plaintiffs claim are false and misleading, when plaintiffs have clearly laid them out on the face of their consolidated complaint.

      b.  <u>Defendants Are Liable Under ICAA</u>

After the decision in *Sherman v. Field Clinic*, 74 Ill. App. 3d 21 (1st Dist. 1979), where the Court found there was an implied private right of action under §9 of the ICAA, Illinois courts and federal courts have repeatedly recognized the existence of a private right of action. *Kim v. Riscuity, Inc.*, 96 C 1585, 2006 WL 2192121 (N.D.Ill., July 31, 2006); *Trull v. GC Services LP*, 961 F.Supp. 1199, 1206-07 (N.D.Ill. 1997); *Grant-Hall v. Cavalry Portfolio Services, LLC*, 856 F.Supp.2d 929, 940-41 (N.D.Ill. 2012); *Simpson v. Merchants Recovery Bureau*, 97 C 7568, 1997 WL 781710 (N.D.Ill., Dec. 12, 1997); *McLaughlin v. LVNV Funding, LLC*, 971 F.Supp.2d 796, 799-800 (N.D.Ill. 2013); *Blair v. Supportkids, Inc.*, 222 F.Supp.2d 1038, 1045-46 (N.D.Ill. 2002).

Since *Sherman*, the Illinois legislature has met, considered ICAA, and amended ICAA on multiple occasions.   P.A. 82-148, § 1, eff. Jan. 1, 1982; P.A. 83-833, §3, eff. July 1, 1984;  P.A. 83-1539, Art. II, § 7, eff. Feb. 4, 1985;  P.A. 84-242, § 1, eff. Dec. 30, 1985; P.A. 86-615, §2, eff. Sept. 1, 1989;    P.A. 87-492, § 1, eff. Jan. 1, 1992; P.A. 87-1200, § 1, eff. Sept. 25, 1992; P.A. 87-1031, § 5, eff. Jan. 1, 1993;  P.A. 88-45, Art. III, § 3-81, eff. July 6, 1993; P.A. 88-363, § 292, eff. Jan. 1, 1994; P.A. 89-387, §95, eff. Jan. 1, 1996;  P.A. 89-474, § 120, eff. June 18, 1996; P.A. 90-673, §905, eff. Jan. 1, 1999; P.A. 91-613, § 930, eff. Oct. 1, 1999;  P.A. 91-454, § 40, eff. Jan. 1, 2000;  P.A. 91-768, § 5, eff. Jan. 1, 2001; P.A. 93-896, § 5, eff. Aug. 10, 2004; P.A. 94-414, § 10, eff. Dec. 31, 2005;  P.A. 95-437, § 5, eff. Jan. 1, 2008;  P.A. 95-876, § 245,

eff. Aug. 21, 2008; P.A. 97-1070, § 5, eff. Jan. 1, 2013; P.A. 99-227, § 945, eff. Aug. 3, 2015. In

addition, the ICAA "sunsets" every ten years and has been reenacted several times without the

legislature making any changes to address the Court's conclusions in *Sherman*. The legislature

is presumed to be aware of the ways that courts construe its enactments and amendment or

reenactment without changing the construction signifies legislative approval of the statute as

previously construed. *People ex rel. Klaeren v. Village of Lisle*, 316 Ill.App.3d 770, 782, 737

N.E.2d 1099 (2nd Dist. 2000)(citing *Nevious v. Bauer*, 281 Ill.App.3d 911, 915 667 N.E.2d 1074

(1996)). The presumption is especially forceful when the statute receives repeated legislative

attention, as has the ICAA. Furthermore, a limitations provision has been added, 225 ILCS

425/9.5, which supports the continued existence of a private right of action.

Defendants argue that 225 ILCS 425/14a, providing a private right to obtain injunctive

relief against unlicensed collection agencies, is exclusive. This ignore the limitations provision,

which has no applicability to an action for injunctive relief against continuing illegal acts. In

addition, 14a authorizes private individuals to sue in the name of the People of the State of

Illinois to obtain broad injunctive relief which could normally be obtained only by public

officials – a highly unusual type of type of action which requires specific legislative

authorization. The creation of such an unusual right of action is not inconsistent with an implied

private right of action for damages.

Defendants cite a number of Illinois trial court decisions to the effect that there is no

private right of action for damages under the ICAA, other than that in 14a, for the conduct of an

unlicensed collection agency. Regardless of whether these decisions are correct – they all

involved a claim regarding licensure ultimately rejected by the Illinois Supreme Court on other

grounds in *LVNV Funding, LLC v. Trice,* 2015 IL 116129, 32 N.E.3d 553, and thus will never be

considered by any reviewing court – they are not on point where violations of 225 ILCS 425/9 are at issue.

Galvan v. NCO Fin. Sys. Inc. No. 11 C 3918, 2016 WL 792009 (N.D. Ill. Mar. 1, 2016) similarly dealt with licensure and the court noted that the Galvan defendants suggested that Sherman was inapplicable because Sherman dealt with a portion of the ICAA more amenable to private enforcement than licensure. Id. at *2. The Galvan Court noted that "Sherman remains good law and Trice 2 does not clearly evince the Illinois Supreme Court's interest in overturning it." Id. at *4. The Galvan court conducted an inquiry based on Sherman, and looked to the specific text of Section 4 of the ICAA to determine whether Section 4 contained an implied private right of action for the specific violation alleged by plaintiffs. Id. This Court should do the same and look closely at section 8a-1.

Unlike section 4, which was concerned with protecting a state's ability to regulate collection agencies, section 8a-1 is concerned with ensuring that consumers are sued by the appropriate parties and litigation is authorized and managed by the actual plaintiff, not a collection agency intermediary. This provision protects the consumer by ensuring that the party directing the litigation is authorized to do so. Filing of a complaint and direction of litigation by an unauthorized party deprives the debtor, among other things, of a party with whom to properly negotiate settlement and from whom to successfully get discovery.

The Galvan court also noted that section 14a of the ICAA, enacted after Sherman, specifically provided for an "adequate remedy" for violations of Section 4. Id. at *6. By contrast, there is no adequate remedy for violations of Section 8a-1. Section 9 broadly prohibits violations of the ICAA, but unlike section 4, the ICAA does not provide a specific enforcement mechanism for Section 8a-1. The Galvan decision was premised on the Court's determination

that "the ICAA sets apart Section 4's licensure requirement and comprehensively prescribes the tools that can be used to address violations." *Id.* In fact, the *Galvan* court specifically noted that it was not disavowing its own prior decision in *Kim* because *Kim* addressed a different section of the ICAA, which had no additional statutory language like that found in sections 4.5 and 14a. *Id.* The implied private right of action identified by the *Sherman* court applies to violations of section 8a-1. This Court should follow the logical path outlined by *Galvan*.

The addition of §9.7 does not undermine the implied private right of action available for violation of the general prohibition in section 9. The language of 9.7 merely clarifies a tool that was already available. It says "the Attorney General *may* enforce" (emphasis added). This language provides a suggestion as to one avenue for enforcement but does not preclude the existence of other, more efficient methods of enforcement which would better support the purposes of the ICAA, to "protect consumers against debt collection abuse." 225 ILCS 425/1a. Defendants suggestion that 8a-1 exists to protect the attorney-client relationships of creditors has no basis in the stated purposes of ICAA.

"Because the Supreme Court of Illinois has not directly addressed whether a private right of action lies under §9 or any other provision of the ICAA, [a federal district court] may deviate from *Sherman* only if there are persuasive indications that the [state supreme court] would decide the [issue] differently. There are no such persuasive indications; to the contrary, the state supreme court has favorably cited *Sherman*'s private right of action analysis." *McLaughlin v. LVNV Funding, LLC*, 971 F. Supp.2d 796, 800 (N.D. Ill. 2013). *McLaughlin* was decided after the amendments to 9.7 and considered them. Similarly, *Galvan*'s reaffirmation of *Kim* occurred after the amendments to 9.7. *Galvan* at *6. The amendments to 9.7 did not undermine an implied private right of action. Given the opportunity to explicitly foreclose an

implied private right of action of which the legislature was surely aware, the legislature chose not to do so.

The incorporation of review under the Administrative Review Law ("ARL") does not militate against the implication of a private right of action. The available remedies under ICAA indisputably include action by the Attorney General and the Illinois Department of Financial and Professional Regulation (IDFPR). The incorporation of review under the ARL provides an avenue for judicial review in the instances where IDFPR is moved to take action. In *Metzger v. DaRosa*, 209 Ill.2d 30, 44 (2004), the Illinois Supreme Court, speaking on a certified question from the Seventh Circuit, found that no private right of action existed for an employee where the statutory scheme provided directly for administrative protection for the employee from the specific type of injury she had sustained. There, the reference to the ARL was part of an enforcement scheme designed to redress the employee's particular injury. In the instant case, the powers granted to the Attorney General and IDFPR under ICAA could not redress the plaintiffs' injuries. In *Abbasi v. Paraskevoulakos*, 187 Ill.2d 386, 394 (1999), rejecting an implied private right of action, the court relied on its observation that a common law negligence claim was available to the plaintiff, would serve to make an injured plaintiff whole and would provide an "adequate remedy.". Here, without a private right of action under ICAA, no alternative action exists to make the plaintiffs whole. *Fisher v. Lexington Health Care*, 188 Ill.2d 455, 460-61 (1999) is entirely inapposite because the court observed that the employee plaintiffs were not the class which the Nursing Home Care Act was designed to protect, their injuries were not the type that the statute was designed to prevent, and implication of a private right for them would not support the statute's purposes. The ICAA, in contrast, was enacted broadly "to protect consumers against debt collection abuse." 225 ILCS 425/1a. The legislature did not intend for

the Attorney General's enforcement to be exclusive in cases of violation of Section 9 of the ICAA.

  c.  Defendants are Liable Under the Illinois Consumer Fraud Act

Plaintiffs properly alleged a cause of action under the ICFA. Plaintiffs alleged that "defendants engaged in unfair and deceptive acts and practices…by controlling the filing and prosecution of collection litigation, without the requisite involvement of the purported client….thereby engaging in the unauthorized practice of law and the improper filing and prosecution of collection litigation under circumstances prohibited by Illinois statute and public policy. (Cons. Compl. ¶253). The above statement clearly indicates the unfair act or practice sought to be enjoined by plaintiffs – the filing and prosecution of collection litigation, without the involvement of a non-collector client. Plaintiff is entitled to the reasonable inferences to be drawn from his complaint. *Khan v. Deutsche Bank AG*, 2012 IL 112219 ¶47. It is reasonable to assume that by controlling the filing of a complaint, as described in detail in the Consolidated Complaint, the defendants intended that plaintiffs either pay them funds or expend funds and time defending the case. No other reasonable purpose for the filling of a collection complaint can be inferred.

**1. Trade or Commerce**

Collection litigation is part of the process of consumer banking, which is governed under the ICFA. *See Law Offices of William J. Stogsdill v. Cragin Federal Bank for Sav.*, 268 Ill.App.3d 433 437, 645 N.E.2d 564 (2nd Dist. 1995)(collecting cases); *Brown v. C.I.L., Inc.*, 1996 WL 164294 (N.D. Ill. April 1, 1996)(finding that debt collection abuses were actionable under ICFA); *People ex rel. Daley v. Datacom Systems Corp.*, 146 Ill.2d 1, 585 N.E.2d 51 (1991)(rejecting argument that debt collection falls outside of ICFA). Defendants' distinction that *Daley* involved

a different stage of collection than the stage at issue here is a distraction. The act of debt collection remains debt collection when it reaches the stage of litigation and defendants fail to cite to anything to suggest otherwise. The ICFA also lists several specific violations that involve collections, indicating that the legislature considered collection activity to be trade or commerce within the meaning of the ICFA. *See e.g.* 815 ILCS 505/2H; 2I; 2S; 2HH; 2MM. The policy language of the ICFA specifically states that it is to be interpreted liberally to effectuate its purposes. 815 ILCS 505/11a. Defendants' citation to cases which reject application of the ICFA against an attorney are similarly inapposite, as the ICFA claim is explicitly against NCO and Transworld, debt collection agencies, only, and does not seek liability against the attorneys who are not liable under the Act. (Cons. Compl. ¶252). Plaintiffs sufficiently alleged that defendants' acts occurred within the trade or commerce of consumer banking and debt collection.

## 2. Proximate Cause

Proximate cause may be easily implied from plaintiffs' allegations. Plaintiffs are entitled to reasonable inferences from their complaint. *Khan* at ¶47. Plaintiffs allege that they were damaged when defendants filed collection lawsuits against them without proper authorization from the National Collegiate Student Loan Trusts and the plaintiffs were forced to defend these unauthorized suits. By directing the filing of the complaints, defendants "spoke" to plaintiffs, and plaintiffs were impacted. But for defendants' direction and pursuit of the unauthorized suits, plaintiffs would not have been dragged into court to defend these lawsuits. Plaintiffs particularly note that all of the cases were voluntarily dismissed by defendants when plaintiffs mounted a defense.

## 3. Damages

Plaintiffs incurred purely economic actual damages in the form of attorneys fees and litigation costs[2] which they were forced to expend on the defense of the unauthorized suits. Defendants citations miss the point. The situation in *McCabe* was substantially different to plaintiffs' situation. *McCabe v. Crawford & Co.*, 272 F.Supp.2d 736, 738-739 (N.D.Ill. 2003). McCabe paid his attorney to pursue the *affirmative* case against Crawford and attempted to recover those amounts. *Id.* at 752. By contrast, plaintiffs in this case paid their attorneys to *defend* them against defendants' unauthorized lawsuits. In *Herkert v. MRC Receivables Corp.*, 655 F.Supp.2d 870, 881 (N.D.Ill.2009), this Court stated without discussion that attorneys' fees are not actual damages under the ICAA but only relied on *McCabe*. Importantly, this Court in *Herkert* found that the *Herkert* plaintiffs were required to pay an appearance fee to defend their cases which qualified as actual damages. Similarly, plaintiffs here alleged that they were required to pay an appearance fee. In addition, plaintiffs suggest that attorneys' fees paid to *defend* a collection action differ fundamentally from fees paid to pursue an affirmative case, and fees paid to defend an action are functionally similar to the appearance fees paid by plaintiffs because, unlike fees for affirmative cases, defense fees are paid out of a necessity created by defendants' actions.

This Court should find that plaintiffs may recover attorneys' fees paid in a *separate* underlying action as actual damages in the current cause of action. Such a finding would be analogous to the position of the Illinois courts in the tort action of wrongful attachment, that "attorneys fees incurred in setting aside the attachment are a proper element of damages in the *tort* action." Baird v. Liepelt, 62 Ill.App.2d 154, 156-57, 210 N.E. 2d 1 (2d Dist. 1993) (emphasis added). Illinois courts have also found that "where the wrongful acts of a defendant involve the plaintiff in litigation with third parties, plaintiff may recover damages against the wrongdoer,

---

[2] Some appearance fees were eventually refunded to plaintiffs.

measured by the reasonable expenses of such litigation including attorneys fees." *Marvel Engineering Co. v. Matson, Driscoll & D'Amico*, 150 Ill.App.3d 787, 793, 501 N.E.2d 948 (2d Dist. 1986); *Ohio Nat. Life Assur. Corp. v Davis*, 803 F.3d 904 (7th Cir. 2015) *Fednav Intern. v. Continental Ins. Co.* 624 F.3d 834, 840 (7th Cir. 2010). Thus, where the wrongful acts of TSI/NCO involved the plaintiffs in litigation with the National Collegiate Trusts, plaintiffs ought to be able to recover actual damages, measured by the reasonable expenses of such litigation, including attorney fees.

Defendants cite *Lewis v. Continental Bank Corp.* 494 U.S. 472, 480 (1990) and *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83 (1998) in support of their position that attorneys' fees are not recoverable as actual damages. However, *Lewis,* like *McCabe* involved a situation fundamentally different from that in this case. The only stake which Continental Bank Corp. had left in the action before the Supreme Court was its petition for fees in the *ongoing* case. *Id.* Those are the variety of fees which the Supreme Court opined could not create an Article III case or controversy. *Steel* represented the same situation, as evidenced by defendants' quote. In contrast, the fees which plaintiffs allege here were incurred in a *separate* underlying action and were not "a byproduct of the litigation" brought by plaintiffs. *Steel* at 107. *Lewis* cites to *Diamond v. Charles*, 476 U.S. 54, 70 (1986), which states "Art. III standing requires an injury with a nexus to the substantive character of the statute or regulation at issue." Here, plaintiffs' injury in the form of their appearance fees and attorneys' fees which they had to pay is directly related to the substantive character of the ICFA, which seeks to prevent injury to consumers from the debt collection abuse of parties like defendants.

### 4. Defendants' Cases Are Distinguishable

Defendants reliance on *Stern v. Norwest Mortgage, Inc.*, 284 Ill.App.3d 506 (1st Dist. 1996), *Lee v. Nationwide Cassel, L.P*, 174 Ill.2d 540, 550-51 (1996), and *Cahnman v. Agency Rent-A-Car System, Inc.*, 299 Ill. App. 3d 54 (1st Dist. 1998) betrays a mischaracterization of plaintiffs claim. There is no disagreement about the interpretation of 8a-1 alleged, nor do defendants attempt to elucidate what the alleged disagreement might be, merely suggesting that plaintiffs' interpretation is "self-serving." (Memo. MTD Cons. Compl. p. 21). Defendants fail to explain how there is a dispute as to the meaning of 8a-1 or cite to any cases that suggest that there is. In fact, in prior sections of the motion to dismiss regarding plaintiffs' direct claims under 8a-1, defendants do not dispute plaintiffs' interpretation at all, but focus on their argument that plaintiffs have no private right under the statute. Defendants fail to present any dispute as to the meaning of 8a-1.

### 5. The List of Statutes in Section 2Z of the ICFA is not Exclusive

The 2Z list of statutes, violation of which is explicitly defined as an ICFA violation, is not an exclusive list. The best evidence for the incorrectness of defendants' position may be found within the ICAA itself. As noted above, the language of Section 9.7 of ICAA explicitly indicates that ICFA may be used to enforce ICAA. 225 ILCS 425/9.7. The legislature expressed its will within the confines of ICAA, without taking the further step to amend ICFA 2Z to add the ICAA to the list of statutes.

*People ex. rel. Daley v. Grady*, 192 Ill.App.3d 330 (1st Dist. 1989), does not stand for the proposition that failure to list the ICAA means that a violation of the ICAA does not constitute a violation of ICFA. Rather, *Daley* stands for the proposition that violations of laws not listed in section 2Z do not *automatically* constitute a violation of ICFA. *Id.* ("The sole issue presented for

43

review is whether a business practice, which if violative of public policy as established by the Real

Estate License Act, would automatically constitute a violation of the Consumer Fraud Act").

> "The [ICFA] simply creates a *per se* rule, providing that a defendant's *knowing* violation of any of the enumerated statutes *automatically* constitutes an unlawful practice under the ICFA. The violation (knowing or unknowing) of other statutes, regulations, or legal rules does not automatically predicate an ICFA claim but can predicate a claim in the alleged conduct is independently deceptive or unfair within the meaning of the ICFA."

*Boyd v. U.S. Bank N.A.*, 797 F.Supp.2d 747, 752 (N.D. Ill. 2011). The appropriate conclusion is

that a violation of ICAA may prove to be a violation of ICFA, but plaintiffs cannot escape the

burden of alleging the elements of an ICFA claim, a burden which plaintiffs alleging violation of

2Z statutes are spared.

*Martis v. Pekin Memorial Hospital*, 395 Ill.App.ed 943 (3d Dist. 2009), demonstrates that

a finding that a statute is not listed in 2Z does not preclude a full review of whether plaintiffs have

alleged an unfair practice under the ICFA. After noting that the Medical Practice Act was not

listed in 2Z, the court discussed separately whether the plaintiff's allegations described an unfair

practice, and thus, a violation of the ICFA. *Id.* A finding that the ICAA is not listed in 2Z is merely

the beginning of a court's inquiry and not its end.

Several courts have found that a claim may exist for violation of ICFA, where the claim is

premised in a statute not listed in 2Z. *Robinson v. Toyota Motor Credit Co.*, 201 Ill.2d 403, 421,

775 N.E. 2d 951 (2002)(discussing an ICFA violation based on required disclosures under the

Truth in Lending Act); *Jackson v. Payday Financial*, 79 F.Supp.3d 779, 788 (finding that a

violation of the Illinois Interest Act may state a claim for unfair practice under the ICFA); *O'Brien

v. Landers,* 2011 WL 221865 at *5-6 (N.D. Ill. Jan. 24, 2011) (finding that violation of a statute

which didn't rise to level of 2Z violation nevertheless stated violation of unfair practice

prohibition).

d.  Unauthorized Filing

Plaintiffs' claims in Counts V and VIII are not derivative of their ICAA claims.  B & G and WWR are alleged to have knowingly filed suits without proper authorization from the putative clients, the National Collegiate Trusts.  These claims are not dependent on the courts findings regarding liability under ICAA.  Defendants refer to the ICAA claims as disputed, but in fact, they do not dispute plaintiffs' allegations that TSI/NCO directed the lawsuits, since to do so would be inappropriate at the motion to dismiss stage.

In *Merriman v. Merriman* (1937), 290 Ill.App. 139, 8 N.E.2d 64 (3rd Dist. 1937), [the] court recognized a cause of action in favor of the defendant in a legal proceeding against the attorney who instituted a proceeding without authority from the putative plaintiff. *Safeway Ins. Co. v. Spinak*, 267 Ill. App. 3d 513, 515, 641 N.E.2d 834, 835 (1st Dist. 1994).  Litigation privilege cannot protect an attorney from claims of unauthorized filing.  The *Spinak* court also addressed defendants concerns that "litigation would never end" if the court recognizes a claim of unauthorized filing by noting that *Merriman* recognized the claim in 1937 and between then and 1994, when *Spinak* was decided, Illinois appellate courts had occasion to address the issue only once. *Id.* at 516. As *Spinak* noted, "hardly a harbinger of the deluge of litigation that defendants predict." *Id.*

Application of the litigation privilege to claims of unauthorized filing would yield a nonsensical result.  The claim of unauthorized filing is only available against attorneys.  "The purpose of the privilege is to secure to attorneys as officers of the court the utmost freedom in their efforts to secure justice for their clients." *Wilton Partners III, LLC v. Gallagher*, No. 03 C 1519, 2003 WL 22880834, at *4 (N.D. Ill. Dec. 5, 2003) (citing *Libco Corp. v. Adams,* 100 Ill.App.3d 314, 317, 55 Ill.Dec. 805, 426 N.E.2d 1130 (1st Dist.1981)).  It would be

inappropriate to apply the litigation privilege here, where defendants are alleged to have filed suit without the authorization of any client.

The cases cited by defendants which suggest that the tort of unauthorized filing does not exist are all predicated on *Lyddon v. Shaw*, 56 Ill. App. 3d 815 (2d Dist. 1978). However, *Spinak*, decided after *Lyddon*, considered *Lyddon* and found that its failure to recognize the tort of unauthorized filing was mistaken.

Plaintiffs have clearly stated a claim for unauthorized filing as described in *Merriman* and *Spinak*. As *Merriman* explained, "the gist of the action [for unauthorized filing]…is based upon the improper liberty of using the name of another person in prosecuting a suit by which the defendant in the action is injured…" *Merriman*, 290 Ill. App. at 145-46. Plaintiffs have alleged that the law firms used the name of the "National Collegiate Trust" entities in bringing and prosecuting suits against plaintiffs, without receiving direction from the "National Collegiate Trust" entities. (Cons. Compl. ¶258). Instead, plaintiffs allege, the law firms took direction from TSI/NCO. *Id.* Additionally, plaintiffs clearly allege that the law firms were directed not to communicate with the "National Collegiate Trust" entities and did not do so. (Cons. Compl. ¶71, 139, 147) Plaintiffs were injured by the law firms' pursuit of these lawsuits without any guidance from the party allegedly filing suit against them.

## VII.   THE DEBT WAS DISPUTED

Defendant's argument that the debt was not disputed indicates a failure to carefully read plaintiffs' complaint. Defendant suggests that Rocco did not allege that she disputed the debts at issue "to any other person or entity." (Memo. MTD Cons. Compl. 26) Defendant also suggests that Rocco is alleging that her "counsel's notices of appearance filed in the underlying collection suits were tantamount to disputes." *Id.* at 27. In fact, Rocco's consolidated complaint clearly

indicates that she not only filed an appearance but filed a responsive pleading disputing the debt and asserting affirmative defenses. (Cons. Compl. ¶156). The consolidated complaint clearly identifies the way in which Rocco disputed the debt, and defendants' motion must be denied.

Afuang made his dispute just as clearly. He sent a letter to collection counsel disputing the debt. (Cons. Compl. ¶133). Defendants' suggestion that written notification to an agent of a debt collector is insufficient to put the debt collector on notice is misguided. As extensively alleged earlier in plaintiffs' Consolidated Complaint, collection counsel operated as an agent of TSI. (Cons. Compl. ¶¶67-76). TSI is charged with the knowledge of information given to its agent. *See Santora v. Starwood Hotel and Resorts Worldwide, Inc.*, 580 F. Supp.2d 673, 677 (N.D.Ill. 2008)("an agent's knowledge is generally imputed to his principal if it is received while he is acting within the scope of his agency and concerns a matter within the scope of his authority.")(quoting *Evanston Bank v. Conticommodity Services, Inc.*, 623 F.Supp. 1014, 1034 (N.D.Ill.. 1985); *Janetos* at *7 ("an entity that is itself a 'debt collector' – and hence subject to the FDCPA – should bear the burden of monitoring the activities of those it enlists to collect debts on its behalf."). A debt collector "should know" information given to the counsel it hires and controls, as alleged in the consolidated complaint.[3] A different result would undermine the purpose of the FDCPA and permit a debt collector to hide from liability any time that information was conveyed to its attorney or to another agency which it had hired. Consumers would be required to personally seek out the concealed entity at the top of the collection food chain in order to make their dispute. Such a result was not envisioned by a legislature seeking to protect consumers. Plaintiffs' complaint has stated sufficient reason to believe that TSI knew or should have known the debt was disputed.

---

[3] Defendants also appear to be suggesting that even the "National Collegiate Trust" entities cannot be charged with the law firms knowledge. (MTD Cons. Compl. p. 4)

**VIII.** <u>**COSIGNER CLAIMS**</u>

      a. <u>The Maintenance of a Lawsuit is Actionable under the FDCPA</u>

The FDCPA prohibits a debt collector from lying about "the character, amount, or legal status of any debt" (15 USC 1692e(2)), from making a "threat to take any action that cannot legally be taken or that is not intended to be taken" (15 USC 1692e(5)), and "The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." (15 USC 1692f(1)) How does one determine the "character, amount, or legal status of any debt," what action "cannot legally be taken," and what amount is "permitted by law"? Obviously, this requires resort to the non-FDCPA law governing the debt, in this case state law relating to the liability of gratuitous sureties.

Inquiry into such matters is expressly required by the FDCPA, and has nothing to do with "procedural" or "evidentiary" issues. Thus, the Seventh Circuit holds that filing suit on time-barred debts is actionable. *Phillips v. Asset Acceptance*, 736 F.3d 1076 (7th Cir. 2013). Similarly, the filing of a collection action barred by res judicata violates the FDCPA. *Montgomery v Donnett*. 1:05-CV-00476, 2006 U.S. Dist. LEXIS 7377, 2006 WL 293727 (S.D. Ohio Feb. 7, 2006); *Donley v. Nordic Properties, Inc.*, 2003 WL 22282523 (N.D. Ill., Sept. 30, 2003). Generally, "a debt collector violates the FDCPA when it actually files suit to collect a debt for which it knows, or reasonably should know, the defendant is not liable." *Royal Financial Group, LLC v. George*, ED92972, 2010 WL 1223791, 2010 Mo.App. LEXIS 399, *11 (March 30, 2010) (wrong person sued, no evidence of assignment). Suing the wrong person is a violation. *Heathman v. Portfolio Recovery Associates, LLC*, 12-cv-201, 2013 WL 755674 (S.D.Cal., Feb. 27, 2013) ("Section 1692e prohibits the use by a debt collector of 'any false,

deceptive, or misleading representation or means in connection with the collection of any debt.'
Donohue, 592 F.3d at 1030. Filing a state court complaint alleging a nonexistent debt clearly
violates this section. See, e.g., Cox v. Hilco Receivable, L.L.C., 726 F.Supp.2d 659, 666
(N.D.Tex.2010) ('a debt collector's representation that a debt is owed to it when it in fact is not,
amounts to a misrepresentation barred by the FDCPA.').

     As stated in plaintiffs' complaint, a gratuitous surety, such as plaintiffs, is "released when
his risk is increased or he is deprived of the opportunity to protect himself by reason of the fact
that the creditor refuses or fails to do some act…which it is his duty to perform." *Watkins*
*Products Inc. v. Walter*, 11 Ill.App.3d 417, 420, 296 N.E.2d 859 (5th Dist. 1973).  Here,
plaintiffs' allegations establish that TSI/NCO maintained suit against cosigner plaintiffs knowing
the plaintiffs were released by virtue of the failure to send notice as was their duty under 2S.
Plaintiffs have stated a claim, and the motion to dismiss should be denied.

     b.   <u>Cosigner Plaintiffs Have Stated a Claim Under ICFA</u>

### i. Plaintiffs Have Sufficiently Alleged Damages

     Plaintiffs have sufficiently alleged actual damages by noting that they were required to
pay appearance fees and fees to their attorneys to defend the state court collection cases which
should never have been filed and maintained against them because they were discharged from
liability by the failure to send notice.  *See supra Section VI(c)(3).*

### ii. Plaintiffs are Within the Coverage of ICFA

     Defendants argument that a cosigner cannot be covered under ICFA would render
Section 2S ineffective.  A court should not apply a construction of a statute that would render it
ineffective. *In Re Baker*, 430 F.3d 858, 860 (7th Cir. 2005)("Canons of statutory construction
discourage an interpretation that would render a statute meaningless").  Section 2S expressly

refers to cosigners in the context of collection and the taking of "any collection action." 815 ILCS 505/2S. Adopting defendants' argument that a cosigner is not covered within the ambit of the ICFA would render 2S entirely meaningless and unenforceable. Section 2S, as well as other sections which address collection action, indicate clearly that the legislature believed consumer debt, the cosigning of consumer debt, and the collection of consumer debt against cosigners to be within the liberal bounds of trade or commerce defined by the ICFA. ICFA is to be interpreted liberally and the Illinois courts have clarified that its coverage is not only available to consumers. For example, it is clear that one business can bring suit against another under the Act for unfair competition. *Empire Home Servs. Inc. v. Carpet Am., Inc.* , 274 Ill.App.3d 666, 653 N.E.2d 852 (1st Dist. 1995), appeal denied, 163 Ill.2d 553, 657 N.E.2d 619 (1995); *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 190 Ill.App.3d 524, 546 N.E.2d 33(2d Dist. 1989); *Zinser v. Rose*, 245 Ill.App.3d 881, 614 N.E.2d 1259 (3d Dist. 1993); *Sullivans Whsle. Drug Co. v. Faryl's Pharmacy, Inc.* 214 Ill. App.3d 1073, 573 N.E.2d 1370 (5th Dist. 1991), leave to appeal denied, 141 Ill.2d 561, 580 N.E.2d 136 (1991); *P.I.A. Mich. City, Inc. v. National Porges Radiator Corp.*, 780 F. Supp. 1421 (N.D.Ill. 1992). The court in *Sullivan's* held that "the protections of the statute are not limited to consumers. "That this is so is made clear by the full title of the Act itself, which indicates that it is 'An act to protect consumers and borrowers and businessmen against fraud, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…'" *Sullivans* at 1082. "Courts have specifically held that standing to sue under the Fraud Act is not limited to consumers….The conclusion reached by these courts is fully supported by the explicit language of the statute and is in accord with the Illinois Supreme Court's interpretation thereof." *Scotsman Group v. Mid-America Distribs.* 1994 WL 118458 *5 (N.D. Ill. April 5, 1994). "A plaintiff need not be a

consumer to proceed under the Act." *Stepan v. Winter Panel Corp.* 948 F.Supp. 802, 805-06 (N.D.Ill. 1996).

### iii. Plaintiffs Sufficiently Pled a Violation of 2S

The pleading with specificity requirement is not applicable to claims under sections like 2S, which clearly define the unfair practice alleged. Section 2S specifically states that "no person may…take any collection action regarding a cosigner of an obligation unless prior thereto, such person has notified the cosigner by first class mail…" 815 ILCS 505/2S. Plaintiffs' complaint alleged that TSI/NCO, a debt collector, directed state court collection litigation to be filed and maintained against plaintiffs, which is indisputable a "collection action," even though cosigner plaintiffs had been sent no notice and thus were discharged from liability. It is difficult to imagine a way in which the allegations could be more specific.

In addition, the Seventh Circuit has explicitly stated that claims of unfair practice under ICFA are not subject to the stricture of Rule 9(b) but rather to the more relaxed pleading standards of Rule 8 of the Federal Rules of Civil Procedure. *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.* 631 F.3d 436, 446 (7th Cir. 2011)(citing *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech Fin. Servs., Inc.* 536 F.3d 663, 670 (7th Cir. 2008).

The involvement alleged by TSI/NCO is not vicarious or derivative. Plaintiffs alleged that TSI/NCO directed and controlled the litigation filed against plaintiffs. Plaintiffs' allegations claim that TSI/NCO were central to the collection action and directly involved with it. (Cons. Compl. ¶137-152). Defendants' suggestion that this is somehow a breach of contract claim dressed up in the language of fraud is made up out of whole cloth, as plaintiffs' claim is clearly for statutory violations.

### iv. Plaintiffs Have Alleged that TSI/NCO's Actions Proximately Caused Their Damages

Plaintiffs pled clearly that TSI/NCO caused collection actions to be brought and maintained against them, which proximately caused them to suffer damages in the form of payments to an attorney and the cost of their appearance fee. (Cons. Compl. ¶268-73). If plaintiffs had received notice, they would have had an opportunity to arrange payment terms or arrange for the student obligor to restart making payments upon the debt, thus avoiding a lawsuit against the co-signer. Plaintiffs have specifically pled that defendants' actions caused harm to them. Defendants seem to believe that if they italicize the words specificity enough times, they will somehow obscure plaintiffs' clear allegations.

At common law, if the contract of a surety or guarantor mandates notice of the default of the principal debtor, failure to provide such notice releases the surety or guarantor, especially if the surety or guarantor is gratuitous. *Mountrail County v.Farmers State Bank*, 53 N.D. 789, 208 N.W. 380, 382 (1926). Recognizing that consumers gratuitously cosigning contracts for friends and relatives were unlikely to have the knowledge or bargaining power to contract for a notice of default, the Illinois General Assembly imposed a notice obligation by statute. Section 2S gives the consigner "the opportunity to protect himself" by imposing a notice duty on the creditor. Prior to taking any action that might adversely affect the cosigner, including credit reporting, referral to a collection agency and legal action, the creditor must notify the cosigner in writing that the principal has become delinquent, allowing the cosigner to take over payments. Because the provision is part of the Consumer Fraud Act, it is not subject to waiver. 815 ILCS 505/10c.

Noncompliance with the obligation imposed by 815 ILCS 505/2S should have at least the consequences of noncompliance with a contract provision protecting a gratuitous surety – noncompliance discharges the cosigner's obligation. Thus, appropriate relief for violation of 815 ILCS 505/2S is a declaration that the cosigner has been discharged and actual damages.

c.   <u>Cosigner Plaintiffs Have Stated a Claim for Violation of ICAA</u>

Plaintiffs have adequately alleged that Defendants control and direction of state court collection action against them violated the ICAA because defendants had reason to know that without 2S notice, they had no right to enforce a remedy against plaintiffs.  Defendants argument would have the Court disregard the deeply important question of the entity to whom an alleged debt is owed.  While plaintiffs admit they cosigned a loan application, none admit that they owe a debt to *a National Collegiate Trust* and they further contend that absent 2S notice, they were discharged from liability entirely.  Defendants interpretation asks that the Court find 2S notice to be a meaningless formality.  It is not.  Provision of notice to the cosigner would have permitted the cosigner to completely avoid a state court collection action by making their own payment arrangements.

Defendants incorrectly suggest that the question of whether there is a private right of action under the ICAA is a simple one.  As *Galvan* amply demonstrates, it is not.  The *Galvan* Court noted that "*Sherman* remains good law and *Trice 2* does not clearly evince the Illinois Supreme Court's interest in overturning it." *Galvan* at *4.  The *Galvan* court followed the *Sherman* approach, and looked to the specific text of Section 4 of the ICAA to determine whether was an implied private right of action for the specific violation alleged by plaintiffs. *Id.* This Court should do the same and look closely at the violations of section 9 alleged by plaintiffs.

Plaintiffs allege that defendants violated ICAA by "attempting or threatening to enforce a right or remedy with knowledge or reason to know that the right or remedy does not exist" and "misrepresenting the amount of the claim or debt alleged to be owed." Like the *Sherman* plaintiffs, these acts of misrepresentation and improper collection against plaintiffs "contravene

the public policy of this State." *Galvan* at *2 (citing *Sherman*).  Like the *Sherman* plaintiffs, the

plaintiffs have experienced attempts to collect a debt against them and are thus "within the class

of persons the statute is designed to protect." *Id.*  Third, the injury allegedly suffered by

plaintiffs, based upon their allegations, is within the range of injuries that the statute was

designed to prevent, specifically, "to protect consumers against debt collection abuse." *Id.*

Fourth, like the *Sherman* plaintiffs, an aggrieved co-signer with an improperly brought suit

against them is unlikely to derive sufficient satisfaction from the suspension or revocation of a

collection agency's certificate or from the criminal prosecution of an offending agency. *Id.*  The

allegations here reference portions of ICAA which directly benefit consumers, unlike the

licensure section reviewed in *Galvan* and found to not contain a private right of action.

    Plaintiffs have sufficiently alleged that they were damaged when they were forced to pay

appearance fees and fees to their attorneys to defend cases that should not have been brought or

maintained because plaintiffs were discharged by virtue of the failure to send notice to them. *See*

*supra Section VI(c)(3).*

## IX.    THE NAME OF THE CREDITOR PROVIDED ON TSI'S LETTERS WAS MISLEADING

    TSI's failure to disclose the creditor to O'Neill was a material misrepresentation.  The

letters confirmed to O'Neill that she had agreed to make a payment, but to whom?  O'Neill was

left with no knowledge of what entity she had made a payment to.  Defendants suggest that

sufficient information was provided because the letter included "creditor's account number for

each loan." (Memo. MTD Cons. Compl. 34)  Neither the letters, nor defendants motion enable

plaintiff to identify who the "creditor" is to whom this number allegedly belonged.  If O'Neill

had a complaint about the servicer, she could not contact the creditor to complain, because she

would not know who they were.  If she thought that her payment was being applied to one loan

instead of the other, she would not know that she needed to complain to two different creditors. If the debt was resold and the creditors account number ceased to have meaning, she would not be able to identify where her payment had been applied to the new creditor. The letters provided for a payment plan that she had allegedly previously negotiated, but there is no reason to believe, and plaintiff has certainly not alleged, that during the supposed negotiations O'Neill was ever informed that 4 different creditors owned her debt. Given TSIs position here, it seems more likely that TSI felt it unnecessary to bestow that information on the plaintiff. The 'gist' of TSI's statement that the creditor was "National Collegiate Trust" was incorrect. There is nothing "bizarre, peculiar or idiosyncratic" about plaintiff's interpretation of the meaningless creditor name on the letters. Even today, plaintiff's attorney is unable to determine who the owners of O'Neill's debt are. The misrepresentation falls in to the third *Lox* category of cases where the language is "plainly deceptive or misleading." *Janetos v. Fulton, Friedman & Gullace, LLP*, 2016 WL 1382174 (7th Cir., April 7, 2016)(citing *Lox v. CDA, Ltd.* 689 F.3d 818 (7th Cir. 2012)).

Unlike the plaintiff in *Hahn v. Triumph Partnerships*, 557 F.3d 755 (7th Cir.. 2009), where plaintiff indicated that he didn't know how he would be impacted by the provided misinformation, plaintiff here has laid out above the many ways in which she was disadvantaged by the failure to provide the creditor name.

Plaintiff seeks only statutory damages, and is not required to show proof that she was misled. *Winiecki v. Creditors Interchange Receivable Mgmt. LLC*, 14 F. Supp. 3d 1086, 1094 (2014)(citing *Barlett v. Heibl*, 128 F.3d 497, 499 (7th Cir. 1997)). "At this stage of the proceedings, plaintiff need only state allegations that allow the Court to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (citing *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009)) At the motion to dismiss stage, the Court may draw the reasonable inference based upon plaintiff's explanations above, that failure to name the actual creditors was materially misleading to the consumer.

## X.    PARAGRAPHS 76-78 OF THE CONSOLIDATED COMPLAINT SHOULD NOT BE STRICKEN

Defendants state conclusively, but fail to explain, why paragraphs 76-78 are irrelevant to the allegations of the complaint.  In fact, paragraphs 76-78, which describe the prior deceptive and unfair conduct of TSI/NCO in the collection of debts, are relevant to the measure of appropriate damages and to the intent of TSI/NCO.  The prior history of TSI/NCO's collection activities give the Court a context to determine whether TSI/NCO's actions were intentional and serves to rebut TSI/NCO's anticipated defense that its actions were unintentional and subject to the bona fide error defense.

## XI.    CONCLUSION

Plaintiffs respectfully request that defendants' motion to dismiss the consolidated complaint be denied in its entirety.

Respectfully submitted,


s/Daniel A. Edelman
Daniel A. Edelman


Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER
    & GOODWIN, L.L.C.
20 S. Clark Street, Suite 1500
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

## CERTIFICATE OF SERVICE

I, Daniel A. Edelman, hereby certify that on June 24 2016, a true and accurate copy of the foregoing document was filed via the Court's CM/ECF system and notification of such filing was sent to all counsel of record.

s/Daniel A. Edelman
Daniel A. Edelman