# APPENDIX A

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

<u>CIVIL MINUTES -- GENERAL</u>

Case No.   **CV 15-7522-JFW (RAOx)**                    Date:  August 31, 2016

Title:         Consumer Financial Protection Bureau -v- CashCall, Inc., et al.

**PRESENT:**

        **HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

      **Shannon Reilly**                                     **None Present**
      **Courtroom Deputy**                             **Court Reporter**

**ATTORNEYS PRESENT FOR PLAINTIFFS:**       **ATTORNEYS PRESENT FOR DEFENDANTS:**
             None                                                      None

**PROCEEDINGS (IN CHAMBERS):**      **ORDER GRANTING PLAINTIFF CONSUMER FINANCIAL PROTECTION BUREAU'S MOTION FOR PARTIAL SUMMARY JUDGMENT [filed 6/30/2016; Docket No. 144];**

                                 **ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [filed 6/30/2016; Docket No. 139]**

On June 30, 2016, Plaintiff Consumer Financial Protection Bureau ("Plaintiff" or "CFPB") filed a Motion for Partial Summary Judgment. On July 11, 2016, Defendants CashCall, Inc. ("CashCall"), WS Funding, LLC ("WS Funding"), Delbert Services Corporation ("Delbert Services"), and J. Paul Reddam ("Reddam") (collectively, "Defendants") filed their Opposition. On July 18, 2016, Plaintiff filed a Reply.

On June 30, 2016, Defendants filed a Motion for Summary Judgment. On July 11, 2016, Plaintiff filed its Opposition. On July 18, 2016, Defendants filed a Reply.

Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found these matters appropriate for submission on the papers without oral argument. The matters were, therefore, removed from the Court's August 15, 2016 hearing calendar and the parties were given advance notice. After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

Initials of Deputy Clerk  _sr_

## I.      FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.      The Defendants

Defendant CashCall, a California corporation, is a lender to consumers and small businesses. Defendant Reddam is the founder, CEO, sole owner, and President of CashCall. Defendant WS Funding is a wholly-owned subsidiary of CashCall, which was formed to purchase loans made by non-party Western Sky Financial.[2] Defendant Delbert Services is a Nevada corporation which was formed to service loans that CashCall deemed in default, or "charged-off", and to provide collection services for other, unrelated clients.

### B.      CashCall's Consumer Loan Business

CashCall entered the unsecured consumer lending market in 2003 to provide a lower cost alternative to payday loans for credit-impaired borrowers and small businesses.  Before 2006, CashCall primarily (if not exclusively) made loans to customers in California.  In 2006, CashCall decided to expand its business beyond California.  However, it opted not to obtain licenses to lend in other states because "in many of those states, the usury laws would not permit [CashCall] to make or service loans at the rates [CashCall] deemed necessary to make a profit."  Instead, CashCall expanded its business by paying two state-chartered federally-regulated banks to make loans that CashCall then purchased and serviced. The Maryland Court of Appeals recently referred to CashCall's arrangement with the state-chartered banks as a "'rent-a-bank' scheme" designed to take advantage of a federally-insured bank's exemption from state usury limits.  *CashCall, Inc. v. Maryland Comm'r of Fin. Regulation*, 139 A.3d 990, 995 n.12 (Md. 2016). This lending model was successful for CashCall until the two state-charted banks withdrew from the arrangement under pressure from the FDIC.

After the two state-chartered banks withdrew from the arrangement, counsel Claudia Callaway of Katten Muchin Rosenman LLP ("Katten") advised CashCall's general counsel, Dan Baren, that she was recommending that her clients move to a "tribal model," and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation."  Baren described the "tribal model" as "almost identical to the [state-chartered] bank model."

Callaway introduced Baren to Martin Webb, who was a member of the Cheyenne River Sioux Tribe ("CRST") in South Dakota and who had founded two or three previous payday lending companies that used the tribal lending model.  Webb and Baren discussed forming a tribal lending entity through which Webb would sell loans to CashCall.

---

[1]To the extent any of these facts are disputed, they are not material to the disposition of this motion.  In addition, to the extent that the Court has relied on evidence to which the parties have objected, the Court has considered and overruled those objections.  As to the remaining objections, the Court finds that it is unnecessary to rule on those objections because the disputed evidence was not relied on by the Court.

[2]References to CashCall in this Order include WS Funding.

Initials of Deputy Clerk _sr_

As a result of those discussions, in 2009, Webb formed Western Sky Financial ("Western Sky") with CashCall in mind. Western Sky was a South Dakota limited liability company and was licensed to do business by the CRST.  Webb was Western Sky's sole owner.  Western Sky's offices were located in Timber Lake and Eagle Butte, on the CRST Reservation in South Dakota. Western Sky constructed new facilities on the Reservation, including a call center and office, and communication infrastructure with CashCall's assistance.  Between January 2010 and August 2013, Western Sky was one of the largest private employers on the Reservation, employing more than 100 employees.

### C.    CashCall and Western Sky's Agreements and Business Relationship

CashCall and Western Sky entered into two agreements signed by Reddam and Webb on behalf of their respective companies: (1) an Agreement for the Assignment and Purchase of Promissory Notes (the "Assignment Agreement"), and (2) an Agreement for Service (the "Service Agreement").  These agreements remained in effect from the time they were signed until Western Sky ceased doing business in September 2013.

Pursuant to the Assignment Agreement, signed in February 2010, CashCall, through its wholly-owned subsidiary WS Funding, agreed to "purchase from Western Sky Financial all loans made through www.westernsky.com as evidenced by the Notes."  CashCall's purchase obligation was "subject to the accuracy and correctness of Western Sky's representations and warranties contained in the Agreement," including that borrowers satisfy "the criteria as set by Western Sky Financial from time to time, as shown more fully in the Criteria Appendix provided by Western Sky Financial."  To fund the Western Sky loans, a reserve account was established for Western Sky, into which CashCall deposited enough money to fund two days of loans, calculated on the previous month's daily average. Western Sky used this money to fund consumer loans.  CashCall purchased all of Western Sky's loans after waiting a minimum of three days after the funding of each loan.  CashCall never declined to purchase a loan made by Western Sky.

CashCall paid Western Sky the full amount disbursed to the borrower under the loan agreement plus a premium of 5.145% (either of the principal loan amount or the amount disbursed to the borrower).  CashCall guaranteed Western Sky a minimum payment of $100,000 per month, as well as a $10,000 monthly administrative fee. Western Sky agreed to sell the loans to CashCall before any payments had been made by the borrowers.  Accordingly, borrowers made all of their loan payments to CashCall, and did not make a single payment to Western Sky.  Once Western Sky sold a loan to CashCall, all economic risks and benefits of the transaction passed to CashCall.

CashCall agreed to reimburse Western Sky for any repair, maintenance and update costs associated with Western Sky's server.  CashCall also reimbursed Western Sky for all of its marketing expenses and bank fees, and some, but not all, of its office and personnel costs.  In addition, CashCall agreed to "fully indemnify Western Sky Financial for all costs arising or resulting from any and all civil, criminal or administrative claims or actions, including but not limited to fines, costs, assessments and/or penalties . . . [and] all reasonable attorneys fees and legal costs associated with a defense of such claim or action."

Pursuant to the Service Agreement between CashCall and Western Sky, Western Sky granted CashCall a "non-exclusive license, to reproduce the name, trade name, trademarks, and

logos of Western Sky Financial." CashCall agreed to provide Western Sky with customer support, marketing, website hosting and support, assignment of a toll-free phone number, and to handle electronic communications with customers (although not all of these services were ultimately provided). In exchange for these services, Western Sky paid CashCall 2.02% of the face value of each loan that it sold to CashCall.

###    D.    The Lending Process for Western Sky Loans

Consumers applied for Western Sky loans by telephone or online. When Western Sky commenced operations, all telephone calls from prospective borrowers were routed to CashCall agents in California. As the business developed, a growing number of Western Sky loan agents on the Reservation handled calls from prospective borrowers. Over time, "[l]oan agents for CashCall only handled the overflow for Western Sky applicants or borrowers calling in, should the staff at Western Sky not be able to handle the amount of calls." CashCall loan agents were instructed to tell loan applicants that CashCall was hired to handle overflow calls for Western Sky.

Western Sky developed the underwriting criteria for its loans with input from CashCall. Although Western Sky employees reviewed, audited, and approved loans from the Western Sky offices on the Reservation, CashCall employees also independently reviewed the documentation submitted by borrowers to determine if it met program criteria and performed other loan origination and underwriting functions.

A borrower approved for a Western Sky loan would electronically sign the loan agreement on Western Sky's website, which was hosted by CashCall's servers in California. The loan proceeds would be transferred from Western Sky's account to the borrower's account. After a minimum of three days had passed, the borrower would receive a notice that the loan had been assigned to WS Funding, and that all payments on the loan should be made to CashCall as servicer. Charged-off loans were transferred to Delbert Services for collection.

The loan agreement for a Western Sky loan identified Western Sky Funding, LLC as the lender, and informed the borrower, in bold type, that it was "**subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation.**" In the "Governing Law" section of the agreement, the borrower was informed that:

> This Agreement is governed by the Indian Commerce Provision of the Constitution of the United States of America and the laws of the Cheyenne River Sioux Tribe. We do not have a presence in South Dakota or any other states of the United States. Neither this Agreement nor Lender is subject to the laws of any state of the United States of America.

In a separate section of the loan agreement, the borrower was informed that Western Sky "may assign or transfer this Loan Agreement or any of our rights under it at any time to any party." The interest rate on the Western Sky loans was clearly and prominently disclosed on the first page of the loan agreement.

Western Sky's loan products included a $2,600 loan with an APR of 134.34%, a $700 loan with an APR of 318.52%, and $5,000 and $10,000 loans. The typical CashCall borrower had a

Initials of Deputy Clerk _sr_

lower-than-average FICO score.

      **E.**    **This Action**

      In its First Amended Complaint filed on March 21, 2014, Plaintiff CFPB alleges that that Defendants have engaged in unfair, deceptive, and abusive acts and practices ("UDAAP") in violation of the Consumer Financial Protection Act of 2010  ("CFPA"), 12 U.S.C. § 5536(a)(1)(B), by servicing and collecting full payment on loans that state-licensing and usury laws had rendered wholly or partially void or uncollectible.

      The CFPB moves for partial summary judgment as to the liability of Defendants under the CFPA.  The CFPB's liability theory is dependent on the Court reaching the following four conclusions: (1) CashCall, and not Western Sky, was the "true lender;" (2) the laws of the borrowers' home states applies to the loan agreements, despite the tribal choice-of-law provision in the loan agreements; (3) the Western Sky loan agreements are void or uncollectible under the laws of 16 states; and (4) CashCall and Delbert Services violated the CFPA by servicing and collecting on loans where payments were not due and owing

      Defendants move for summary judgment in relevant part on the grounds that: (1) the CFPB has exceeded the authority granted it under the CFPA by predicating its claims solely upon violations of state law; (2) the CFPB seeks to establish a usury limit, which is expressly prohibited by the CFPA; (3) the loan agreements are not void because the laws of the CRST apply in accordance with the choice-of-law provision in those loan agreements; (4) the Defendants' conduct was not unfair, deceptive, or abusive as a matter of law under the CFPA; (5) the CFPB is violating Defendants' due process rights by seeking to penalize them for UDAAP violations without fair notice of what conduct is prohibited; and (6) the CFPB's structure is unconstitutional.

## II.    LEGAL STANDARD

      Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party meets its burden, a party opposing a properly made and supported motion for summary judgment may not rest upon mere denials but must set out specific facts showing a genuine issue for trial. *Id.* at 250; Fed. R. Civ. P. 56(c), (e); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data.").  In particular, when the non-moving party bears the burden of proving an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element or be subject to summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is not enough to defeat summary judgment; there must be a genuine issue of material fact, a dispute capable of affecting the outcome of the case."  *American International Group, Inc. v. American International Bank*, 926 F.2d 829, 833 (9th Cir. 1991) (Kozinski, dissenting).

      An issue is genuine if evidence is produced that would allow a rational trier of fact to reach a verdict in favor of the non-moving party.  *Anderson*, 477 U.S. at 248.  "This requires evidence, not

speculation." *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1225 (9th Cir. 1999). The Court must assume the truth of direct evidence set forth by the opposing party. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992). However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom. *See Anderson*, 477 U.S. at 249-50; *TW Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631-32 (9th Cir. 1987). Although the party opposing summary judgment is entitled to the benefit of all reasonable inferences, "inferences cannot be drawn from thin air; they must be based on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party." *American International Group*, 926 F.2d at 836-37. In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).

## III. DISCUSSION

### A. The Court will apply the law of the 16 subject states.

The CFPB's theory as to Defendants' liability rests entirely on its argument that the Court should disregard the tribal choice-of-law provision in the loan agreements, and apply the law of the borrowers' home states. Accordingly, the Court must first determine whether the loan agreements are governed by CRST law, as provided by the choice-of-law provision, or the law of the borrowers' home states.

Because the Court's jurisdiction is premised on federal question jurisdiction, federal common law supplies the choice-of-law rules. *See Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006) (holding that, where jurisdiction is not premised on diversity of citizenship, federal common law governs). "Federal common law follows the approach outlined in the Restatement (Second) of Conflict of Laws." *Huynh*, 465 F.3d at 997. Pursuant to section 187(2) of the Restatement (Second) of Conflict of Laws ("Restatement"), "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied, . . ., unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." Restatement § 187(2). The Court concludes that the CRST choice-of-law provision fails both of these tests, and that the law of the borrowers' home states applies to the loan agreements.

#### 1. CashCall, not Western Sky, is the "true" or "de facto" lender.

In order to properly apply the choice-of-law principles set forth in Restatement § 187(2), the Court must determine the identity of the parties to the loan agreements. Although Western Sky is identified as the lender in the loan agreements, the CFPB argues that the Court should consider the substance, not the form, of the transaction and determine that CashCall is the "true" or "de

Initials of Deputy Clerk _sr_

facto" lender.[3]  Neither the Court nor the parties have discovered any binding precedent on this issue. However, after reviewing all of the relevant case law and authorities cited by the parties, the Court agrees with the CFPB and concludes that it should look to the substance, not the form, of the transaction to identify the true lender.  *See Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190, 1196 (N.D. Cal. 2012) (after conducting an extensive review of the relevant case law, noting that, "where a plaintiff has alleged that a national bank is the lender in name only, courts have generally looked to the real nature of the loan to determine whether a non-bank entity is the de facto lender"); *Eastern v. American West Financial*, 381 F.3d 948, 957 (9th Cir. 2004) (applying the de facto lender doctrine under Washington state law, recognizing that "Washington courts consistently look to the substance, not the form, of an allegedly usurious action"); *CashCall, Inc. v. Morrisey*, 2014 WL 2404300, at *14 (W.Va. May 30, 2014) (unpublished) (looking at the substance, not form, of the transaction to determine if the loan was usurious under West Virginia law); *People ex rel. Spitzer v. Cty. Bank of Rehoboth Beach, Del.,* 846 N.Y.S.2d 436, 439 (N.Y. App. Div. 2007) ("It strikes us that we must look to the reality of the arrangement and not the written characterization that the parties seek to give it, much like Frank Lloyd Wright's aphorism that "form follows function.").[4]  "In short, [the Court] must determine whether an animal which looks like a duck, walks like a duck, and quacks like a duck, is in fact a duck." *In re Safeguard Self-Storage Trust*, 2 F.3d 967, 970 (9th Cir. 1993).

In identifying the true or de facto lender, courts generally consider the totality of the circumstances and apply a "predominant economic interest," which examines which party or entity has the predominant economic interest in the transaction.  *See CashCall, Inc. v. Morrisey*, 2014 WL 2404300, at *14 (W.D. Va. May 30, 2014) (affirming the lower court's application of the "predominant economic interest" test to determine the true lender, which examines which party has the predominant economic interest in the loans); *People ex rel. Spitzer v. Cty. Bank of Rehoboth Beach, Del.,* 846 N.Y.S.2d 436, 439 (N.Y. App. Div. 2007) ("Thus, an examination of the totality of the circumstances surrounding this type of business association must be used to determine who is the 'true lender,' with the key factor being 'who had the predominant economic interest' in the transactions.); *cf.* Ga. Code Ann. § 16-17-2(b)(4) ("A purported agent shall be considered a de facto lender if the entire circumstances of the transaction show that the purported agent holds, acquires, or maintains a predominant economic interest in the revenues generated by the loan.").

---

[3]Defendants argue that the Court should not consider the CFPB's "true lender" theory because it was not alleged in the First Amended Complaint and they have been unfairly surprised. However, not only is the "true lender" theory not a claim that must be pled in the First Amended Complaint, the Court concludes that Defendants had fair notice of the CFPB's theory.  *See* First Amended Complaint [Docket No. 27] at ¶ 21 ("Under these agreements, WS Loans were made in Western Sky's name, but were marketed by CashCall, financed by WS Funding, almost immediately sold and assigned to WS Funding, and then serviced and collected by CashCall, Delbert, or both."); Joint Statement Re: Local Rule 7-3 Conference of Counsel Prior to Filing of Motion [Docket No. 138] ("The Bureau also referenced the decision concerning CashCall released that day by Maryland's highest court, noting the portion of that decision holding that CashCall was the de facto lender in its dealings with a state-chartered bank.").

[4]*But see Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359, 1367-1369 (D. Utah 2014); *Hudson v. Ace Cash Express, Inc.*, 2002 WL 1205060 (S.D. Ind. May 30, 2002).

Initials of Deputy Clerk _sr_

The key and most determinative factor is whether Western Sky placed its own money at risk at any time during the transactions, or whether the entire monetary burden and risk of the loan program was borne by CashCall.  *See, e.g., Eastern*, 381 F.3d at 957 ("[T]he touchstone for decision here is whether licensed or unlicensed parties were placing their own money at risk at any time during the transactions."); *Morrisey*, 2014 WL 2404300 at *7 (in reaching its conclusion that CashCall was the true or de facto lender, the lower court found that "numerous provisions of CashCall's agreements with FB & T placed the entire monetary burden and risk of the loan program on CashCall, and not on FB & T.").   Indeed,  as the Ninth Circuit stated in *Eastern*, "a lender is one who puts money at risk." *Eastern*, 381 F.3d at 957.

Based on the totality of the circumstances, the Court concludes that CashCall, not Western Sky, was the true lender.  CashCall, and not Western Sky, placed its money at risk.  It is undisputed that CashCall deposited enough money into a reserve account to fund two days of loans, calculated on the previous month's daily average and that Western Sky used this money to fund consumer loans.  It is also undisputed CashCall purchased *all* of Western Sky's loans, and in fact paid Western Sky more for each loan than the amount actually financed by Western Sky. Moreover, CashCall guaranteed Western Sky a minimum payment of $100,000 per month, as well as a $10,000 monthly administrative fee. Although CashCall waited a minimum of three days after the funding of each loan before purchasing it, it is undisputed that CashCall purchased each and every loan *before* any payments on the loan had been made.  CashCall assumed all economic risks and benefits of the loans immediately upon assignment.  CashCall bore the risk of default as well as the regulatory risk.  Indeed, CashCall agreed to "fully indemnify Western Sky Financial for all costs arising or resulting from any and all civil, criminal or administrative claims or actions, including but not limited to fines, costs, assessments and/or penalties . . . [and] all reasonable attorneys fees and legal costs associated with a defense of such claim or action."

Accordingly, the Court concludes that the entire monetary burden and risk of the loan program was placed on CashCall, such that CashCall, and not Western Sky, had the predominant economic interest in the loans and was the "true lender" and real party in interest.  The Court will now apply the principles set forth in Restatement § 187(2), in light of the Court's determination of the real parties in interest to the loan agreement, i.e., CashCall and the borrower.

> 2.   <u>The Cheyenne River Sioux Tribe has no substantial relationship to the parties or the transactions and there is no other reasonable basis for the parties' choice of CRST law.</u>

The Court concludes that the CRST has no substantial relationship to the parties or the transactions and that there is no other reasonable basis for the parties' choice of CRST law. *See* Restatement § 187(2)(a).

As indicated in the comments to Restatement § 187(2), a state has a substantial relationship to the parties or the transaction when, for example,  "this state is that where performance by one of the parties is to take place or where one of the parties is domiciled or has his principal place of business. The same will also be the case when this state is the place of contracting except, perhaps, in the unusual situation where this place is wholly fortuitous and bears no real relation either to the contract or to the parties."  Restatement § 187(2), comment f.

In light of CashCall's status as the true lender, the Court concludes that the CRST does not have a substantial relationship to the parties or the transactions. Indeed, CashCall, the true lender, is a California corporation domiciled in Orange County that the CRST neither owns or manages. The borrowers do not reside on the Reservation and, in fact, never entered CRST lands to apply for loans. They applied for their loans online, and made all of their payments from their home states. Although a borrower electronically signed the loan agreement on Western Sky's website, that website was, in fact, hosted by CashCall's servers in California. While Western Sky performed loan origination functions on the Reservation, the Court finds these contacts are insufficient to establish that the CRST had a *substantial* relationship to the parties or the transaction, especially given that CashCall funded and purchased all of the loans and was the true lender. *Cf. Ubaldi v. SLM Corp.*, 2013 WL 4015776, at *6 (N.D. Cal. Aug. 5, 2013) ("If Plaintiffs' *de facto* lender allegations are true, then Oklahoma does not have a substantial relationship to Sallie Mae or Plaintiffs or the loans.").

The Court also finds that there is no other "reasonable basis" for the parties' choice of CRST law. Indeed, it is clear that the parties' choice was solely based on CashCall's desire to shield itself against state usury and licensing laws. Accordingly, after applying the principles of Restatement § 187(2)(a), the Court concludes that the tribal choice of law provision is unenforceable.

        3.    <u>Fundamental public policy disfavors the choice of CRST law.</u>

In addition, even if the parties had a reasonable basis for choosing CRST law under Restatement § 187(2)(a), the Court concludes that the tribal choice-of-law provision would still be unenforceable under Restatement § 187(2)(b). Specifically, the Court concludes that application of CRST law "would be contrary to a fundamental policy of a state which has a materially greater interest than the [CRST] in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." Restatement § 187(2)(b).

        *(a)    Application of CRST law would be contrary to a fundamental public policy of sixteen states, and those states have a materially greater interest than CRST in the application of their laws.*

The Court concludes that sixteen states (Alabama, Arizona, Arkansas, Colorado, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, and Ohio) (the "Subject States") have expressed a fundamental public policy in protecting its citizens from usurious loans and unlicensed lenders by enacting statutes that render contracts that violate those policies void and/or uncollectible. *See* Restatement § 187 comment g ("[A] fundamental policy may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining strength."). Although not every statute expresses a state's fundamental policy, statutes that render contracts void are certainly much more likely to express that state's fundamental policy.

Moreover, each of these Subject States has a materially greater interest than the CRST in determining the validity of the Western Sky loan agreements. Indeed, the CRST does not have a

significant interest in the application of its law when Western Sky is neither a tribally-owned corporation, nor the true lender.  Moreover, as a district court in Colorado noted in describing the Western Sky loan transactions, "[t]he borrowers do not go to the reservation in South Dakota to apply for, negotiate or enter into loans.  They apply for loans in Colorado by accessing defendants' website.  They repay the loans and pay the financing charges from Colorado; Western Sky is authorized to withdraw the funds electronically from their bank accounts.  The impact of the allegedly excessive charges was felt in Colorado."  *Colorado v. W. Sky Fin., L.L.C.*, 845 F. Supp. 2d 1178, 1181 (D. Colo. 2011).

Although Defendants argue that the CRST has a strong interest in the application of its laws (based on Western Sky's involvement in the loan transactions), Defendants never address whether the CRST has a strong interest in the application of its laws specifically as they relate to interest rates and licensing.  As the Restatement counsels, the Court must weigh the interests of the CRST and the Subject States in "the determination of the *particular* issue."  Defendants fail to present evidence regarding what, if any, CRST laws apply to these transactions.  Of course, the lack of a usury law or licensing law does not necessarily mean that the CRST has a less substantial concern than the Subject States in interest rates and licensing.   Indeed, the lack of such laws may instead merely "reflect a choice to favor individual contract decisions and the free flow of capital."  *See Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1213 (9th Cir. 2001). However, as the CFPB points out, the CRST has enacted laws that *criminalize* usury,[5] suggesting that the CRST does not have any interest in protecting these types of transactions.

Accordingly, the Court concludes that application of CRST law would be contrary to a fundamental policy of the Subject States, and that the Subject States have a materially greater interest than the CRST in the enforcement of its usury and licensing laws.

> (b)   *Absent an effective choice-of-law provision, the Subject States' laws apply.*

Pursuant to Restatement § 188, absent an effective choice of law provision by the parties, courts apply the local law of the state which "has the most significant relationship to the transaction and the parties."   Restatement § 188(1). In making this determination, courts consider the

---

[5]Defendants contend that the tribal council's adoption of the Uniform Commercial Code in 1997 and, specifically, its enactment of CRST UCC § 16-3-112 somehow superseded the CRST's criminal usury law.  However, this argument is simply wrong. *See* Unif. Comm. Code § 3-112 cmt 2. ("The purpose of subsection (b) is to clarify the meaning of 'interest' in the introductory provision of Section 3-104(a). It is not intended to validate a provision for interest in an instrument if that provision violates other law."); 6B Anderson U.C.C. § 3-112:4 (3d. ed.) ("The authorization of interest by Revised Article 3 does not address whether the rate so specified is, or is not, usurious. The purpose of this section is simply to make clear that the interest term of an instrument does not affect the negotiability of the instrument and to authorize various rates of interest. Nothing in the Uniform Commercial Code is intended to have any effect upon the non-Code law governing usury, which law therefore continues in effect.").

following factors: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." *Id.* at § 188(2). "These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.*

In light of the CashCall's status as true lender, these factors weigh in favor of the application of the law of the borrowers' home states.  The borrowers were citizens or residents of the addresses listed on their loan applications (i.e., their home states), the borrowers applied for the loans from their home states, the funds were received by the borrowers in their home states, and the borrowers made payments on their loans from their home states.   In addition to the home states of the borrowers, California also has significant contacts to the loan transactions.  CashCall is a California corporation domiciled in Orange County. In order to apply for the loan, the borrowers visited Western Sky's website, which was hosted by CashCall's servers in California. In addition, the funds for the loans were provided by CashCall in California (albeit initially funneled through Western Sky's bank accounts).  Moreover, although some loan origination functions took place on the Reservation, some also took place in California. Although California, the CRST, and the borrowers' home states each have *some* interest in the loan transactions, the Court is required to determine which state has the *most* significant relationship to the transaction and the parties.  After weighing all of the factors, the Court concludes that the borrowers' home states have the most significant relationship to the transactions.[6]

The Court's conclusion is consistent with Restatement § 195, which specifically governs the "Contracts for the Repayment of Money Lent." Section 195 provides in relevant part: "The validity of a contract for the repayment of money lent and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that repayment be made . . . ."  However, Restatement § 195 only applies "when the contract requires that the loan be repaid in a particular state. It is necessary either that the place of repayment be explicitly stated in the contract, or that it can be determined by necessary inference from the contract's terms, or lastly, that repayment in a particular place is required by business usage. The rule does not apply when the loan can be repaid in any one of two or more states." Restatement § 195, comment a.  In this case, nine of the ten sample loan agreements provided to the Court authorized Western Sky (and in reality, CashCall) to withdraw the borrower's loan payments by electronic funds transfer from the borrower's bank account, unless the borrower opted out.  Thus, repayment was generally required to be made by EFT from or in the borrowers' home states.

Accordingly, the Court concludes that, absent an effective choice-of-law provision, the law of the borrowers' home states applies to the loan agreements.

---

[6]Although California has a significant relationship to the parties and the transactions (and certainly a more significant relationship than the CRST), the Court concludes that the law of the borrowers' home states should apply, especially in light of the fact that the borrowers would have had no expectation that California law would apply.  *See* Restatement § 6 (listing "the protection of justified expectations" as one of the key principles to consider in determining what law to apply).

Initials of Deputy Clerk __sr__

For the foregoing reasons, where Western Sky loans were made to borrowers in the Subject States, the Court concludes that the tribal choice of law provision is unenforceable and the Court will apply the laws of the Subject States.

**B.      Western Sky loans are void or uncollectible under the laws of most of the Subject States.**

Because the CFPB has established that CashCall is the true lender and that the laws of the Subject States apply to the loan agreements, the Court must now determine whether the CFPB has demonstrated that the loans are void or uncollectible under the laws of the Subject States.  In absence of any meaningful briefing by the Defendants on this issue, the Court concludes that Defendants do not seriously dispute the CFPB's argument.

The Court concludes that the CFPB has established that the Western Sky loans are void or uncollectible under the laws of most of the Subject States.[7] *See* CFPB's Combined Statement of Facts [Docket No. 190] ("CFPB's CSF") at ¶¶ 147 - 235.  Indeed, CashCall has admitted that the interest rates that it charged on Western Sky loans exceeded 80%, which substantially exceeds the maximum usury limits in Arkansas, Colorado, Minnesota, New Hampshire, New York, and North Carolina.  (Arkansas's usury limit is 17%; Colorado's usury limit is 12%; Minnesota's usury limit is 8%; New Hampshire's usury limit is 36%; New York's usury limit is 16%; and North Carolina's usury limit is 8%).  A violation of these usury laws either renders the loan agreement void or relieves the borrower of the obligation to pay the usurious charges.   In addition, all but one of the sixteen Subject States (Arkansas) require consumer lenders to obtain a license before making loans to consumers who reside there. Lending without a license in these states renders the loan contract void and/or relieves the borrower of the obligation to pay certain charges.  CashCall admits that, with the exception of New Mexico and Colorado, it did not hold a license to make loans in the Subject States during at least some of the relevant time periods.[8]

**C.      CashCall and Delbert Services violated the CFPA by servicing and collecting on loans where payments were not due and owing.**

After resolving these preliminary issues, the Court is finally able to address the gravamen of the CFPB's claims – whether Defendants' conduct violates the CFPA.  Under section 5536(a)(1)(B) of the CFPA, it is unlawful for any covered person "to engage in any unfair, deceptive, or abusive

---

[7]The Court cannot, on this record, determine exactly which loans are void or uncollectible under the Subject States' laws, given, for example, that CashCall held licenses in some states during at least some of the relevant time periods.

[8]The CFPB apparently contends that the Court should find that Western Sky loans made to borrowers in New Mexico and Colorado are void under those state's licensing laws, even though CashCall held a license to make loans in those states.  The CFPB appears to rely on the fact that Western Sky was not licensed in those states.  The Court finds that the CFPB's position is disingenuous in light of its argument that CashCall, not Western Sky, is the true lender.

Initials of Deputy Clerk  _sr_

act or practice." 12 U.S.C. § 5536(a)(1)(B).[9]  "An act or practice is deceptive if: (1) there is a
representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably
under the circumstances, and (3) the representation, omission, or practice is material."  *Consumer
Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1192-93 (9th Cir. 2016) (quotations and citations
omitted).  "Deception may be found based on the 'net impression' created by a representation."  *Id.*
(quotations and citations omitted).

Based on the undisputed facts, the Court concludes that CashCall and Delbert Services
engaged in a deceptive practice prohibited by the CFPA.  By servicing and collecting on Western
Sky loans, CashCall and Delbert Services created the "net impression" that the loans were
enforceable and that borrowers were obligated to repay the loans in accordance with the terms of
their loan agreements. As discussed *supra*, that impression was patently false -- the loan
agreements were void and/or the borrowers were not obligated to pay.

The Court concludes that the false impression created by CashCall's and Delbert Services'
conduct was likely to mislead consumers acting reasonably under the circumstances. Indeed, the
intentionally complicated and sham structure of the Western Sky loan program would have made it
impossible for reasonable consumers to know that CRST law did not govern the loan agreements,
and thus that their loans were void and/or not payable under the laws of their home states.  Not
surprisingly, the CFPB has presented evidence that borrowers were, in fact, misled.  *See* CFPB's
Exh. 524 (Affidavit of Karen Barboza) at ¶ 12 ("I was under the impression that I was obligated to
pay back the full amount of my loan. I do not recall ever being told by anyone at CashCall that I
was not obligated to pay back all or some of my loan."); Exh. 526 (Affidavit of John A. Melo) at ¶ 12
("From the beginning I was led to believe that I was obligated to repay my loan in full. Aside from
the May 2013 phone call wherein they said that they are not presently collecting from
Massachusetts' residents, I do not recall being told by anyone at CashCall or Western Sky that my
loan was void or that I was not obligated to repay all or some of the loan."); Exh. 527 (Declaration
of Stephen J. Viera) at ¶ 15 ("Until I received this letter, I was led to believe that I was obligated to
repay my loan in full.  I do not recall being told by anyone at CashCall or Western Sky that my loan
was void or that I was not obligated to repay all or some of the loan.").  And, not surprisingly,
Defendants have presented no evidence to the contrary.

Lastly, the Court easily concludes that the false impression created by CashCall's and
Delbert Services' conduct is material. *See F.T.C. v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338, 1372
(D. Nev. 2014) ("The number of finance charges, the total amount owed, the existence of an
automatic renewal plan, and the procedure for declining the renewal plan are material terms of a
loan contract."). Accordingly, CashCall and Delbert Services engaged in a deceptive practice under
the CFPA.

Defendants fail to make any meaningful arguments to the contrary.  For example,

---

[9]A "covered person" is "any person that engages in offering or providing a consumer
financial product or service." 12 U.S.C. § 5481(6)(A).  A "financial product or service" includes
"extending credit and servicing loans, including acquiring, purchasing, selling, brokering, or other
extensions of credit".  12 U.S.C. § 5481(15)(A)(i).  CashCall, WS Funding, and Delbert Services --
by acquiring and servicing consumer loans -- are all "covered persons" under the CFPA.

Initials of Deputy Clerk _sr_

Defendants argue that their conduct was not deceptive, as a matter of law, because every loan agreement contained a prominent choice-of-law provision and a prominent interest rate disclosure. In other words, Defendants contend that their conduct was not deceptive because they were merely enforcing the express terms of their agreements with the borrowers.  However, this argument is entirely irrelevant and misplaced given the CFPB's theory of liability and the Court's ultimate conclusion that the loan agreements were void and/or not payable.  Defendants completely and utterly fail to explain how the alleged (and now proven) conduct at issue (i.e., servicing and collecting on loans where no payment is due) was not deceptive under the CFPA.

Defendants also argue, without citation to any relevant authority, that, "where, as here, a UDAAP claim is predicated on the resolution of an underlying legal question, such as whether the loans on which Defendants collected are void, a defendant's reasonable belief on that question serves as a complete defense to liability."  Defendants' Memorandum [Docket No. 139] at 21. However, a mistake of law is not typically a defense to liability, no matter how reasonable that mistake. *See Jerman v. Carlisle, McNellie, Rini,Kramer & Ulrich LPA*, 559 U.S. 573, 581 (2010) (quotations and citations omitted) ("We have long recognized the common maxim, familiar to all minds that ignorance of the law will not excuse any person, either civilly or criminally."). Defendants fail to point to any language in the CFPA  that alters this general rule. Accordingly, the Court declines Defendant's invitation to re-write the CFPA to include a general mistake-of-law defense. *Id.*  ("[W]hen Congress has intended to provide a mistake-of-law defense to civil liability, it has often done so more explicitly . . . ..").

Because the Court concludes that CashCall and Delbert Services' conduct was deceptive, the Court finds it unnecessary to address whether their conduct was also unfair and abusive.

### D.      Reddam is individually liable under the CFPA.

The Court concludes that Reddam is individually liable under the CFPA.

"An individual may be liable for corporate violations if (1) he participated directly in the deceptive acts or had the authority to control them and (2) he had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentation, or was aware of a high probability of fraud along with an intentional avoidance of the truth." *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1193 (9th Cir. 2016) (quotations and citations omitted).

The Court concludes that Reddam both participated directly in and had the authority to control CashCall's and Delbert Services' deceptive acts.  Reddam is the founder, sole owner, and president of CashCall, the president of CashCall's wholly-owned subsidiary WS Funding, and the founder, owner, and CEO of Delbert Services.  He had the complete authority to approve CashCall's agreement with Western Sky and, in fact, approved CashCall's purchase of the Western Sky loans.  He signed both the Assignment Agreement and the Service Agreement on behalf of WS Funding and CashCall.  In addition, as a key member of CashCall's executive team, he had the authority to decide whether and when to transfer delinquent CashCall loans to Delbert Services.  Furthermore, he made the ultimate decision to wind down the Western Sky loan program in the face of "regulatory problems," and he frequently discussed the status of CashCall's many lawsuits involving Western Sky loans with CashCall's general counsel, Dan Baren.

Initials of Deputy Clerk __sr__

Reddam does not seriously dispute that he participated in and had the authority to control CashCall's implementation of the Western Sky loan program based upon the tribal lending model, which was intentionally designed to avoid state usury limits and licensing laws. Instead, he argues that the CFPB has failed to demonstrate that he had the requisite knowledge, or that he was recklessly indifferent to the wrongdoing, which is necessary to hold him individually liable under the CFPA. Specifically, Reddam argues that, based on the legal advice provided by Katten,[10] he did not have actual knowledge of any potential UDAAP violations because "his understanding was that the Western Sky loans were not subject to state interest rate and licensing restrictions, and would be valid and enforceable if assigned to CashCall." Defendants' Memorandum [Docket No. 139] at 5. In other words, Reddam claims that he believed that the loans were payable and fully collectible based on the advice of his counsel.

However, "[r]eliance on advice of counsel is not a valid defense on the question of knowledge required for individual liability." *Federal Trade Commission v. Grant Connect, LLC*, 763 F.3d 1094, 1102 (9th Cir. 2014); *see also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 581 (2010) (quotations and citations omitted) ("We have long recognized the common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally."). In this case, the Court concludes that the undisputed facts demonstrate that Reddam had the requisite factual knowledge to subject him to individual liability under the CFPA, e.g., he knew of and approved of the tribal lending model to avoid state usury limits and licensing laws; he knew that CashCall would fund Western Sky's loans and bear the entire financial risk of the loan program; he knew that CashCall, through its wholly owned-subsidiary, WS Funding, would purchase all of Western Sky's loans at a premium; he knew that CashCall and Delbert Services would attempt to collect on such loans; and he knew that borrowers would believe that they were obligated to pay such loans in accordance with their loan agreements. At the very least, these facts demonstrate that Reddam was recklessly indifferent to the wrongdoing.

Accordingly, based on the undisputed facts, the Court concludes that Reddam is individually liable under the CFPA.

**E.    Defendants' Other Arguments**

Defendants argue that they cannot be held liable under the CFPA, in relevant part, because the CFPB's claims are predicated upon state law violations and Congress did not authorize the CFPB to transform a state law violation into a violation of federal law. Defendants raised the identical argument in their prior Motion for Judgment on the Pleadings [Docket No. 104], which was rejected by the Court. The Court concludes that there is no basis to reconsider its prior ruling. As

---

[10]Katten issued several opinions to both CashCall and its lenders on the enforceability of the choice-of-law provision in the loan agreements, concluding that "we are of the opinion, although the issue is not free from doubt and significant litigation risk exists, that a court of competent jurisdiction interpreting applicable federal and state law . . . should conclude that [federal consumer protection laws, or state laws limiting interest rates] would not apply to the loan agreements" because those states will "enforce the choice of CRST law set forth in the loan agreements," and further, "upon assignment, CashCall, as assignee, will be entitled to the . . . choice of law rights held by Western Sky."

Initials of Deputy Clerk _sr_

the Court previously held, while Congress did not intend to turn every violation of state law into a violation of the CFPA, that does not mean that a violation of a state law can never be a violation of the CFPA.  *See* Order [Docket No. *110]; Currier v. First Resolution Inv. Corp.*, 762 F.3d 529, 537 (6th Cir. 2014).  The proper question is whether the CFPB has alleged, and proven, that Defendants have engaged in conduct that falls within the broad range of conduct prohibited by the CFPA.  The Court concludes that Defendants' conduct, i.e., servicing and collecting on Western Sky loans where payments were not due and owing, satisfies the requisite elements of a UDAAP violation under the CFPA.[11]

Defendants also repeat another argument raised in their Motion for Judgment on the Pleadings, i,e, that the CFPB is seeking to establish a usury limit, which is expressly prohibited by the CFPA, 12 U.S.C. § 5517(o).  The Court again concludes that there is no basis to reconsider its prior ruling.  As the Court previously held, the CFPB  is not seeking to establish a usury limit, but is instead seeking to enforce a prohibition on collecting amounts that consumers do not owe.

The Court also rejects Defendants' arguments that the CFPB is violating Defendants' due process rights by seeking to penalize them for UDAAP violations without fair notice, especially in light of the CFPA's use of language or terms that have established meanings under other consumer-protection statutes.  *See CFPB v. Gordon*, 819 F.3d 1179, 1193 n.7 (9th Cir. 2016) ("The term 'deceptive act or practice' has an established meaning in the context of the Federal Trade Commission Act, 15 U.S.C. § 45(a), and Congress used very similar phrasing in § 5536(a)(1)(B)."); *CFPB v. ITT Educ. Servs., Inc.*, 2015 WL 1013508, at *20 (S.D. Ind. Mar. 6, 2015) ("Because the CFPA itself elaborates the conditions under which a business's conduct may be found abusive – and because agencies and courts have successfully applied the term as used in closely related consumer protection statutes and regulations – we conclude that the language in question provides at least the minimal level of clarity that the due process provision demands of non-criminal economic regulation.").

Finally, for the reasons stated in *CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1086-1092,  the Court rejects Defendants' challenges to the constitutionality of the CFPB's structure.

## IV.    CONCLUSION

For the foregoing reasons, the CFPB's Motion for Partial Summary Judgment is **GRANTED** and Defendants' Motion for Summary Judgment is **DENIED.**

IT IS SO ORDERED.

---

[11]The Court's conclusion is further supported by the fact that, when a "covered person" under the CFPA violates the Federal Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692, *et seq.*, that covered person also violates the CFPA.  *See* 12 U.S.C. §§ 5536(a)(1)(A); 5481(12)(H), (14). The FDCPA prohibits using "any false, deceptive, or misleading representation or means in connection with the collection of any debt", including falsely representing "the legal status of any debt," as well as using "unfair or unconscionable means to collect or attempt to collect any debt", including attempting to collect amounts not permitted by law.  *See* 15 U.S.C. §§ 1692e, 1692e(2)(A), 15 U.S.C. § 1692f, 15 U.S.C. § 1692f(1).

Initials of Deputy Clerk  _sr_

# APPENDIX B

In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-3273

ERICK MARQUEZ, et al.,

*Plaintiffs-Appellants,*

*v.*

WEINSTEIN, PINSON & RILEY, P.S.,
et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-cv-00739 — **John J. Tharp, Jr.**, *Judge.*

ARGUED MAY 19, 2016 — DECIDED SEPTEMBER 7, 2016

Before WOOD, *Chief Judge*, and POSNER and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Plaintiffs-appellants Erick Marquez, Iraida Garriga, and Doris Russel brought an action, individually and on behalf of a class, against defendants-appellees Evan L. Moscov, his law firm Weinstein, Pinson & Riley, P.S. ("Weinstein"), and debt collection agency NCO Financial

Systems, Inc. (NCO), alleging violations of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 et seq., arising out of the defendants' attempt to collect on student loan debts allegedly owed by the plaintiffs. The gravamen of the complaint was that the defendants included a misleading and deceptive statement in a paragraph of the debt-collection complaint they filed against the plaintiffs in state court. The district court granted the initial motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), and after the plaintiffs filed their second amended complaint, granted a subsequent motion to dismiss as well, this time with prejudice. The plaintiffs now appeal that dismissal.

This case arose from complaints filed in state court by the defendant Weinstein, on behalf of NCO and signed by Moscov as their attorney, (the "debt collectors") seeking repayment of student loans from the plaintiffs (the "consumers").[1] Those complaints contained typical language for such cases, reciting the loan agreement and the outstanding principal amount, and alleging the breach of that loan agreement and the corresponding damages. However, following those allegations, and immediately preceding the prayer for relief, the debt collectors included Paragraph 12 in the complaints, which stated:

---

[1] The terms "plaintiff" and "defendant" can cause confusion in this case, because the defendants in the state court collection action are the plaintiffs here, and *vice versa*. To avoid such confusion, we will refer to the plaintiffs and defendants in the state court action as debt collectors and consumers, and use the terms plaintiff and defendant to refer to the parties in this FDCPA action.

No. 15-3273                                                        3

12. Pursuant to 11 U.S.C. § 1692g(a), Defendants are informed that the undersigned law firm is acting on behalf of Plaintiff to collect the debt and that the debt referenced in this suit will be assumed to be valid and correct if not disputed in whole or in part within thirty (30) days from the date hereof.

The plaintiffs in the FDCPA action before us assert that Paragraph 12 violated the FDCPA in that it was misleading and deceptive as to both the manner and timing of their response to the state lawsuit. The central issue in this appeal is whether the district court erred in determining that paragraph 12 of the state law complaint was not misleading or deceptive as a matter of law, and therefore granting the motion to dismiss the FDCPA claim. We review de novo a district court's decision to grant a motion to dismiss under Rule 12(b)(6), accepting as true all well-pleaded factual allegations and drawing all reasonable inferences in favor of the plaintiff. *McMillan v. Collection Professionals, Inc.*, 455 F.3d 754, 758 (7th Cir. 2006).

Before considering whether the district court properly held that Paragraph 12 was not misleading or deceptive as a matter of law, we must address a preliminary matter. NCO argues that we need not address the FDCPA challenge at all because 15 U.S.C. § 1692e does not regulate the content of state court pleadings. That issue was properly preserved because it was presented, and rejected, in the district court.[2]

---

[2] NCO attempts to raise a number of other issues on appeal that were not properly presented to the district court, but those arguments are waived

(continued...)

In *Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 480 F.3d 470, 473 (7th Cir. 2007) and *O'Rourke v. Palisades Acquisition XVI, LLC*, 635 F.3d 938, 941 n.1 (7th Cir. 2011), we postponed for a future case the question of whether § 1692e of the FDCPA covers the process of litigation. This is that future case, as the issue is squarely presented to us and the answer is necessary to resolution of this appeal. Numerous circuits already have addressed this issue, and often in nearly identical reasoning, have concluded that pleadings or filings in court can fall within the FDCPA. See, e.g., *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 176-77 (3d Cir. 2015); *Goldman v. Cohen*, 445 F.3d 152, 155-56 (2nd Cir. 2006); *Sayyed v. Wolpoff & Abramson*, 485 F.3d 226, 231 (4th Cir. 2007); *Stratton v. Portfolio Recovery Associates, LLC*, 770 F.3d 443, 449-50 (6th Cir. 2014), as amended (Dec. 11, 2014); *Powers v. Credit Mgmt. Servs., Inc.*, 776 F.3d 567, 573-74 (8th Cir. 2015); *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1031–32 (9th Cir. 2010); *James v. Wadas*, 724 F.3d 1312, 1316 (10th Cir. 2013); *Miljkovic v. Shafritz & Dinkin, P.A.*, 791 F.3d 1291, 1297-1300 (11th Cir. 2015). Those circuits almost uniformly base their conclusion on the Supreme Court's analysis in *Heintz v. Jenkins*, 514 U.S. 291 (1995), as well as on the amendment to the FDCPA following that decision. We agree with the reasoning of those circuits and for those same reasons conclude that § 1692e of the FDCPA applies to the statement in Paragraph 12 of the state court complaint at issue here.

---

[2] (...continued)
and we do not address them. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012).

No. 15-3273                                          5

In *Heintz*, Darlene Jenkins had borrowed money from Geiner Bank to purchase an automobile. *Id.* at 293. She defaulted on that loan, and the bank's law firm sued her in state court to recover the balance owed. In an effort to settle the case, an attorney for the bank's law firm, George Heintz, sent a letter to Jenkins' lawyer listing the amount that she owed. Jenkins filed suit alleging that the letter violated the FDCPA in that it contained a false statement of the amount that she owed the bank. The district court dismissed the lawsuit holding that the FDCPA was inapplicable to lawyers, but we reversed and the Supreme Court agreed with us, holding that the FDCPA applies to "the litigating activities of lawyers." *Id.* at 294. Heintz had argued that the Court should construe the statute as containing "an implied exemption for those debt-collecting activities of lawyers that consist of litigating," but the Court rejected that interpretation. *Id.* at 295. The Court held that the FDCPA applies to attorneys who "'regularly' engage in consumer-debt-collection activity, even when that activity consists of litigation." *Id.* at 299.

Although the communication at issue in *Heintz* was a letter rather than a legal pleading, the Court recognized the applicability of the FDCPA even to attorneys whose debt-collection activity consisted of litigation, and nothing in that analysis commands a differentiation between the two. Nothing in the broad language in *Heintz* would support an interpretation that would apply the FDCPA to attorneys whose debt collection activity consisted of litigation, but limit it to only those representations made by those attorneys outside of that litigation. The conclusion that the FDCPA applies to legal pleadings is supported by a post-*Heintz* amendment enacted

by Congress. In the post-*Heintz* amendment, Congress exempted legal pleadings from a specific provision in the FDCPA, but did not exempt it from the FDCPA as a whole. Specifically, 15 U.S.C. § 1692e prohibits a debt collector from using any false, deceptive or misleading representation in connection with the collection of any debt. The statute itemizes sixteen communications that constitute violations of that provision, including at § 1692e(11), the failure to disclose in the initial written communication to the consumer that the debt collector is attempting to collect a debt and that any information will be used for that purpose. After *Heintz* was decided in 1995, however, Congress amended § 1692e(11) to exclude formal legal pleadings from that requirement, with the amended version now stating that "this paragraph shall not apply to a formal pleading made in connection with a legal action." By providing that sub-section 1692e(11) did not apply to a formal pleading made in connection with a legal action, the implication is that § 1692e as a whole other than § 1692e(11) applies to formal legal pleadings. Otherwise, the amendment would be merely superfluous, exempting formal legal pleadings from one specific requirement in the act even though legal pleadings were not subject to any provisions of the act already. It is "a cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001); *United States v. Michalek*, 54 F.3d 325, 335–36 (7th Cir. 1995). A natural interpretation of that provision which gives meaning to all words is that Congress, post-*Heintz*, envisioned § 1692e of the FDCPA as applying to communications in the

form of legal pleadings as well as communications in other forms such as letters, and that it sought to exempt legal pleadings from only § 1692e(11).

That interpretation is consistent with the purpose of the FDCPA, "to eliminate abusive debt collection practices, to ensure that those debt collectors who abstain from such practices are not competitively disadvantaged, and to promote consistent state action to protect consumers." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 577 (2010); 15 U.S.C. § 1692(e). That purpose would be undermined if the FDCPA was inapplicable to communications that occurred in the context of litigation, particularly in the debt collection area in which judgments are overwhelmingly reached through forfeiture, and thus misleading or deceptive statements are more likely to influence the response of the defendant without ever coming to the attention of the court in any meaningful way. In fact, although we have not previously addressed the question of whether pleadings fall within § 1692e of the FDCPA, we have already decided a number of FDCPA cases alleging FDCPA violations in state court filings (in which this issue was presumably not raised), thus illustrating that the dangers addressed in the FDCPA arise in the context of pleadings just as in other forms of communication. See *O'Rourke v. Palisades Acquisition XVI, LLC*, 635 F.3d 938, 948 (7th Cir. 2011)(Tinder, J., concurring) and cases cited therein. Accordingly, we hold that representations may violate § 1692e of the FDCPA even if made in court filings in litigation. Accord *Kaymark*, 783 F.3d at 176-77; *Powers*, 776 F.3d at 574; *Miljkovic*, 791 F.3d at 1297; *Stratton*, 770 F.3d at 450; *James*, 724 F.3d at

1316; *Donohue*, 592 F.3d at 1031–32; *Sayyed*, 485 F.3d at 231; *Goldman*, 445 F.3d at 155-56.

We turn then to the question of whether the district court erred in holding that Paragraph 12 was "plainly and clearly not misleading" as a matter of law and dismissing the case on that basis. Dist. Ct. Op. at 8. The FDCPA provides that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt," including, but not limited to the false representation of "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e generally and § 1692e(2)(A). In *McMillan v. Collection Professionals Inc.*, 455 F.3d 754, 759 (7th Cir. 2006), we noted that a determination of whether a statement is false, deceptive or misleading, like a determination as to whether a statement is confusing under the FDCPA, is a fact-bound determination of how an unsophisticated consumer would perceive the statement. We cautioned in *McMillan* that in determining whether a statement is confusing or misleading, a district court must "tread carefully" because "district judges are not good proxies for the 'unsophisticated consumer' whose interest the statute protects." *Id.* Accordingly, Rule 12(b)(6) dismissal on that issue is appropriate only if there is no set of facts consistent with the pleadings under which the plaintiffs could obtain relief. *Id.*

In its effort to collect the student loan debt, the debt collectors initially sent each of the consumers a demand letter, which informed them that they were in default on their loan payments and demanded payment of the outstanding balance. Pursuant to § 1692g of the FDCPA, that letter contained a

statement informing the consumers that they had 30 days after receipt of the notice to dispute the validity of the debt, and provided that "[u]nless you dispute this debt, or any portion of it, within 30 days from receipt of this notice, we will assume the debt to be valid." The demand letter instructs the consumer to dispute the debt by either calling a toll free number or submitting a dispute in writing to their law offices.

The debt collectors subsequently filed suit against the consumers and served the consumers with a summons and complaint in that state court action. The summons informed the consumers that they had to file an appearance by a specified date approximately 30 days after issuance, and an answer to the complaint before the time period set forth in the applicable subsections of paragraph 3 or 4 on the reverse side of the summons. Unfortunately, that standard summons form contained an error, in that paragraphs 3 or 4 contain no subsections, and the relevant subsections for the consumers were contained in paragraph 2 on that reverse side of the summons. Paragraph two provided that for amounts less than $10,000, the consumer only needs to file an appearance but not an answer unless otherwise ordered by the court, but that for amounts over $10,000, an answer must be filed no more than 10 days from the appearance date (return date) set forth on the summons. In all capitalized letters for emphasis, the summons also declared that if the consumer failed to do so "A JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT, A COPY OF WHICH IS HERETO ATTACHED." Thus, the summons directs the consumers to the complaint, both in determining the answer and in the relief that could be imposed. The complaint,

however, in paragraph 12 declares: "Pursuant to 11 U.S.C. § 1692g(a), Defendants [consumers] are informed that the undersigned law firm is acting on behalf of Plaintiff [debt collector] to collect the debt and that the debt referenced in this suit will be assumed to be valid and correct if not disputed in whole or in part within thirty (30) days from the date hereof." The court erred in holding that the paragraph 12 declaration would not be misleading or deceptive as a matter of law.

Paragraph 12 is misleading to the unsophisticated consumer both as to the proper timing to respond to the complaint and as to the manner of response. A plain reading of the summons and the complaint would cause a consumer to believe that he had until the date in the summons to file an answer and contest the claim, but that beyond the 30-day period in paragraph 12 he could no longer contest the validity or correctness of the debt. Because the 30-day period would expire before the date that the answer had to be filed for each of the litigants, those provisions in conjunction would lead an unsophisticated consumer to believe that he had that 30-day period to dispute the debt and beyond that period he could not dispute that debt in his answer. For each plaintiff in this FDCPA action, the time period for "disputing the debt" was shorter than the time period provided by law for the answer. For instance, for one plaintiff in this FDCPA action, the complaint provided that the debt must be disputed by December 14 while the answer was not due, according to the summons, until December 23. Paragraph 12 thus effectively shortened the time period provided in the summons for the consumer to answer, because the consumer had been told in paragraph 12 that he only had the 30-day period to dispute the

validity or correctness of the debt. That would cause an unsophisticated consumer to believe that beyond that time period in Paragraph 12 for disputing the debt, even if filing an answer, the validity of the debt could no longer be disputed in that answer.

The language used in Paragraph 12 is particularly pernicious in that regard. The language regarding the 30-day dispute period was not merely lifted from the demand letter, which provided that unless the debt was disputed within that 30-day period, "*we* [the debt collector] will assume the debt to be valid." [emphasis added] Nor does that language track § 1692g(a)(3), which provides that if consumers do not dispute the debt within 30 days of the written notice, "the debt will be assumed to be valid *by the debt collector*." The language in Paragraph 12 differs in a material way from those provisions, in that it does not contain the limiting language that the debt will be considered valid *by the debt collector*, instead stating that after the 30-day period "the debt will be considered valid." The presence of such language in a court complaint, cross-referenced in the summons, would lead an unsophisticated consumer to believe that the debt will be considered valid by the *court* if not disputed within that 30 days, because the relevant language that would have limited the assumption to only the debt collector is absent from Paragraph 12, whether intentionally or otherwise. Whether the consumer is a sophisticated or unsophisticated consumer, one cannot say—as the district court did – that reading the summons and paragraph 12 in relation to each other is to interpret it in a "bizarre or idiosyncratic fashion." It is in fact a rational reconciliation of the two provisions.

Magnifying the problem, that sentence regarding the 30-day period to dispute the debt mirrored the earlier demand letter to the consumers informing them of their rights to dispute the debt. The inclusion of that sentence in the complaint would lead an unsophisticated consumer to believe that she must dispute the debt through the procedures outlined in the earlier letter, rather than in an answer in court, or she would forfeit her right to contest the debt. That would place the consumers at risk of losing their rights in court if they disputed the debt through contact with the debt collectors rather than in the form of an answer.

The district court's reading of the provisions illustrates the problem with its analysis. The district court characterizes Paragraph 12 as providing that a consumer could dispute the "debt" and that the "debt" will be valid if not disputed, not as providing that the legal claim to collect it will somehow be resolved. Therefore, according to the district court, the consumer might attempt to dispute the debt directly with the debt-collection firm but could not view that as a sufficient response to the lawsuit. The problem with the court's interpretation is twofold. First, it asks us to assume that an unsophisticated consumer will distinguish the "disputing of a debt" from "disputing a claim to collect that debt." But an unsophisticated consumer is unlikely to distinguish those concepts. In fact, even at oral argument counsel for defendants alternated between stating that the plaintiffs could dispute the debt by answering the complaint and that they could dispute it by contacting the law firm. Given the shortened time frame for disputing the debt set forth in Paragraph 12, the notion that the dispute should be in the form of the answer illustrates the

problem – its 30-day provision would thereby shorten the time
for the answer. Moreover, the court acknowledges that the
consumer may be led to dispute the debt directly with the debt
collector. Yet if a consumer was led to believe that she had to
pursue a dispute directly with the debt collector, as the district
court acknowledges, then that same consumer is also likely to
believe that if she fails to do so within the 30-day period, the
debt is assumed to be valid and correct, and cannot be con-
tested in the court action. This is particularly true because, as
previously discussed, the wording in paragraph 12 has moved
the phrase "by the debt collector" so that it no longer clarifies
who will assume the debt to be valid. Finally, paragraph 12 is
simply improper in its entirety at this stage of the proceedings,
as the failure to dispute the debt will have no impact on the
court case. Its presence in the complaint serves no purpose, as
conceded by counsel for defendant.  Its function in the com-
plaint is only to mislead.  In *Ruth v. Triumph Partnerships*, 577
F.3d 790, 800 (7th Cir. 2009), we recognized that suits alleging
deceptive or misleading statements fall within three distinct
categories: (1) "cases involving statements that plainly, on their
face, are not misleading or deceptive;" (2) "cases involving
statements that are not plainly misleading or deceptive but
might possibly mislead or deceive the unsophisticated con-
sumer," for which plaintiffs must produce extrinsic evidence
to prove that unsophisticated consumers find the statements to
be so; and (3) communications which are plainly deceptive and
misleading to an unsophisticated consumer as a matter of law.
See also *Janetos v. Fulton Friedman & Gullace, LLP*, 825 F.3d 317,
322–23 (7th Cir. 2016). The district court held that the state-
ments in this case rest within the first category, but they fall

within the third.  For the reasons stated above, we hold that Paragraph 12 is misleading and deceptive as a matter of law, and that the district court erred in reaching the opposite conclusion.  Accordingly, the district court erred in granting the motion to dismiss.

The decision of the district court is REVERSED and the case REMANDED for further proceedings consistent with this opinion.