# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SHARON EUL et al., on behalf of
themselves and a class,

        Plaintiffs,

        v.

TRANSWORLD SYSTEMS et al.,

        Defendants.

)
)
)
)
)
)
)
)
)
)

No. 15 C 7755

Chief Judge Rubén Castillo

## MEMORANDUM OPINION AND ORDER

Plaintiffs in this putative class action allege that the Defendants—various debt holders, debt servicers, and law firms retained to collect debt—violated multiple provisions of the federal Fair Debt Collection Practices Act ("FDCPA"), the Illinois Interest Act, the Illinois Collection Agency Act, and the Illinois Consumer Fraud and Deceptive Business Practices Act in the course of their attempts to collect on alleged student loan debt from the Plaintiffs. (R. 79, Cons. Compl.) Before the Court is Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (R. 72.) For the reasons set forth below, Defendants' motion is granted in part and denied in part, as set forth below.

## BACKGROUND

Because of the wide array of conduct alleged in Plaintiffs' Consolidated Complaint, (R. 79), and the varying circumstances alleged as to each named Plaintiff, the Court sets forth only a general background of the allegations sufficient to enable an understanding of the more specific allegations that are discussed in each section of the Court's analysis.

The Plaintiffs are 19 individuals, mostly citizens of Illinois, who all currently live in Illinois or at some relevant time in the past lived in Illinois. (R. 79, Cons. Compl. ¶¶ 3-15.) All

but one of them allege that they have been sued in Cook County Circuit Court to collect on alleged student loan debts, some because they were cosigners on the loans. (*Id.* ¶¶ 79(a)-(m), 96-97, 100, 118, 126, 153, 167, 171, 176-77, 181, 189.) They hired lawyers and defended against those lawsuits by filing answers and asserting various defenses. (*Id.* ¶¶ 112, 114, 152(a), 155, 175, 185.) Many of the lawsuits were nonsuited shortly after the Plaintiffs appeared and filed answers. (*Id.* ¶¶ 79(a)-(m), 116, 123, 131, 150(f), 186.) These lawsuits were all brought by various "National Collegiate Trust" ("NCT") entities, which are Delaware statutory trusts that acquire and hold a significant number of private student loans. (*Id.* ¶¶ 25-42.) For example, the NCT entities that are named as Defendants here are: National Collegiate Student Loan Trust 2003-1; National Collegiate Student Loan Trust 2004-1; National Collegiate Student Loan Trust 2006-2; National Collegiate Student Loan Trust 2006-3; National Collegiate Student Loan Trust 2006-4; National Collegiate Student Loan Trust 2007-1; National Collegiate Student Loan Trust 2007-2; National Collegiate Student Loan Trust 2007-3; and National Collegiate Student Loan Trust 2007-4. (*Id.*) These NCT entities did not originate Plaintiffs' students loans; rather they acquired the loans after they were originated by another entity. (*Id.* ¶ 88.) The NCT entities all have a corporate trustee, but the trustee is not involved in the filing of lawsuits in the name of the trusts, and the NCT entities have no employees and never had any. (*Id.* ¶¶ 27, 45.) None of the NCT entities have a bank or financial institutions charter or a license from the State of Illinois entitling them to charge interest at more than 9%. (*Id.* ¶ 44.)

All the actions taken on behalf of the NCT entities against the Plaintiffs were actually performed by a "servicing agent," either Defendant NCO Financial Systems, Inc. ("NCO") or its successor, Defendant Transworld Systems ("Transworld"), or by attorneys employed by these servicing agents. (*Id.* ¶¶ 20, 46, 55.) Transworld is a collection agency that seeks to collect on

defaulted consumer debts, and it holds a collection agency license from the State of Illinois. (*Id.* ¶¶ 17, 18.) NCO, Transworld's predecessor, was also a collection agency and also is licensed as one by the State of Illinois. (*Id.* ¶¶ 20, 22.) As of approximately 2013-2014, NCO claimed to be the "servicing agent" for the NCT entities. (*Id.* ¶ 57.) Subsequent to corporate changes in early 2015 involving NCO and Transworld, Transworld claimed to be the servicing agent of the NCT entities. (*Id.* ¶¶ 58-59.) The same personnel, practices, and form documents were employed by NCO and Transworld in collecting debts for NCT entities before and after the changeover from NCO to Transworld. (*Id.* ¶ 63.) NCO represented on its website that it maintained an "Attorney Network" for filing suits to collect debt, including student loan debt. (*Id.* ¶ 65.) Transworld similarly manages "Agency and Attorney Networks," which are described on its website as designing and implementing "cost-effective collection solutions on behalf of clients across the country." (*Id.* ¶ 64.) NCO represented in filings with the U.S. Securities and Exchange Commission that through its "Attorney Network Services," it "coordinate[s] and implement[s] legal collection solutions undertaken on behalf of our clients through the management of nationwide legal resources specializing in collection litigation." (*Id.* ¶ 66.)

Defendant Blitt and Gaines, P.C. ("Blitt") is a consumer collection law firm organized as an Illinois professional corporation. (*Id.* ¶ 47.) Blitt is one of the firms in the Transworld/NCO "Attorney Network," and was hired to collect debts against some of the Plaintiffs. (*Id.* ¶¶ 49, 67.) Defendant Weltman, Weinberg, and Reis Co. L.P.A. ("WWR") is a law firm organized as an Ohio professional corporation and was likewise hired to pursue debt collection litigation against some of the Plaintiffs. (*Id.* ¶¶ 51, 67.) NCO and Transworld selected counsel, communicated with counsel, and instructed counsel; the nominal plaintiff (as relevant here, the NCT entities) did not select, communicate with, or instruct counsel. (*Id.* ¶ 69.)

Plaintiffs allege that the NCT entities, NCO/Transworld, Blitt, and WWR engaged in a variety of misconduct in the process of attempting to collect alleged student loan debt from the Plaintiffs, including violating multiple provisions of the federal Fair Debt Collection Practices Act, the Illinois Interest Act, the Illinois Collection Agency Act, and the Illinois Consumer Fraud and Deceptive Business Practices Act. The Plaintiffs define various classes of individuals on whose behalf they bring suit.[1] (*Id.* ¶¶ 209-10.)

The Defendants presently move to dismiss most Counts of the Consolidated Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (R. 72.) Defendants offer numerous arguments in support of their motion, which are addressed below.

## LEGAL STANDARD

A complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Kubiak v. City of Chi.*, 810 F.3d 476, 480-81 (7th

---

[1] For brevity, the Court does not set forth any of the Plaintiffs' proposed class definitions here, because there are many proposed classes, and the definitions are not necessary to the disposition of the present motion.

Cir. 2016), *cert. denied*, 137 S. Ct. 491 (2016). In deciding a motion to dismiss, the Court may consider the complaint itself, "documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). The purpose of considering such documents is "to prevent parties from surviving a motion to dismiss by artful pleading or by failing to attach relevant documents." *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002).

## ANALYSIS

### I.    Count I – Usury (FDCPA)

Count I, captioned "FDCPA Usury – Class Claim," is asserted by six of the Plaintiffs as representatives of the putative "Usury FDCPA" class against Defendants NCO and Transworld. (R. 79, Cons. Compl. ¶¶ 216-17.) Plaintiffs[2] allege in Count I that Defendants violated §§ 1692e and 1692f of the FDCPA, 15 U.S.C. §§ 1692e and 1692f, by collecting and attempting to collect interest on the Plaintiffs' students loans that exceeds state law limits, as well as by filing and prosecuting state court lawsuits that sought to collect such interest on those loans. (*Id.* ¶¶ 218-20.) In support of Count I, Plaintiffs allege that "[e]ach of the[ir] loans had a variable rate formula that produced a rate in excess of the 9% maximum under Illinois law, 815 ILL. COMP. STAT. 205/4, or the 8% maximum under Ohio law, Ohio R.C. §1343.01 . . . or, to the extent relevant because a national bank was the purported originator of the loans, . . . any rate allowable under 12 U.S.C. §85." (*Id.* ¶ 80.) Plaintiffs allege that collecting or attempting to collect interest

---

[2] The Court generally refers only to "Plaintiffs" and "Defendants" throughout this opinion even though each Count is brought on behalf of a different subgroup of Plaintiffs against a different subgroup of Defendants. Where important, the Court may refer more precisely to a particular Plaintiff or to the particular subgroup of Plaintiffs or Defendants that is at issue, *e.g.*, by reference to "the Count I–Plaintiffs."

that is usurious under state law constitutes both "false, deceptive, or misleading representation or means" in violation of § 1692e and "unfair or unconscionable means" of collecting debt in violation of § 1692f. (*Id.* ¶¶ 216-20.)

Section 1692e of the FDCPA prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Section 1692f prohibits debt collectors from using "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. Both provisions include numerous subsections setting forth nonexhaustive examples of prohibited conduct. *See* 15 U.S.C. §§ 1692e(1)-(16), 1692f(1)-(8). Defendants argue that Count I must be dismissed because the FDCPA cannot be used to police violations of other federal and state laws. (*Id.* at 13-14.)

The U.S. Court of Appeals for the Seventh Circuit has explained repeatedly that "[t]he FDCPA is not an enforcement mechanism for matters governed elsewhere by state and federal law." *Bentrud v. Bowman, Heintz, Boscia & Vician, P.C.*, 794 F.3d 871, 875 (7th Cir. 2015); *see also Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 778 (7th Cir. 2007) ("[A] violation of state law is not in itself a violation of the federal [FDCPA] Act[.]"); *Butler v. J.R.S-I, Inc.*, No. 15 C 6059, 2016 WL 1298780, at *6 (N.D. Ill. Apr. 4, 2016) ("[T]he Seventh Circuit has repeatedly held that the FDCPA is not an enforcement mechanism for matters governed elsewhere by state and federal law." (citation and internal quotation marks omitted)); *Fick v. Am. Acceptance Co., LLC*, No. 3:11-cv-229, 2012 WL 1074288, at *3 (N.D. Ind. Mar. 28, 2012) ("Because Section 1692f is not a piggyback jurisdiction clause, plaintiff cannot use its prohibition[s] . . . as an enforcement mechanism for Indiana's state licensing law" (citation and internal quotation marks omitted)); *Washington v. N. Star Capital Acquisition, LLC*, No. 08 C 2823, 2008 WL 4280139, at *2 (N.D. Ill. Sept. 15, 2008) ("The FDCPA was designed to provide

basic, overarching rules for debt collection activities; it was not meant to convert every violation of a state debt collection law into a federal violation.").

This principle is well illustrated by *Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 480 F.3d 470 (7th Cir. 2007). In *Beler*, the plaintiff claimed that the debt-collector defendant violated § 1692f by serving a citation to discover assets that caused the plaintiff's bank to freeze her checking account for three weeks. 480 F.3d at 473. The plaintiff asserted that the federal Social Security Act and corresponding Illinois law exempted the account from attachment or other legal execution because her income consisted solely of Social Security disability payments. *Id.* at 472. She argued that because the debt collector's conduct violated the Social Security Act and Illinois law, it was thereby "unfair and unconscionable" under § 1692f. *Id.* at 473-74 ("[H]er argument is that we should use § 1692f to enforce existing state and federal laws exempting certain assets from execution[.]"). The Seventh Circuit rejected this argument in broad terms, describing it as improperly attempting to bootstrap § 1692f "to enforce other legal rules." *Id.* at 473. Section 1692f, the court explained, "does not so much as hint at being an enforcement mechanism for other rules of state and federal law." *Id.* at 474. The court affirmed summary judgment for the debt collector, reasoning that "[i]f the [debt collector] violated the Social Security Act, that statute's rules should be applied," and "[l]ikewise if [it] violated Illinois law." *Id.*

The Seventh Circuit applied and reiterated this principle more recently in *Bentrud v. Bowman, Heintz, Boscia & Vician, P.C.*, 794 F.3d 871 (7th Cir. 2015). There, a debt collector had previously sued the plaintiff in state court to collect on the plaintiff's credit card debt. *Bentrud*, 794 F.3d at 872. During the state court lawsuit, the plaintiff invoked the arbitration provision of his credit card agreement, which allowed him to force arbitration of the dispute. *Id.*

When the debt collector subsequently filed a motion for summary judgment in the state court lawsuit, the plaintiff filed a federal suit alleging violation of the FDCPA. *Id.* at 872-73. The plaintiff argued that the debt collector's summary judgment motion in state court was an "unfair or unconscionable" means of collecting debt under § 1692f because the arbitration provision of the credit card agreement, once invoked, precluded further litigation. *Id.* at 873-74. The Seventh Circuit rejected this claim and affirmed summary judgment for the debt collector, explaining that the plaintiff was "seek[ing] to transform the FDCPA into an enforcement mechanism for the arbitration provision in his credit card agreement." *Id.* at 875. The court reiterated that the FDCPA "is not an enforcement mechanism for matters governed elsewhere by state and federal law." *Id.* If the plaintiff objected to the debt collector's resumption of the state court litigation after he elected arbitration, the court reasoned, "his remedy sounds in breach of contract, not the FDCPA." *Id.* The court explained further that "[a] contrary ruling would require [the court] to declare that adherence to an arbitration provision in a contract . . . is essential to fair debt collection. This we will not do." *Id.* (internal citation omitted).

The same principle applies here. As in *Beler* and *Bentrud*, Plaintiffs are attempting to use the FDCPA as a vehicle for enforcing matters governed by state law—in this case, state usury laws.[3] *See Bentrud*, 794 F.3d at 875; *Beler*, 480 F.3d at 473-74. However, while the Seventh Circuit in both *Beler* and *Bentrud* broadly rejected using the FDCPA as an enforcement mechanism for other laws, it did so only in the context of § 1692f claims. *Bentrud*, 794 F.3d at

---

[3] To be clear, Plaintiffs do not allege that the interest rates on their student loans are, in and of themselves, "unfair or unconscionable means to collect a debt" or constitute a "false, deceptive, or misleading representation or means" of collecting debt under the FDCPA. *See* 15 U.S.C. §§ 1692e, 1692f. That would be a different claim than the one presented and would require interpreting the FDCPA in common-law fashion to inherently forbid some rates of interest. *See Beler*, 480 F.3d at 474 ("[Plaintiff] could prevail under § 1692f only if we were to declare, as a matter of federal common law, that a pre-citation hearing is essential to 'fair' debt collection[.]"). Instead, Count I is predicated solely on the alleged violation of state usury laws.

874-76; *Beler*, 480 F.3d at 473-74. The Seventh Circuit has not, so far as this Court is aware, applied the same principle to claims under § 1692e. *See Fick*, 2012 WL 1074288, at *3 ("[N]either of these Seventh Circuit cases hold that a violation of state law cannot create liability under Section 1692e.") In the absence of similar authority regarding § 1692e, the Court believes the correct approach is to apply this principle only to Plaintiffs' claim under § 1692f. *See id.* ("Defendants' position is that a violation of state law may never form the basis for a violation of the FDCPA[.] However, the court believes that [since] . . . there is no Seventh Circuit precedent that is dispositive on the issue of whether a state law violation can form the basis of a Section 1692e claim, the best approach, an approach taken by numerous district and appellate courts, is to determine if the alleged violation of state law is also a violation of [§ 1692e].") Count I therefore fails to state a claim under § 1692f and is dismissed in part, but only as to any claim under § 1692f. *Bentrud*, 794 F.3d at 875. Because Defendants do not argue that Count I insufficiently alleges a violation of § 1692e, the Court declines to dismiss Count I as to any § 1692e claim.

## II.      Count II – Usury (Illinois Interest Act)

Count II, captioned "Interest Act – Individual and Class Claim," is asserted by two of the Plaintiffs individually against particular Defendants,[4] and by nine of the Plaintiffs as representatives of the putative "Interest Act" class against all Defendants. (R. 79, Cons. Compl. ¶¶ 221-24.) Count II asserts that Defendants have committed usury in violation of Illinois law. More specifically, Plaintiffs allege that Defendants violated the Illinois Interest Act ("IIA"), 815 ILL. COMP. STAT. 205/4, by contracting for and collecting interest at rates in excess of the 9% statutory limit under the IIA. (*Id.* ¶¶ 80, 225.)

---

[4] Count II is asserted individually by Plaintiff Gruber against Transworld, Blitt, and NCT 2003-1, and by Plaintiff Timbario against NCO, Transworld, Blitt, and NCT 2004-1. (R. 79, Cons. Compl. ¶¶ 223-24.)

Defendants argue that Plaintiffs' IIA usury claim must be dismissed for two principal reasons. First, Defendants argue that the National Bank Act ("NBA"), 12 U.S.C. §§ 85-86, preempts any state-law claim of usury because all of Plaintiffs' loans were originated by JP Morgan Chase ("Chase"), a national bank. (R. 73, Defs.' Mem. at 5-6.) Defendants' second argument is that, as assignees of the Plaintiffs' student loan debts, they are permitted to charge and collect interest at the same rate as the original lender. (*Id.* at 1, 6-7.) Defendants contend that since the original lender was authorized to charge the interest rates provided for in Plaintiffs' student loans—or, at least, since there is no plausible allegation to the contrary—Defendants are too. (*Id.*) These arguments are addressed in turn.

## A.     National Bank Act Preemption

Defendants' first argument is that the NBA entirely preempts Plaintiffs' state-law usury claim. (R. 73, Defs.' Mem. at 5-6.) Section 85 of the NBA provides that a national bank[5] may "take, receive, reserve, and charge on any loan . . . interest at the rate allowed by the laws of the State, Territory, or District where the bank is located." 12 U.S.C. § 85. Section 86 provides that knowingly charging interest at a higher rate than permissible in § 85 is "deemed a forfeiture of the entire interest" and allows borrowers who have paid more interest than is allowed to recover damages for twice the excess amount. 12 U.S.C. § 86. In *Beneficial National Bank v. Anderson*, 539 U.S. 1 (2003), the U.S. Supreme Court held that §§ 85 and 86 of the NBA provide the exclusive cause of action for usury claims against national banks. *Id.* at 9-11. The Court explained that those provisions "supersede both the substantive and the remedial provisions of state usury laws and create a federal remedy for overcharges that is exclusive." *Id.* at 11. As a consequence, "there is, in short, no such thing as a state-law claim of usury against a national

___
[5] National banks are "corporate entities chartered not by any State, but by the Comptroller of the Currency of the U.S. Treasury." *Wachovia Bank v. Schmidt*, 546 U.S. 303, 306 (2006).

bank." *Id.*; *see also City of Chi. v. Comcast Cable Holdings, L.L.C.*, 384 F.3d 901, 905 (7th Cir. 2004) (noting that NBA "knocks out all state regulation of national banks' interest charges, so that any claim must rest on federal law alone"); *Bank of Am., N.A. v. Shelbourne Dev. Grp., Inc.*, 732 F. Supp. 2d 809, 820 (N.D. Ill. 2010) ("[Defendant's] IIA affirmative defense and counterclaim accuse [Bank of America] of charging fees that exceeded those allowed by law. As such, they are based on usury and preempted by the NBA.").

Plaintiffs acknowledge in their complaint that Chase was the "purported originator" of their student loans and that Chase is a national bank. (R. 79, Cons. Compl. ¶ 80-81.) Nevertheless, the Court is not persuaded at this time that the NBA preempts Plaintiffs' IIA claim as a matter of law. First, Plaintiffs are not suing a national bank. Were they suing Chase itself for usury under the IIA there is little doubt the claim would preempted. *See Beneficial Nat'l Bank*, 539 U.S. at 11. But Plaintiffs' IIA claim is not against Chase, the purported original lender; it is rather against the assignees of their student loans, who are not national banks.[6] (R. 79, Cons. Compl. ¶ 88 (alleging that Plaintiffs' student loans were "sold to a non-bank 'National Collegiate Trust' entity" after being made).) However, it is not so clear that NBA preemption applies to *assignees* of loans originated by national banks. While neither party addresses this proposition, the only U.S. Court of Appeals to have squarely addressed the issue held recently that such assignees are *not* entitled to NBA preemption simply by virtue of the loan originating with a national bank. *Madden v. Midland Funding, LLC*, 786 F.3d 246, 249-53 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2505 (2016).

---

[6] Count II is also asserted against the loan servicers (NCO and Transworld) and the law firms that sought to collect the Plaintiffs' student loans (Blitt and WWR). (R. 79, Cons. Compl. ¶¶ 222-24.) The Court's analysis and conclusions apply the same to these Defendants as they do to the NCT defendants.

In *Madden v. Midland Funding, LLC*, the plaintiff alleged that the buyers of her Bank of America credit card debt violated New York state usury laws by attempting to collect interest on the debt at 27%. *Id.* at 247-48. The debt buyers argued that preemption applied—that, as assignees of a loan originated by a national bank (Bank of America), they too were covered by the NBA so as to preempt the plaintiff's state law usury claim. *Id.* at 250. The U.S. Court of Appeals for the Second Circuit rejected this argument, concluding that the reasons justifying preemption for national banks did not apply to the debt buyers because the debt buyers were not "a subsidiary or agent of a national bank, or . . . otherwise acting on behalf of a national bank" and "application of the state law on which [the plaintiff's] claims rely would not significantly interfere with any national bank's ability to exercise its powers under the NBA." *Id.* at 247, 249.[7] The Second Circuit reversed the district court's contrary holding that NBA preemption applied to the debt buyers, explaining that the district court misapprehended the case law to suggest that "once a national bank has originated a credit, the NBA and the associated rule of . . . preemption continue to apply to the credit, even if the bank has sold the credit and retains no further interest in it." *Id.* at 252 n.2. Defendants rely on the same proposition here—that the NBA applies to them and serves to preempt Plaintiffs' IIA claim because the loans originated with a national bank. In light of persuasive authority from the Second Circuit rejecting this proposition—and the absence of any other authority that squarely addresses the issue—the Court is not persuaded that NBA preemption applies here as a matter of law.

---

[7] The court recognized the potential economic impact of limiting NBA preemption as it did, but found that any economic effects would not "significantly interfere" with a national bank's exercise of its power. *Madden*, 786 F.3d at 251 ("Although it is possible that usury laws might decrease the amount a national bank could charge for its consumer debt in certain states (i.e., those with firm usury limits, like New York), such an effect would not 'significantly interfere' with the exercise of a national bank power.").

A second reason persuades the Court that NBA preemption does not apply here: Plaintiffs have alleged that Chase was not in fact the true originator of their student loans. Plaintiffs have alleged that "[e]ach loan *purported* to be originated in the name of JP Morgan Chase—sometimes using the name of Bank One"—but that the true lender was "First Marblehead," a non-bank entity that acted behind the scenes and effectively "rented" Chase's banking charter to make loans. (R. 79, Cons. Compl. ¶¶ 81, 83 (emphasis added).) Plaintiffs allege that First Marblehead supplied all the loan application documents, reviewed the loan applications, determined which loans to make and on what terms, designated who would administer the loans, designated the servicer that borrowers would send payments to, and directed who the loans would be sold to after origination. (*Id.* ¶¶ 84-90.) Plaintiffs allege that Chase "never had any economic interest in the loans, instead receiving small 'marketing' and 'origination' fees totaling a few hundred dollars for allowing its name to be used in connection with originating the loans." (*Id.* ¶ 82.) Accepting these allegations as true, as this Court must, NBA preemption would not apply even if assignees of loans originated by national banks were entitled to NBA preemption, because Plaintiffs' student loans allegedly were not originated by a national bank. (*Id.* ¶ 84.)

Defendants argue that the Court cannot credit Plaintiffs' so-called "rent-a-charter" scheme as plausible, because exhibits should trump allegations when they conflict and the Plaintiffs' loan documents themselves—attached to and referenced in the complaint—list Chase or its subsidiary, Bank One, as the lender. (R. 76, Defs.' Reply at 7-8; R. 84, Defs.' Resp. at 2-8.) It is true that the Plaintiffs' loan documents all appear to identify Chase or Bank One as the lender. Plaintiffs Clark's and McCool's loan documents, for example, list "Bank One (JP Morgan Chase Bank, N.A.)" as the lender. (R. 79-1, Cons. Comp., App. 5 at 31-32; *id.*, App. 12 at 87-88.) And under Federal Rule of Civil Procedure 10, "[a] copy of a written instrument that is

an exhibit to a pleading is a part of the pleading for all purposes." FED. R. CIV. P. 10(c). However, "Rule 10(c) does not require a plaintiff to adopt every word within the exhibits as true for purposes of pleading simply because the documents were attached to the complaint." *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend* ("*Indiana Gun*"), 163 F.3d 449, 455 (7th Cir. 1998). Favoring a written instrument attached to a complaint over a complaint's allegations makes sense, for example, in a breach of contract claim where the contract clearly does not provide what the plaintiff alleges. *See Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 529 (7th Cir. 1999) ("The inconsistency between the complaint and the actual terms of the contract substantially undermines [plaintiff's] argument that the parties' contract was not a transaction in goods . . . . As we have explained: '[W]here the allegations of a pleading are inconsistent with the terms of a written contract attached as an exhibit, the terms of the latter . . . must prevail[.]'"). But it does not make sense, as the Seventh Circuit has explained, to credit as true all assertions in "letters written by the opposition for what could be self-serving purposes" just because they are attached as exhibits to a complaint. *Indiana Gun*, 163 F.3d at 455.

Here, it is plausible to infer from Plaintiffs' allegations that the identification of Chase or Bank One as lender on the loan documents was a self-serving statement, insofar as it facilitated the alleged "rent-a-charter" scheme. To disregard Plaintiffs' express allegations in favor of the lender listed on the face of the loans would require the Court to draw a factual inference against the Plaintiffs—that Chase *was* in fact the originator of the loans—which it may not do at the pleading stage. *See Kubiak*, 810 F.3d at 480-81; *see also Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190, 1194-95 (N.D. Cal. 2012) (rejecting argument on a motion to dismiss that because a national bank was listed "as the lender on the loan documents, [the NBA] expressly preempts

14

Plaintiff's state law claims" finding that the "imprimatur of a national bank on the loan documents" does not "automatically trigger[] preemption" and "foreclos[e] inquiry into the real nature of the loan, or whether the debtor may invoke the protection of state consumer laws if she proves that the actual lender in substance is not a national bank"). Because Plaintiffs allege that Chase was not the true originator of their loans, the Court is not persuaded that NBA preemption applies here.

### B.    Defendants' Rights as Assignees

Defendants' second argument is that, as assignees of the Plaintiffs' student loan debts, they are permitted to charge and collect interest at the same rate at the original lender. (R. 73, Defs.' Mem. at 1, 6-7.) Since the original lender was authorized to charge and collect the interest prescribed for the Plaintiffs' loans, Defendants contend they were too. (*Id.*)

Defendants are correct that under the Illinois Interest Act, an assignee of debt can charge and collect interest at the same rate as the original lender, even if the assignee would not otherwise be permitted to charge such a rate. *See Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 289 (7th Cir. 2005); *accord PRA III, LLC v. Hund*, 846 N.E.2d 965, 968-69 (Ill. App. Ct. 2006). This principle is based on the common law rule that an "assignee steps into the shoes of the assignor." *Olvera*, 431 F.3d at 288; *see also Hund*, 846 N.E.2d at 968 ("The assignee, by acquiring the same rights as the assignor, stands in the shoes of the assignor." (citation omitted)). In *Olvera*, the Seventh Circuit dealt squarely with the question of "whether the assignee of a debt in Illinois is free to charge the same interest rate that the assignor—the original creditor— charged . . . rather than constrained to the lower [IIA] statutory rate, even if the assignee does not have a license that expressly permits the charging of a higher rate." 431 F.3d at 286. The court answered in the affirmative because "the Illinois Interest Act does not affect the common law

rights of assignees," which "puts the assignee in the assignor's shoes." *Id.* at 289; *see also Hund*, 846 N.E.2d at 968 (agreeing with holding of *Olvera*).

Plaintiffs allege that "[n]one of the 'National Collegiate Trusts' had a bank or financial institutions charter, or license from the State of Illinois entitling it to charge interest at more than 9% per annum." (R. 79, Cons. Compl. ¶ 44.) Plaintiffs also allege, however, that the NCT Defendants are assignees of Plaintiffs' student loan debts. (*Id.* ¶¶ 84, 88 ("The loans were . . . sold to a non-bank 'National Collegiate Trust' entity after being made. The . . . originating bank did not retain any interest in the loans.").) By virtue of being assignees, Defendants can charge and collect interest on those debts at the same rate as the original lender, even if that rate exceeds the 9% that Defendants might otherwise be limited to under the IIA. *Olvera*, 431 F.3d at 289; *Hund*, 846 N.E.2d at 968-69. However, Defendants' argument does not address whether the original lender was permitted to charge rates in excess of 9%. As noted, Plaintiffs have alleged that the non-bank entity "First Marblehead" was the true lender acting behind the scenes for their loans, notwithstanding that the Plaintiffs' loan documents identify Chase or Bank One as the "lender." (R. 79, Cons. Compl. ¶¶ 81, 83 (emphasis added).) At this stage, the Court must credit Plaintiffs' allegations of a "rent-a-charter" scheme, and it is plausible to infer from these allegations that the non-bank entity "First Marblehead" was not authorized to charge in excess of the 9% limit under the IIA. If, as is plausibly alleged, First Marblehead could not exceed the 9% statutory cap, Defendants' argument regarding the common law rights of assignees simply does not apply. For these reasons, the Court declines to dismiss Count II.

## III.     Count III – Time-Barred Debts (FDCPA)

Count III, captioned "FDCPA – Time-Barred Debts," is asserted by four of the Plaintiffs (Rosen, Patel, and both Castanos) as representatives of the putative "Time Bar FDCPA" class against Defendants Transworld, NCO, Blitt, and WWR. (R. 79, Cons. Compl. ¶¶ 210, 229-30.)

Count III alleges that Defendants violated the FDCPA, 15 U.S.C. §§ 1692e, 1692e(2), and 1692e(10), by filing debt collection lawsuits against Plaintiffs that were barred by the applicable statute of limitations. (*Id.* ¶ 231.)

The FDCPA prohibits debt collectors from using any "false, deceptive, or misleading representation or means" in the collection of any debt. 15 U.S.C. § 1692e. In this Circuit, filing a time-barred debt collection lawsuit, in and of itself, violates this prohibition because such a suit falsely implies that the debt collector has legal recourse to collect the debt. *Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1079 (7th Cir. 2013); *see also Owens v. LVNV Funding, LLC*, 832 F.3d 726, 730 (7th Cir. 2016) ("[O]ur case law hold[s] that the FDCPA prohibits creditors from filing lawsuits to collect on stale debts."), *pet. for cert. docketed*, No. 16-315 (Sept. 12, 2016).

Defendants argue that Count III fails to state a claim under the FDCPA because the allegedly prohibited debt collection lawsuits were timely under the applicable statute of limitations, which Defendants contend is 10 years. (R. 73, Defs.' Mem. at 8-13.) Defendants argue that the 10-year limitations period applies because the debts are based on promissory notes, written contracts, or other written evidence of indebtedness under 735 ILL. COMP. STAT. 5/13-206. (*Id.*) Plaintiffs do not dispute that Defendants' debt collection suits were timely *if* the correct limitations period is 10 years, but argue that the agreements underlying their student loans do not qualify as promissory notes, written contracts, or other written evidence of indebtedness under the statute. (R. 75, Pls.' Resp. at 20-31.) Consequently, Plaintiffs contend, the shorter 5-year limitations period for actions on unwritten or oral contracts applies, under which Defendants' suits were untimely and Plaintiffs have stated a claim of violating the

FDCPA. (*Id.*) Thus, the principal dispute between the parties is whether Illinois' 5- or 10-year statute of limitations applies to Plaintiffs' student loan debts.

Illinois law provides a 10-year statute of limitations for suits on "promissory notes," "written contracts" and "other evidences of indebtedness in writing":

> Except as provided in Section 2-725 of the "Uniform Commercial Code", actions on . . . promissory notes, . . . written contracts, or other evidences of indebtedness in writing . . . shall be commenced within 10 years next after the cause of action accrued; but if any payment or new promise to pay has been made, in writing, on any . . . note, . . . contract, or other written evidence of indebtedness, within or after the period of 10 years, then an action may be commenced thereon at any time within 10 years after the time of such payment or promise to pay.

735 ILL. COMP. STAT. 5/13-206. The limitations period for actions on unwritten or oral contracts, by contrast, is five years:

> Except as provided in Section 2-725 of the "Uniform Commercial Code" . . . and Section 11-13 of "The Illinois Public Aid Code" . . . actions on unwritten contracts, expressed or implied . . . shall be commenced within 5 years next after the cause of action accrued.

735 ILL. COMP. STAT. 5/13-205.

Two issues warrant preliminary discussion. First, Plaintiffs attached a number of documents to their Consolidated Complaint relating to their respective student loans, including the complaints in the allegedly prohibited state court debt collection lawsuits and the agreements underlying their student loans. (*E.g.*, R. 79-1, Cons. Compl., App. 1 at 2-5; *id.*, App. 19 at 136-40.) In some cases, however, the attachments were evidently incomplete, and Defendants attached some of the omitted materials to their present motion. (R. 79-1, Cons. Compl., App. 1 at 2-5 (attaching state court complaint, without attached affidavit or exhibits); R. 72-1, Defs.' Mot., Ex. A at 2-8 (attaching state court complaint, with attached affidavit and exhibits).) The Court concludes as a preliminary matter that it properly may consider the documents attached by both Plaintiffs and Defendants—the student loan agreements in particular—because they are

referenced in Plaintiffs' complaint and are central to Plaintiffs' allegations as to Count III. *See Williamson*, 714 F.3d at 436; *see also Langone v. Miller*, 631 F. Supp. 2d 1067, 1070 (N.D. Ill. 2009) (noting that in the context of a Rule 12 motion, "'[w]ritten instrument' is construed broadly to include such things as affidavits, letters, contracts, and loan documents"); *Walker v. Rieth-Riley Const. Co.*, No. 2:03-cv-507, 2005 WL 1799535, at *2 (N.D. Ind. July 25, 2005) ("Here, the Plaintiffs attached portions of the Handbook as an exhibit to their complaint and repeatedly refer to that Handbook throughout Count VII. Accordingly, the Court shall consider the entirety of the Handbook in its analysis."). Plaintiffs' Consolidated Complaint repeatedly refers to and quotes the agreements underlying their student loans. (*E.g.*, R. 79, Cons. Compl. ¶¶ 103-04, 106-09.) The agreements are also central to Plaintiff's allegations: Count III is premised on the Defendants' debt collection suits being untimely under the 5-year statute of limitations. If a 10-year limitations period applies instead—because the underlying loan agreements qualify as promissory notes, written contracts, or other written evidence of indebtedness under the statute— then the suits were concededly timely. Without looking to the agreements themselves, it is impossible for the Court to determine whether a 5- or 10-year limitations period applies and, consequently, whether Plaintiffs have stated a claim that Defendants filed lawsuits prohibited by the FDCPA. The documents themselves are therefore central to Plaintiffs' allegations and the Court may consider them.

The second preliminary matter is which agreements to consider. Count III is asserted by four Plaintiffs as representatives of the putative "Time Bar FDCPA" class. (R. 79, Cons. Compl. ¶ 229.) In their briefing on the motion to dismiss, both Plaintiffs and Defendants essentially treat Plaintiff Patel's student loan agreement as representative of the others; the parties do not separately address the agreements signed by Rosen and the Castanos. (*See* R. 75. Pls.' Resp. at

20-22, 27 (referencing Plaintiff Patel's agreement at Appendix 19).) Importantly, the parties do not argue that there are any material differences between the agreements that warrant addressing them individually or treating them differently. Consequently, the Court considers and discusses Plaintiff Patel's student loan agreement as representative of the others.

The Court first considers whether the Plaintiffs' student loan agreements qualify as a "written contract" under 735 ILL. COMP. STAT. 5/13-206. To be clear, Plaintiffs do not dispute the *existence* of contracts governing their student loans; they merely dispute whether "all the essential terms" were in writing, so as to implicate the 10-year statute of limitations. "For statute of limitations purposes a contract is considered to be written if all the essential terms of the contract are in writing and are ascertainable from the instrument itself." *Brown v. Goodman*, 498 N.E.2d 854, 856 (Ill. App. Ct. 1986). "If parol evidence is needed to make the contract complete, then the contract is treated as being oral under the statute of limitations." *Id.* at 857.

The parties' dispute centers on two documents: a "Non-Negotiable Credit Agreement" (the "Credit Agreement") and a "Note Disclosure Statement" (the "Disclosure Statement"). (R. 79-1, Cons. Compl., App. 19 at 136-37; 72-1, Defs.' Mot., Ex. A at 7.) The Credit Agreement is a four-page document signed on the first page by the borrower (and co-borrower, if applicable). (R. 79-1, Cons. Compl., App. 19 at 136-39.) The first page identifies the lender and borrower(s) by name and discloses parameters of the loan that are specific to the transaction. (*Id.* at 136.) Plaintiff Patel's Credit Agreement, for example, identifies "Bank One, N.A." as the lender, "Rupali R. Patel" as the borrower, "Education One® Education One Undergraduate Loan" as the loan type, "DEPAUL UNIVERISTY" as her educational institution, "09/2004 – 07/2005" as the academic period for which the loan is made, the "Origination Fee" as 8%, and "Interest Only Repayment with Deferred Principal" as the repayment option. (*Id.*) The first page also lists a

dollar amount for the loan, denoting it as the "Loan Amount Requested," as well as the interest rate (or margin over an index, in the case of a variable rate loan). (*Id.* ("Loan Amount Requested: $8500.00"; "Deferral Period Margin: 4.65"; "Repayment Period Margin: 4.65").) The remaining three pages set forth detailed terms and conditions, including a commitment by the borrower to repay: "PROMISE TO PAY: I promise to pay to your order, upon the terms and conditions of this Credit Agreement, all principal, interest, and other charges set forth herein." (*Id.* at 137.) Page 1 is signed by the borrower(s) underneath a certification that states: "By my signature, I certify that I have read, understand and agree to the terms of and undertake the obligations set forth on all four (4) pages of this Loan Request / Credit Agreement." (*Id.* at 136.)

The Credit Agreement also explains that the disbursement check for the loan will be accompanied by a "statement disclosing certain information about the loan in accordance with the federal Truth-in-Lending Act (the 'Disclosure Statement')," which will "tell [the borrower] the amount of [the] disbursement and the amount of the Loan Origination Fee." (R. 79-1, Cons. Compl., App. 19 at 137.) The Disclosure Statement is a one page document that lists the names of the "Student" and the "Borrower(s)," the "Amount Financed," the dollar amount of the "Origination Fee," the date of disbursement of the loan that the Disclosure Statement relates to, the "Annual Percentage Rate" of the loan, the number and schedule of the payments for the loan, and the "Finance Charge"—which is the estimated "dollar amount the credit will cost" the borrower over the life of the loan. (R. 72-1, Defs.' Mot., Ex. A at 7.)

Defendants argue that the Credit Agreement sets forth all the essential terms of the agreement between the borrower and lender and therefore qualifies as a "written contract" to which the 10-year statute of limitations applies. (R. 73, Defs.' Mem. at 10-11.) Plaintiffs do not dispute that the Credit Agreement provides many essential terms of the loan, but argue that two

are not present: the amount and repayment terms. (R. 75, Pls.' Resp. at 26-27.) Plaintiffs contend that parol evidence, in the form of additional documents and the subsequent course of dealing between the borrower and lender, would be necessary to identify both terms. (*Id.* at 28.)

Plaintiffs argue that the amount actually loaned is not ascertainable from the Credit Agreement itself because: (1) the dollar amount on page 1 is identified only as a "Loan Amount Requested"; and (2) the Credit Agreement expressly allows the lender to loan less than the "Loan Amount Requested." (*Id.*) Plaintiffs argue that either the Disclosure Statement or a cancelled loan disbursement check would be needed to determine the amount actually loaned and that both constitute parol evidence. (*Id.* at 27-28.) They contend that the need to examine outside documents for this essential loan term means not "all the essential terms" of the contract are in writing, and so the 5-year statute of limitations applies.

Based on the language in the Credit Agreement, Plaintiffs appear to be correct that it does not fix the amount actually loaned, and that one would need to look to either the Disclosure Statement or a cancelled loan disbursement check to ascertain that amount. However, the Disclosure Statement is not parol evidence because it is expressly incorporated into the Credit Agreement. It is axiomatic that "parties to a contract may incorporate by reference another document if that intention is clearly shown on the face of the contract." *Jago v. Miller Fluid Power Corp.*, 615 N.E.2d 80, 82 (Ill. App. Ct. 1993); *see also Unifund CCR Partners v. Shah*, 946 N.E.2d 885, 891 (Ill. App. Ct. 2011) ("It is a fundamental principal of contract law that 'an instrument may incorporate all or part of another instrument by reference.'" (citation omitted)). If outside documents are so incorporated, they "become as much a part of the contract as if they were expressly written in it." *Wilson v. Wilson*, 577 N.E.2d 1323, 1329 (Ill. App. Ct. 1991). The Credit Agreement specifies that "[t]he Disclosure Statement is part of this Credit Agreement."

(R. 79-1, Cons. Compl., App. 19 at 137.) This language plainly evinces an intention to incorporate by reference, rendering the Disclosure Statement "as much a part of" the Credit Agreement as if the Disclosure Statement had been physically a part of it. *Wilson*, 577 N.E.2d at 1329. Thus, the amount actually loaned is in writing and does not require parol evidence to ascertain.

Plaintiffs also contend that "terms on which the loan is to be repaid" are essential but not provided for in the Credit Agreement. (R. 75, Pls.' Resp. at 2, 22-23.) Specifically, Plaintiffs argue that parol evidence would be needed to ascertain (1) the duration of the loan and (2) the date when the borrower was obligated to begin repayment. (*Id.* at 25, 27.) This argument is also not persuasive. First, Plaintiffs cite no authority for the proposition that duration or repayment start date is an essential term of a loan; in fact, a case that they cite suggests otherwise. *See Kranzler v. Saltzman*, 942 N.E.2d 722, 726 (Ill. App. Ct. 2011) (holding that a written and signed loan "memo" that did not specify a rate of interest or a repayment date or schedule nevertheless included all essential terms for purposes of the statute of limitations). Second, even if these terms of repayment are essential, the Credit Agreement discloses them. The first page identifies the "Repayment Option" elected by the borrower, and the terms on page 2 explain each possible Repayment Option in elaborate detail. (R. 79-1, Cons. Compl., App. 19 at 136-37.) For Plaintiff Patel, for example, the Repayment Option is identified as "Interest Only Repayment with Deferred Principal," which is explained on page 2 as requiring "payments each month during the Deferment Period equal to the accrued interest on the outstanding balance of this Credit Agreement." (*Id.*) The terms further explain that "interest payments will begin 30-60 days after the disbursement of [the] loan, the 'Deferment End Date' will be the date the Student graduates or ceases to be enrolled at least half-time in the School . . . and principal and interest payments

will begin 30-60 days after that date." (*Id.* at 137.) The terms also explain that "[t]he Repayment Period is 20 years, unless monthly payments equal to the minimum monthly payment amount (See Paragraph E.4) will repay all amounts owed in less than 20 years," and that during the Repayment Period, the "monthly repayment amount will equal the amount necessary to pay in full, over the number of months remaining in the Repayment Period, the amount I owe in equal monthly installments of principal and interest at the Variable Rate in effect at the time of the calculation." (*Id.*) The terms of repayment are sufficiently "in writing and are ascertainable from" the Credit Agreement. *Brown*, 498 N.E.2d at 856. Plaintiffs' argument to the contrary is meritless.

Plaintiffs rely heavily on *Portfolio Acquisitions, LLC v. Feltman*, 909 N.E.2d 876 (Ill. App. Ct. 2009), which held that an agreement governing use of a bank credit card was not a contract wholly in writing for purposes of the statute of limitations. *Id.* at 884. However, *Portfolio Acquisitions* relied on the "unique nature" of credit cards, explaining that Illinois courts have held that "the issuance of a credit card . . . is a standing offer to extend credit that may be revoked at any time." *Id.* at 881. The court explained that "[w]hen the cardholder makes a purchase, the bank advances funds to the merchant and this arrangement constitutes a loan between the bank and cardholder." *Id.* "Therefore, each time the credit card is used, a separate contract is formed between the cardholder and bank." *Id.* However, *Portfolio Acquisitions* is not persuasive here because this case does not involve credit card debt or even debt incurred through a revolving credit line (which is the broader category that credit cards fall under). The Plaintiffs' student loan agreements are fundamentally different from the "standing offer[s] to extend credit that may be revoked at any time," *id.* at 881, at issue in *Portfolio Acquisitions*.

Plaintiffs make one last argument for why the contract should be deemed unwritten for purposes of the statute of limitations. They suggest that since the Disclosure Statement is not itself signed by the borrower(s), parol evidence in the form of a borrower's receipt and acquiescence to the Disclosure Statement would be necessary to demonstrate mutuality of obligation between the parties, thus rendering the contract partly unwritten. (R. 81, Pls.' Sur-Reply at 3-4.) It is true that the Disclosure Statement is not itself signed by the borrower(s); however, a contract will still be deemed in writing for purposes of the statute of limitations even "where mutuality is established by [extrinsic] proof of the acceptance of [a] writing." *Memory v. Niepert*, 23 N.E. 431, 433 (Ill. 1890); *see also Stanley v. Chastek*, 180 N.E.2d 512, 520 (Ill. App. Ct. 1962) (citing *Neipert* for the proposition that "[t]hough parole evidence may be necessary to show delivery of a writing and its acceptance and adoption by a party, the contract is, notwithstanding, a written contract"). In *Memory v. Niepert*, the Illinois Supreme Court rejected an argument similar to the Plaintiffs' here. The sales contract sought to be enforced in *Niepert* was signed only by the defendant, and the plaintiffs argued that it was unwritten for statute of limitations purposes because extrinsic proof would be required to show the plaintiff's receipt and acquiescence. The Illinois Supreme Court rejected this argument, noting that "[t]he delivery of a writing, and its acceptance and adoption by the party to whom it is delivered, are necessarily facts [outside] the writing itself." *Id.* Notwithstanding the resort to such extrinsic evidence, the court held, the contract was still entirely written and subject to a 10-year statute of limitations. *Id.*; *see also Moloney v. Cressler*, 236 F. 636, 642 (7th Cir. 1916) (finding agreement for "certain improvements to be made . . . as specified in certain plans and specifications already submitted" to be written for purposes of Illinois statute of limitations notwithstanding a dispute as to which writing "plans and specifications" referred to, reasoning that the contract merely incorporated

another writing and a dispute over the identity of that writing did not make the contract unwritten).

The Court concludes that Plaintiffs' student loan agreements constitute "written contracts" such that a 10-year statute of limitations applies.[8] Because Plaintiffs have not alleged any debt collection lawsuits that were filed outside a 10-year limitations period, Count III is dismissed.

## IV.    Count V – Filing Prohibited Lawsuits (FDCPA)

Count V, captioned "FDCPA – Filing Prohibited Lawsuits," is asserted by 13 of the Plaintiffs as representatives of the putative "FDCPA ICAA" class against Defendants NCO, Transworld, Blitt, and WWR. (R. 79, Cons. Compl. ¶¶ 210, 239-40.) Plaintiffs allege in Count V that Defendants violated §§ 1692e, 1692e(2), 1692e(5), 1692e(10), and 1692f of the FDCPA by pursuing Illinois debt collection lawsuits where the referral to counsel and the resulting filing and prosecution of the lawsuits were prohibited by § 8a-1 of the Illinois Collection Agency Act ("ICAA"), 225 ILL. COMP. STAT. 425/8a-1. (*Id.* ¶ 241.) Specifically, Plaintiffs allege that Defendants violated these provisions of the FDCPA by pursuing state court litigation that was not authorized by the true creditor in the manner required by the ICAA. (*Id.* ¶¶ 120-22, 128-30, 242.) Plaintiffs also appear to allege FDCPA violations not dependent upon the ICAA, based on the Defendants: (1) "filing complaints that purport to have been authorized by the 'National Collegiate' trusts" when they were not actually so authorized; (2) "requesting the entry of judgments in such complaints"; and (3) attaching affidavits to those complaints in which the affiant represented that s/he was "authorized" by the creditor to make the representations in the affidavit when in fact they were not so authorized. (*Id.* ¶ 242.) Plaintiffs allege that these actions

---

[8] Because the Court concludes that the agreements constitute "written contracts," the Court does not address whether they also constitute "promissory notes" or "other evidences of indebtedness in writing."

constitute false representations and deceptive and unfair means to attempt to collect debts, in violation of § 1692e and § 1692f, falsely representing the legal status of the debts, in violation of § 1692e(2)(A), and a threat to take action that cannot legally be taken, in violation of § 1692e(5). (*Id.*)

Defendants argue that Count V must be dismissed for multiple reasons. First, Defendants contend that Count V improperly uses the FDCPA as an enforcement mechanism for state law, to the extent Plaintiffs' claim is based on, or derivative of, alleged violations of the ICAA. (R. 73, Defs.' Mem. at 15-16.) Second, Defendants contend that even as to alleged violations of the FDCPA that are not derivative of the ICAA, Plaintiffs have failed to state a claim under § 1692e because (1) state court pleadings and filings cannot be the basis of a § 1692e violation, and (2) Plaintiffs have not identified any representations that were allegedly false or misleading under § 1692e. (*Id.* at 16) Third, Defendants contend that alleged misrepresentations in state court pleadings and filings likewise cannot be basis of a § 1692f claim. (*Id.*) Fourth, Defendants contend that Plaintiffs have not alleged any "threats" under § 1692e(5). (R. 76, Defs.' Reply at 2.) These arguments are each addressed in turn.

A.      **Enforcing State Law with the FDCPA**

Defendants' first contention is that Plaintiffs improperly use the FDCPA as a mechanism to enforce state law because their FDCPA claim is, at least in part, derivative of alleged violations of the ICAA. In Plaintiffs' Count V allegations, they rely on and quote § 8a-1 of the ICAA, which provides that before a collection agency may turn over an account to an attorney for further collection action (such as filing a collection lawsuit), the account creditor must be "notified in writing . . . of the collection agency's intent to refer the account to an attorney." 225 ILL. COMP. STAT. 425/8a-1(a). Following notice from the collection agency, the account creditor has the opportunity to "notif[y] the collection agency . . . that the creditor is withholding

authorization for the account to be referred to an attorney." *Id.* The statute can alternatively be satisfied if the account creditor itself signs any complaint that is filed seeking judgment based on the debt. *Id.* Plaintiffs allege that Defendants filed state court debt collection lawsuits against them without satisfying either the "notice requirement"—as it is referred to in the statute—or the pleading procedure set forth in § 8a-1, and that the lawsuits were consequently prohibited under the ICAA. (R. 79, Cons. Compl. ¶¶ 120-22, 128-30, 242.)

As explained previously for Count I, "[t]he FDCPA is not an enforcement mechanism for matters governed elsewhere by state and federal law." *Bentrud*, 794 F.3d at 875; *Evory*, 505 F.3d at 778; *Beler*, 480 F.3d at 473; *Butler*, 2016 WL 1298780, at *6; *Fick*, 2012 WL 1074288, at *3; *Washington*, 2008 WL 4280139, at *2. *Washington v. North Star Capital Acquisition, LLC*, is particularly instructive here. There, the plaintiff alleged that the defendant violated §§ 1692e and 1692f of the FDCPA—the same provisions asserted here[9]—by failing to follow the ICAA when prosecuting a state court lawsuit to collect on the plaintiff's debt. *Washington*, 2008 WL 4280139, at *1-2. Specifically, the defendant allegedly failed to attach to its state court complaint an assignment agreement that satisfied § 8b of the ICAA. *Id.* at *2. The court granted the defendant's motion to dismiss, explaining that the FDCPA cannot be used as an enforcement mechanism for state law. *Id.* The court concluded that "if [defendant] violated the ICAA, then that statute's rules should be applied. The FDCPA should not be used . . . to piggyback one's state claims into federal court." *Id.* As in *Washington*, Plaintiffs are attempting to use the FDCPA as an enforcement mechanism for the ICAA. That is not a permissible use of the FDCPA, and Count V therefore fails to state a claim to the extent it is based on alleged violations of the

---

[9] Paralleling this case even more, the plaintiffs in *Washington* alleged a violation of the same subsections of § 1692e—namely (2), (5), and (10)—as are asserted here in Count V. 2008 WL 4280139, at *1.

ICAA. *Bentrud*, 794 F.3d at 875; *Evory*, 505 F.3d at 778; *Beler*, 480 F.3d at 473; *Washington*, 2008 WL 4280139, at *2.

As noted, however, Plaintiffs appear to allege FDCPA violations that are not directly dependent upon violations of the ICAA. Thus, Plaintiffs' FDCPA claim does not appear to be entirely derivative of the ICAA, and the Court will consider Defendants' remaining arguments as to these alleged FDCPA violations.

### B.     Section 1692e

As to the allegations that are not derivative of the ICAA, Defendants contend that Count V fails to state a claim under § 1692e for two reasons. First, Defendants contend that alleged misrepresentations that occur during state court debt collection litigation are not actionable under § 1692e. (R. 73, Defs.' Mem. at 13-14, 16.) Defendants cite numerous cases from this District that do appear to support that proposition. (*Id.* at 13-14.) However, the Seventh Circuit held recently that § 1692e can apply to misrepresentations during litigation, including to alleged misrepresentations in state court pleadings and filings. *Marquez v. Weinstein, Pinson & Riley, P.S.*, 836 F.3d 808, 810 (7th Cir. 2016). In *Marquez*, the Seventh Circuit noted that it had not previously addressed whether § 1692e covers the process of litigation, and that it had expressly left this issue open in prior cases. *Id.* at 810 ("In *Beler* . . . and *O'Rourke v. Palisades Acquisition XVI, LLC*, 635 F.3d 938, 941 n.1 (7th Cir. 2011), we postponed for a future case the question of whether §1692e of the FDCPA covers the process of litigation."). The court agreed with the conclusion of many other U.S. Courts of Appeals that § 1692e does apply to litigation, and that misrepresentations may violate § 1692e even if made in state court pleadings or filings. *Id.* at 810, 812 (citing *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168 (3d Cir. 2015) and *Goldman v. Cohen*, 445 F.3d 152 (2nd Cir. 2006), among others).

The cases cited by Defendants are therefore inapposite to the extent they reached a contrary conclusion. The Court notes that all of Defendants' cited cases were decided before *Marquez*, and nearly all of them expressly relied on the Seventh Circuit's remark in *Beler* that "it is far from clear that the FDCPA controls the contents of pleadings filed in state court," 480 F.3d at 473, or statements to similar effect.[10] However, as the Seventh Circuit subsequently noted in *Marquez*, *Beler* expressly did not decide whether § 1692e applies to the process of litigation. *Marquez*, 836 F.3d at 810. The court in *Beler* "suppose[d], for the sake of argument," that § 1692e did apply to the litigation process and went on to evaluate the merits of plaintiff's § 1692e claim. 480 F.3d at 473. While the dicta in *Beler* may have previously guided courts in this District, the Court does not find it persuasive after *Marquez*.[11]

Defendants' second argument is that even if § 1692e applies to the litigation process, Plaintiffs "fail to allege the very basic elements of any § 1692e claim." (R. 73, Defs.' Mem. at 16.) More specifically, Defendants contend that Plaintiffs "do not identify any representations that they are claiming were false or misleading." (*Id.*) This argument is not persuasive.

---

[10] For example, Defendants cite *Pantoja v. Portfolio Recovery Associates, LLC*, No. 13 C 7654, 2015 WL 1396609, at *3 (N.D. Ill. Mar. 24, 2015), in which the plaintiff alleged that a debt collector violated § 1692e when it sued the plaintiff in state court to collect debt based on unverified account information and with no intention of proving its case at trial. *Id.* at *1-3. In granting summary judgment for the debt collector, the court relied on *Beler*'s "far from clear" remark, finding it "persuasive" and "declin[ing] to police the adequacy of state court filings in the context of an FDCPA claim." *Id.* at *3. Defendants also cite *Krawczyk v. Centurion Capital Corp.*, No. 06-C-6273, 2009 WL 395458 (N.D. Ill. Feb. 18, 2009), but *Krawczyk* too relied on *Beler*'s suggestion that § 1692e does not apply to the process of litigation. *Id.* at *9 ("Although it did not resolve the issue, in *Beler* . . . the Seventh Circuit noted that 'it is far from clear that the FDCPA controls the contents of pleadings filed in state court.' . . . [T]his language suggests that a judgment about the quality of the pleadings and evidence submitted in state court should be left to the discretion of the state court judge.").

[11] The Court does not, however, fault Defendants for relying on pre-*Marquez* decisions in this District, as *Marquez* did not issue until September 7, 2016—well after principal briefs on the motion to dismiss had already been filed.

As noted, § 1692e prohibits the use of any "false, deceptive, or misleading representation or means" in collecting debt. 15 U.S.C. § 1692e. Plaintiffs allege in Count V, among other things, that Defendants attached affidavits to their state court debt collection complaints in which the affiant falsely represented that s/he was "authorized" by the creditor to make the representations in the affidavit. (R. 79, Cons. Compl. ¶ 242.) Plaintiffs provide additional detail on the content of these affidavits and the circumstances of the corresponding debt collection lawsuits, at least as to Plaintiffs Afuang and the Castanos.[12] Plaintiffs allege that Afuang and the Castanos were sued in 2014 and 2015, respectively, by NCT entities purportedly represented by Defendants WWR and Blitt. (Id. ¶ 118, 126.) Plaintiffs allege that in both suits, an affidavit was attached to the complaint in which the affiant stated "I am duly authorized by Plaintiff to make the representations contained in this Affidavit" and "I have been authorized by Plaintiff to make this certification on behalf of Plaintiff for this case." (Id. ¶¶ 119, 121, 127, 129.) Plaintiffs expressly allege that the affidavits were not in fact authorized as represented in the affidavit. (Id. ¶ 122, 130.) These allegations identify at least some representations that Plaintiffs claims were false or misleading. Defendants do not offer any other arguments for why Plaintiffs fail to state a § 1692e claim in Count V.[13] Therefore, the Court declines to dismiss this claim on this basis.

---

[12] The complaint does not appear to include similarly detailed allegations as to any of the other named Count V Plaintiffs. However, Defendants argue only generally that the allegations are insufficient to state a claim under § 1692e; they do not make arguments specific to any Count V Plaintiff. Consequently, the Court does not consider whether the complaint sufficiently alleges a § 1692e claim as to every Count V Plaintiff.

[13] Defendants do not argue, for example, that the allegedly false statements in the affidavits concerning "authoriz[ation]" were immaterial. *See Lox v. CDA, Ltd.*, 689 F.3d 818, 826 (7th Cir. 2012) ("[A] false or misleading statement is only actionable under the FDCPA if it is material, . . . meaning that it has the ability to influence a *consumer's* decision." (citation and internal quotation marks omitted)); *Hahn v. Triumph P'ships LLC*, 557 F.3d 755, 758 (7th Cir. 2009) (explaining that "a false but non-material statement is not actionable" under § 1692e).

## C.    Whether Alleged Misrepresentations in State Court Pleadings Are Actionable Under § 1692f

Defendants' third argument is that Plaintiffs fails to state a claim under § 1692f in Count V because their allegations are an impermissible attack on Defendants' state court pleadings. Plaintiffs have alleged that Defendants violated § 1692f by: (1) "filing complaints that purport to have been authorized by the 'National Collegiate' trusts" when they were not actually so authorized, (R. 79, Cons. Compl. ¶ 242); (2) "requesting the entry of judgments in such complaints," (*id.*); and (3) attaching affidavits to their state court complaints in which the affiant represented that s/he was "authorized" by the creditor to make the representations in the affidavit when in fact the affiant was not so authorized, (*id.*). Defendants contend that violations of § 1692f cannot, as a matter of law, be based on alleged misconduct in state court debt collection litigation, which is all that Plaintiffs are asserting. (R. 73, Defs.' Mem. at 16.)

Section 1692f, as noted, prohibits the use of "unfair or unconscionable means" in the collection of debt, a phrase that the Seventh Circuit has called "as vague as they come." *Beler*, 480 F.3d at 474. In *Bentrud*, the Seventh Circuit observed that some language in § 1692f suggested that the entire section is not applicable to state judicial proceedings. 794 F.3d at 874-75. Specifically, the court took note of subsection (6), which prohibits "[t]aking or threatening to take any nonjudicial action to effect dispossession or disablement of property" under certain circumstances. *Id.* In the court's view, the operative phrase in § 1692f(6)—"nonjudicial action"—"implies that state judicial proceedings are outside the scope of § 1692f." *Id.* at 875 (citation and internal quotation marks omitted). The Seventh Circuit made a similar observation in *Beler*. 480 F.3d at 475 ("The implication [of § 1692f(6)] is that state judicial proceedings are outside the scope of § 1692f."). The court in *Bentrud* also commented that it "very much doubt[ed] that a state court motion for summary judgment . . . could qualify as an unfair or

unconscionable act under the FDCPA." 794 F.3d at 874. Defendants assert that *Bentrud* "unequivocally forecloses on plaintiffs' ability to bring their § 1692f claim." (R. 73, Defs.' Mem. at 16.)

However, neither *Bentrud* nor *Beler* squarely held that alleged misconduct in state judicial proceedings are outside the scope of § 1692f. In fact, in *Bentrud*, the court "note[d] that subsection (6) is merely one of eight illustrations in a non-exhaustive list" and "look[ed] to the facts of this particular case before [passing] judgment" on the plaintiff's § 1692f claim. *Id.* at 875. Had the court squarely held that misconduct during state judicial proceedings is never actionable under § 1692f, there would have been no need to "look to the facts of" the plaintiff's case. Absent clear direction from the Seventh Circuit, this Court cannot conclude as a matter of law that alleged misconduct during state judicial proceedings is never actionable under §1692f.

### D.    "Threats" Under § 1692e(5)

Defendants' fourth argument is that Plaintiffs have failed to state a claim under § 1692e(5) because they have alleged no threats and are attempting instead to treat state court debt collection litigation as a "threat." (R. 76, Defs.' Reply at 2.) Subsection (5) is one of the specifically enumerated examples of conduct that violates § 1692e; it prohibits "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken." 15 U.S.C. § 1692e(5). This subsection is "aimed at preventing empty threats of litigation as a means of scaring the debtor into payment." *Jenkins v. Union Corp.*, 999 F. Supp. 1120, 1136 (N.D. Ill. 1998). By its plain language, "[s]ection 1692e(5) does not prohibit the taking of an action that cannot legally be taken." *Fick*, 2012 WL 1074288, at *4. Rather, "[t]he plain language . . . makes clear that the prohibition extends only to *threats* of action that cannot legally be taken." *Id.* (emphasis added); *see also Vanhuss v. Kohn Law Firm S.C.*, 127 F. Supp. 3d 980, 988 (W.D. Wis. 2015) ("This court agrees . . . that extending § 1692e(5) to apply to actions actually taken

conflicts with the statutory text."); *Bravo v. Midland Credit Mgmt., Inc.*, No. 14 C 4510, 2014 WL 6980438, at *3 (N.D. Ill. Dec. 9, 2014) (holding that "§ 1692e(5) prohibits only the *threat* of unlawful action, not the unlawful action *itself*" because "Congress intended that provision to prohibit only threats, not actions" and that "the weight of authority from district[] courts in this Circuit . . . supports this conclusion"), *aff'd*, 812 F.3d 599 (7th Cir. 2016); *Thompson v. CACH, LLC*, No. 14 cv 313, 2014 WL 5420137, at *4 (N.D. Ill. Oct. 24, 2014) ("[T]hreats in and of themselves . . . animate § 1692e(5), not what unfolds following the taking of a debt collection action.").

In *Fick v. American Acceptance Co., LLC*, for example, the plaintiff alleged that the defendant violated § 1692e(5) by filing a debt collection complaint against her in state court without having a collection agency license as required under Indiana law. 2012 WL 1074288, at *1. The plaintiff had alleged only "actual action taken, instead of threats of action," but contended that "filing an illegal lawsuit [was] tantamount to threatening to take action that cannot legally be taken" and therefore violated § 1692e(5). *Id.* at *3-4. The court rejected this argument, reasoning that "[t]he plain language of the statute makes clear that the prohibition extends only to threats of action that cannot legally be taken . . . not [to] illegal actions actually taken." *Id.* at *4. Because the plaintiff had alleged only action taken, rather than any threats, the court dismissed the plaintiff's § 1692e(5) claim. *Id.*

The same reasoning applies here. Plaintiffs allege only actions, not threats, in support of their § 1692e(5) claim. Plaintiffs allege that Defendants filed state court debt collection complaints against them, requested entry of judgment in such complaints, and attached affidavits with allegedly false statements to those complaints. (R. 79, Cons. Compl. ¶ 242.) These are not "threats"; they are actions. *See St. John v. Cach, LLC*, 822 F.3d 388, 390-91 (7th Cir. 2016)

("[A] threat, in the broadest sense, involves a declaration of an intention to take some action."). Plaintiffs do not identify any statements in Defendants' state court complaints or accompanying affidavits as an alleged threat, nor do they allege a threat in any other context. Consequently, Count V fails to state a claim under § 1692e(5).

## V.      Count VI – Filing Prohibited Lawsuits (ICAA)

Count VI, captioned "Illinois Collection Agency Act - Filing Prohibited Lawsuits," is asserted by 16 of the Plaintiffs as representatives of the putative "ICAA" class against Defendants NCO and Transworld. (R. 79, Cons. Compl. ¶¶ 243-244.) Plaintiffs allege in Count VI that Defendants violated §§ 8a-1 and 9 of the ICAA, 225 ILL. COMP. STAT. 425/1 *et seq.* (*Id.* ¶ 246.) Section 8a-1 provides, as relevant to Plaintiffs' allegations, that "[a] collection agency shall not take any action that in fact or in appearance interferes with the professional relationship between the attorney and the creditor." 225 ILL. COMP. STAT. 425/8a-1. Section 9 provides, in relevant part, that the Illinois Department of Financial and Professional Regulation ("DFPR") may take various forms of disciplinary action against collection agencies that "[a]ttempt[] or threaten[] to enforce a right or remedy with knowledge or reason to know that the right or remedy does not exist" or "[e]ngag[e] in dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud, or harm the public," among other conduct. 225 ILL. COMP. STAT. 425/9(a)(24), (35). Plaintiffs allege that Defendants violated these provisions of §§ 8a-1 and 9 by controlling the filing and prosecution of debt collection lawsuits against Plaintiffs. (R. 79, Cons. Compl. ¶¶ 246-48.)

Defendants argue that Count VI must be dismissed because Plaintiffs have no private right of action under the ICAA as to either § 8a-1 or § 9. (R. 73, Defs.' Mem. at 16-20.) Defendants contend that neither section expressly creates a private right of action and neither can be read to imply a private right of action. (*Id.*) Plaintiffs do not dispute that neither section

expressly authorizes a private right of action, but contend that a private right of action should be implied. (R. 75, Pls.' Resp. at 34-39.)

The Illinois Supreme Court has not squarely decided whether a private right of action exists as to either § 8a-1 or § 9 of the ICAA. The Court addresses § 9 first because Plaintiffs treat their § 8a-1 claim as dependent on an implied private right of action under § 9. (R. 75, Pls.' Resp. at 37.) The parties' principal dispute as to § 9 is whether this Court should follow *Sherman v. Field Clinic*, 392 N.E.2d 154 (Ill. App. Ct. 1979), a case in which the Illinois Appellate Court held that an implied private right of action exists to pursue violations of § 9 of the ICAA. *Id.* at 161. In *Sherman*, the plaintiffs alleged that the defendant violated § 9 of the ICAA by "engag[ing] in severe harassment . . . in an attempt to collect" on debt owed to the defendant. *Id.* at 156. The plaintiffs alleged among other things that the defendant called their home 10-20 times per day, sent numerous letters, called family members at work and threatened to garnish their wages, and threatened to embarrass family members by contacting their employers and co-workers. *Id.* at 156-57; *see also Galvan v. NCO Fin. Sys., Inc.*, No. 11 C 3918, 2016 WL 792009, at *2 (N.D. Ill. Mar. 1, 2016) (discussing *Sherman*). The Illinois Appellate Court recognized that the ICAA gave no express authorization for private action, but concluded under those circumstances that a private right of action should be implied. *Sherman*, 392 N.E.2d at 161.

Plaintiffs argue that *Sherman* is controlling and that they consequently have an implied private right of action to redress Defendants' alleged violations of § 9. The Court disagrees that *Sherman* is controlling. This Court is obliged to consider and give weight to Illinois Appellate Court decisions, but it is not bound by such decisions and may deviate from them when there are "persuasive indications" that the Illinois Supreme Court would decide the issue differently. *Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016); *Commonwealth Ins. Co. v.*

*Stone Container Corp.*, 323 F.3d 507, 509 (7th Cir. 2003); *McCabe v. Crawford & Co.*, 272 F. Supp. 2d 736, 751 n.16 (N.D. Ill. 2003). This Court has previously expressed "serious doubts" that an implied private right of action exists under § 9 of the ICAA, *McCabe*, 272 F. Supp. 2d at 751, and concludes now that there are numerous persuasive indications that the Illinois Supreme Court would depart from *Sherman* and find no implied private right of action under § 9.

First, *Sherman* was decided nearly 40 years ago, and no Illinois appellate decision before or since has found, applied, or even mentioned an implied private right of action under § 9—or, so far as this Court's research reveals, any other provision of the ICAA. *Sherman* stands alone in a broader sense too: as Defendants point out, Illinois circuit courts have frequently declined to follow *Sherman* and have dismissed private actions seeking to enforce provisions of the ICAA, including private actions based on alleged violations of § 9.[14]

Second, both the DFPR and the Illinois Attorney General are expressly authorized to take action in cases of proscribed conduct under § 9, evincing a legislative intent not to imply a private right of action. In recent cases where the Illinois Supreme Court has explored whether a private right of action should be implied from a statute, it has explained that "when a statute

---

[14] *See White v. N. Star Capital Acquisition, LLC*, No. 11 CH 15336 (Ill. Cir. Ct. Nov. 27, 2012) (finding no private right of action under § 9 of the ICAA, explaining that "the ICAA was amended extensively" after *Sherman*, and that "[t]he justification for allowing a private right of action under *Sherman* no longer exists under the current version of the ICAA"); *Harris v. Investment Retrievers, Inc.*, No. 12 CH 2141 (Ill. Cir. Ct. Aug. 6, 2012) (declining to find a private right of action under § 9 of the ICAA notwithstanding *Sherman*, explaining that "the continuing viability of *Sherman* is questionable given subsequent legislative enactments to the ICAA and subsequent decisions of the Illinois Supreme Court"); *Merritt v. Palisades Acquisition XVI, LLC*, No. 11 CH 14691 (Ill. Cir. Ct. July 3, 2012) (declining to find private right of action under § 9); *Brown v. Credit Line Recovery, Inc.*, No. 11 CH 14710 (Ill. Cir. Ct. June 18, 2012) (same); *Betts v. Atl. Credit & Fin., Inc.*, No. 11 CH 23341 (Ill. Cir. Ct. June 18, 2012) (same); *Rewak v. Erin Capital Mgmt., LLC*, No. 11 CH 28506 (Ill. Cir. Ct. May 25, 2012) (finding no private right of action under the ICAA, explaining that "the structure of the ICAA indicates that the legislature did not intend to imply a private right of action"); *Dremo v. Davis Acquisitions Corp.*, No. 11 CH 18522 (Ill. Cir. Ct. May 25, 2012) (same); *see also Galvan v. NCO Fin. Sys., Inc.*, No. 11 C 3918, 2016 WL 792009, at *3 (N.D. Ill. Mar. 1, 2016) (collecting cases and noting that "circuit judges in Cook County have recently questioned the continuing vitality of *Sherman*"). Defendants attached the above-listed Illinois Circuit Court decisions to their memorandum in support of the motion to dismiss (R. 73).

grants a state official broad authority to enforce the statute . . . it indicates the legislature's intent not to imply a private right of action for others to enforce the statute." *Metzger v. DaRosa*, 805 N.E.2d 1165, 1172 (Ill. 2004) (finding no implied private right of action under Illinois whistleblower statute). Section 9 does not simply prohibit certain conduct and leave ambiguous how violators are to be disciplined; it expressly authorizes the DFPR to take both "disciplinary" and "non-disciplinary" action—including reprimands, license revocation, and fines—against collection agencies that engage in any of the more than 30 different types of conduct listed. *See* 225 ILL. COMP STAT. 425/9(a) ("The Department may refuse to issue or renew, or may revoke, suspend, place on probation, reprimand or take other disciplinary or non-disciplinary action as the Department may deem proper, including fines not to exceed $10,000 per violation, for any one or any combination of the following causes . . . ."). The ICAA also authorizes the Illinois Attorney General to "enforce the knowing violation of Section 9" as an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act. 225 ILL. COMP. STAT. 425/9.7. The express grant of authority to both the DFPR and the Illinois Attorney General to pursue violations of § 9 "indicates the legislature's intent not to imply a private right of action." *Metzger*, 805 N.E.2d at 1172.

Third, the ICAA expressly adopts Illinois' Administrative Review Law ("ARL"), as part of its statutory framework, for review of the DFPR's final administrative decisions. As already noted, § 9 authorizes the DFPR to take disciplinary action for proscribed conduct. Section 26 of the ICAA provides that these disciplinary actions "are subject to judicial review under the Administrative Review Law and its rules." 225 ILL. COMP. STAT. 425/26(a). The Illinois Supreme Court has explained that "[w]here the statute creating or conferring power on an administrative agency expressly adopts the Administrative Review Law, a circuit court has no

authority to entertain an independent action." *Metzger*, 805 N.E.2d at 1171. This principle, which applies here to the ICAA, is another persuasive indication that the Illinois Supreme Court would not imply a private right of action under § 9.

Fourth, other sections in the ICAA expressly provide a private right of action, evidencing the legislature's intent not to imply a private right of action in § 9. The Illinois Supreme Court has explained that "[w]here . . . the legislature has expressly provided a private right of action in a specific section of the statute, we believe the legislature did not intend to imply private rights of action to enforce other sections of the same statute." *Id.* at 1172. Section 14a of the ICAA expressly provides a private right of action; it authorizes "any person" to pursue injunctive relief against collection agencies that operate in Illinois without a license. 225 ILL. COMP. STAT. 425/14a ("The Secretary, the Attorney General, the State's Attorney of any county in the State, or any person may maintain an action in the name of the People of the State of Illinois . . . to enjoin such entity from engaging in [the unlicensed practice as a collection agency].") The express authorization for private actions in § 14a shows that the legislature "did not intend to imply private rights of action to enforce other sections" such as § 9. *Metzger*, 805 N.E.2d at 1172.

Finally, in *People ex rel. Daley v. Datacom Sys. Corp.*, 585 N.E.2d 51 (Ill. 1991), the Illinois Supreme Court itself suggested in dicta that no implied private right of action exists to enforce violations of the ICAA. *Datacom* was a suit by the Cook County State's Attorney, on behalf of Illinois citizens, against the City of Chicago and a city vendor that was contracted to collect on delinquent parking tickets. *Id.* at 54-55. The suit alleged that the vendor violated various ICAA provisions in the process of collecting on the parking tickets. *Id.* On appeal to the Illinois Supreme Court, the vendor argued that "the State ha[d] no standing to prosecute civil

39

damage suits under the Collection Agency Act for the benefit of private parties." *Id.* at 62. The Illinois Supreme Court agreed that "only the Department [of Financial and Professional Regulation] had standing to pursue civil violations of the Collection Agency Act."[15] *Id.* While the statement is dictum because the State's complaint ultimately sought relief under a different statute, *id.*, it is nevertheless a persuasive indication that the Illinois Supreme Court would find no implied private right of action in § 9 of the ICAA, particularly so because *Datacom* is far more recent than *Sherman*.

This Court recognizes that several decisions from this District have relied on and favorably cited *Sherman* for the proposition that the ICAA implies a private right of action. *See, e.g.*, *McLaughlin v. LVNV Funding, LLC*, 971 F. Supp. 2d 796, 800 (N.D. Ill. 2013); *Grant-Hall v. Cavalry Portfolio Servs., LLC*, 856 F. Supp. 2d 929, 940 (N.D. Ill. 2012). With due deference to those decisions, it does not appear that the parties in those cases presented their respective courts with all of the indications discussed above that the Illinois Supreme Court would decide the issue differently. It appears that as a result, those decisions concluded that "[t]here are no such persuasive indications." *Grant-Hall*, 856 F. Supp. 2d at 940; *see also McLaughlin*, 971 F. Supp. 2d at 800 (quoting *Grant-Hall*). Instead, those courts appear to have relied on the Illinois Supreme Court's citation to *Sherman* in *Sawyer Realty Group, Inc. v. Jarvis Corp.*, 432 N.E.2d

---

[15] The court did qualify its statement in *Datacom* with "at the time the State filed the complaint," implying that at some point after February 1986 (when the State filed its complaint), but before the court's decision, the DFPR no longer had exclusive standing to pursue civil violations of the ICAA. *Datacom*, 585 N.E.2d at 62. The court's citations reveal that it was referring to a later-enacted provision of the ICAA (that is, subsequent to the filing of State's 1986 complaint) that expressly provided a private right of action. Specifically, the court cited ILL. REV. STAT. 1989, ch. 111, ¶ 2039a, enacted in 1989, which is now codified at 225 ILL. COMP. STAT. 425/14a. Section 14a, as already discussed, expressly provides "any person" the right to pursue injunctive relief against collection agencies operating without a license. 225 ILL. COMP. STAT. 425/14a. The court did not cite any authority *implying* a private right of action under any provision of the ICAA. *Datacom*, 585 N.E.2d at 62. It merely recognized that the ICAA was amended during the pendency of the litigation to expressly authorize a private action for one purpose; other than that exception, the court agreed that "only the Department had standing to pursue civil violations." *Id.*

849, 852-53 (1982). *See McLaughlin*, 971 F. Supp. 2d at 800 (noting that *Sawyer* cited *Sherman* in its private right of action analysis); *Grant-Hall*, 856 F. Supp. 2d at 940 (same). However, the Court is persuaded that the dictum in *Datacom*, discussed above, is a much better indication of how the Illinois Supreme Court would decide this issue, particularly so because *Datacom* is a much more recent decision than *Sawyer* and expressly referenced the ICAA. By contrast, *Sawyer* dealt with the Illinois Real Estate Brokers and Salesmen License Act. 432 N.E.2d at 850. In addition, after *Sawyer* but before *Datacom*, the ICAA was amended to expressly provide a private right of action in § 14a, which the *Datacom* court recognized was an exception to its general conclusion that "only the Department [of Financial and Professional Regulation] had standing to pursue civil violations of the Collection Agency Act." *Datacom*, 585 N.E.2d at 62. Finally, the Court is not persuaded that the number of these federal district court decisions, in and of itself, should be accorded weight. Whether an implied right of action exists under § 9 of the ICAA is an issue of *state* law. The Court is thus particularly mindful of the fact that, as Defendants have pointed out, Illinois circuit courts regular conclude that § 9 confers no such implied right.

In light of these persuasive indications, the Court concludes that the Illinois Supreme Court would most likely depart from *Sherman* and find that no implied private right of action exists under § 9 of the ICAA. As noted, Plaintiffs are basing their claim under § 8a-1 on an implied right of action under § 9. (R. 75, Pls.' Resp. at 37 ("The implied private right of action identified by the *Sherman* court applies to violations of section 8a-1.").) Because Plaintiffs have no implied private right of action under § 9, they also have failed to state a claim under § 8a-1. Consequently, Count VI is dismissed.

## VI.        Count VII – Filing Prohibited Lawsuits (ICFA)

Count VII, captioned "Illinois Consumer Fraud Act - Filing Prohibited Lawsuits," is asserted by 16 of the Plaintiffs as representatives of the putative "ICFA" class against Defendants NCO and Transworld. (R. 79, Cons. Compl. ¶¶ 251-52.) Plaintiffs allege in Count VII that Defendants engaged in unfair and deceptive acts and practice in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILL. COMP. STAT. 505/2. (R. 79, Cons. Compl. ¶ 253.) The ICFA provides a remedy for "[u]nfair methods of competition and unfair or deceptive acts or practices . . . in the conduct of any trade or commerce." 815 ILL. COMP. STAT. 505/2. Plaintiffs allege that Defendants violated the ICFA by "controlling the filing and prosecution of collection litigation, without the requisite involvement of the purported client." (R. 79, Cons. Compl. ¶ 253.) Defendants argue that Count VII must be dismissed because Plaintiffs have failed to plausibly and specifically allege all the elements of a claim under the ICFA.

"To adequately plead a private cause of action under the ICFA, a plaintiff must allege: (1) an unfair or deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) that the deception occurred in the course of conduct involving trade or commerce; (4) actual damage to the plaintiff; and (5) that such damages were proximately caused by the defendant's deception." *Thrasher-Lyon v. Ill. Farmers Ins. Co.*, 861 F. Supp. 2d 898, 908-09 (N.D. Ill. 2012); *see also Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 850 (Ill. 2005) (listing elements). In addition, a claim of deceptive conduct under the ICFA "must be pled with particularity," meaning a plaintiff "must allege with particularity the 'who,

what, when, where, and how' of the fraud or misrepresentation."[16] *Thrasher-Lyon*, 861 F. Supp. 2d at 909 (citation omitted); *see also Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 399 (7th Cir. 2011) ("Claims for violation of the [ICFA] are subject to the same heightened pleading standards as other fraud claims; as such, they must satisfy the particularity requirement of Rule 9(b) of the Federal Rules of Civil Procedure."); *accord Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996) ("[A] complaint alleging . . . consumer fraud must be pled with the same particularity and specificity as that required under common law fraud."). The entirety of Plaintiffs' substantive allegations in Count VII are that:

> 253. Defendants engaged in unfair and deceptive acts and practices, in violation of 815 ILCS 505/2, by controlling the filing and prosecution of collection litigation, without the requisite involvement of the purported client, as set forth above, thereby engaging in the unauthorized practice of law and the improper filing and prosecution of collection litigation under circumstances prohibited by Illinois statute and public policy.
>
> 254. Defendants engaged in such conduct in the course of trade and commerce.

(R. 79, Cons. Compl. ¶¶ 253-54.)

The Court agrees that Plaintiffs have failed to state a claim under the ICFA. Among other things, Plaintiffs have failed to plausibly and specifically allege intent. Plaintiffs' allegations in Count VII do not at all address Defendants' intent, and Plaintiffs identify no other allegations in

---

[16] The Court recognizes that the Seventh Circuit has distinguished between claims of "unfair" practices or conduct and "deceptive" practices or conduct under the ICFA and explained that only the latter are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008) (holding that "unfair" practices claims are not subject to Rule 9(b) pleading because "neither fraud nor mistake is an element of unfair conduct under" the ICFA). Count VII largely parrots the ICFA's statutory language, alleging that Defendants engaged in both "unfair *and* deceptive acts and practices." (R. 79, Cons. Compl. ¶ 253 (emphasis added).) However in their briefs, Plaintiffs have not taken the position that they are claiming "unfair" acts or practices based on Defendant's conduct, nor have they argued that any aspect of Count VII is not subject to particularized pleading under Rule 9(b). Thus, the Court presumes that Plaintiffs are claiming only deceptive acts and practices in Count VII, such that Count VII is subject to the heightened pleading standard of Rule 9(b). Nevertheless, the Court concludes that even if Plaintiffs were also asserting an "unfair" practices claim subject to the lower pleading standard of Rule 8, Plaintiffs have failed to plausibly allege all the elements of such a claim.

the complaint that do. Plaintiffs have also failed to plausibly and specifically allege that any damages were proximately caused by the Defendants' allegedly unfair or deceptive acts. "Proximate causation is an element of all private causes of action under the [ICFA]." *Avery*, 835 N.E.2d at 861. To plausibly allege proximate causation, "Plaintiffs must . . . set forth sufficient allegations to find it plausible that 'but for' Defendants' unfair and deceptive acts, Plaintiffs would not have been damaged." *Blankenship v. Pushpin Holdings, LLC*, No. 14 C 6636, 2015 WL 5895416, at *11 (N.D. Ill. Oct. 6, 2015). "[T]he plaintiff must actually be deceived by a statement or omission that is made by the defendant. If a consumer has neither seen nor heard any such [deceptive] statement, then she cannot have relied on the statement and, consequently, cannot prove proximate cause." *De Bouse v. Bayer*, 922 N.E.2d 309, 316 (Ill. 2009).

As best this Court can discern from Plaintiffs' generalized allegations in Count VII, the only allegedly unfair or deceptive acts that Defendants engaged in were prosecuting debt collection lawsuits against the Plaintiffs without the "requisite involvement of the purported client."[17] (*Id.* ¶ 253.) The only damages that Plaintiffs allege are that they incurred costs and attorneys' fees in defending against those lawsuits. (*E.g.*, R. 79, Cons. Compl. ¶ 117 (alleging that Plaintiffs Rosen and Patel "paid appearance fees and attorneys fees and spent time defending the lawsuits against them"); *id.* ¶ 152 (alleging that Plaintiffs "had to pay an appearance fee and attorneys fees").) Plaintiffs nowhere allege—let alone with sufficient particularity, *see Greenberger*, 631 F.3d at 399—that any deceptive statement or omission was made during those

---

[17] To the extent that Plaintiffs believe that their ICFA claim is based on some other deceptive or unfair act or omission, they have failed to make that clear in their briefs and do not identify any other allegations in the complaint as relevant to their ICFA claim. It is not this Court's task to "sift through a complaint to extract some merit when the attorney who drafted it has failed to do so himself." *Stanard v. Nygren*, 658 F.3d 792, 800 (7th Cir. 2011). "[A] complaint must be presented with intelligibility sufficient for a court or opposing party to understand whether a valid claim is alleged and if so what it is." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 775 (7th Cir. 1994) (citation and internal quotation marks omitted).

suits and by whom, how they relied on it, or how they would have avoided their alleged damages (costs and attorneys fees) "but for" the deception. *See Blankenship*, 2015 WL 5895416, at *11; *De Bouse*, 922 N.E.2d at 316. Rather than relying on an allegedly deceptive statement or omission, Plaintiffs appear to contend that the filing of the debt collection suits against them was, in and of itself, a deceptive act: they argue that "[b]y directing the filing of the complaints, defendants 'spoke' to plaintiffs, and plaintiffs were impacted." (R. 75, Pls.' Resp. at 40.) Even assuming that the filing of a lawsuit, in and of itself, could constitute a deceptive act,[18] Plaintiffs still have not adequately alleged proximate causation. Plaintiffs are not alleging that they were deceived by the filing of the lawsuits into believing that the debts were valid and voluntarily paid the amounts sought as a result, but would instead have vigorously defended had they known some material fact that Defendants omitted or misrepresented during the lawsuits. The only damages they allege are costs and attorneys fees. It is entirely unclear how the filing of the lawsuits "deceived" Plaintiffs into paying these. Costs and attorneys' fees would have been incurred once the suits were filed whether or not Defendants maintained the "requisite involvement of the purported client." Plaintiffs have failed to adequately allege either intent or proximate causation and therefore fail to state a claim under the ICFA. Count VII is therefore dismissed without prejudice.

## VII.    Count VIII – Unauthorized Filing of Lawsuits

Count VIII, captioned "Unauthorized Filing of Lawsuits," is asserted by 16 of the Plaintiffs as representatives of the putative "Blitt" and "WWR" classes against Defendants Blitt and WWR. (R. 79, Cons. Compl. ¶¶ 255-256.) Plaintiffs allege in Count VIII that Defendants Blitt and WWR filed debt collection lawsuits against them that had not been authorized as

---

[18] It not clear how the filing of a lawsuit, in and of itself, can constitute a deceptive act under the ICFA, and Plaintiffs cite no authority to support this questionable proposition.

required by § 8a-1 of the ICAA, 225 Ill. Comp. Stat. 425/8a-1. As previously noted, § 8a-1 provides that before a collection agency may turn over an account to an attorney for further collection action (such as filing a collection lawsuit), the account creditor must be "notified in writing . . . of the collection agency's intent to refer the account to an attorney." 225 Ill. Comp. Stat. 425/8a-1(a). Following notice from the collection agency, the account creditor has the opportunity to "notif[y] the collection agency . . . that the creditor is withholding authorization for the account to be referred to an attorney." *Id.* The statute can alternatively be satisfied if the account creditor itself signs any complaint that is filed seeking judgment based on the debt. *Id.*

Defendants argue that Count VIII must be dismissed because it asserts a violation of the ICAA, but the ICAA expressly does not apply to lawyers and law firms such as Blitt and WWR—the only Defendants against whom Count VIII is asserted. (R. 73, Defs.' Mem. at 24.) It appears that Count VIII is expressly based on the alleged violation of § 8a-1 of the ICAA: Plaintiffs allege that "Blitt and WWR filed lawsuits against plaintiffs and the class members that had not been authorized as required by Illinois law, in that they were filed *in violation of 225 ILCS 425/8a-1.*" (R. 79, Cons. Compl. ¶ 258 (emphasis added).) Section 2.03 of the ICAA, titled "Exemptions," provides that "[t]his Act does not apply to" various enumerated individuals and entities, including "[l]icensed attorneys at law." 225 Ill. Comp. Stat. 425/2.03(5); *see also Grant-Hall*, 856 F. Supp. 2d at 945 ("The Law Firms are correct that they may not be sued under the ICAA.")

Plaintiffs do not dispute that § 2.03 applies here. Instead, Plaintiffs contend that Count VIII is not based an alleged violation of the ICAA, and that they have instead alleged the independent tort of "unauthorized filing of a lawsuit" that was recognized in *Safeway Insurance Co. v. Spinak*, 641 N.E.2d 834 (Ill. App. Ct. 1994). (R. 75, Pls.' Resp. at 44-45.) Defendants

argue that even if Count VIII can be read to allege this tort,[19] Plaintiffs have failed to plausibly allege an "unauthorized filing" claim against Blitt and WWR. (R. 73, Defs.' Mem. at 25-26.)

In *Safeway*, the Illinois Appellate Court recognized a cause of action for the "'unauthorized filing' of a lawsuit," as distinct from a claim of malicious prosecution or abuse or process. 641 N.E.2d at 835-36. A claim for "unauthorized filing," the court explained, "seeks redress against those who set our judicial system in motion when there is no litigant seeking to enforce a right." *Id.* at 836. In reaching this conclusion, the court relied on prior cases that had "recognized a cause of action in favor of the defendant in a legal proceeding against the attorney who instituted such proceeding without authority from the putative plaintiff." *Id.* at 835. While the court did not explicitly identify the elements of such a claim—and this Court has not located any authority that does—it appears sufficient to state a claim of "unauthorized filing" by alleging that an attorney filed suit on behalf of a putative plaintiff without the knowledge or consent of the putative plaintiff. *See id.* at 836-37. Here, Plaintiffs have alleged that Blitt and WWR initiated debt collection lawsuits against them on behalf of NCT entities, that "[o]n information and belief, no trustee or employee of any 'National Collegiate' trusts had knowledge about the claims pursued in their names," and that the only consent for the filing of the lawsuits "comes from NCO/Transworld." (R. 79, Cons. Compl. ¶¶ 148, 150(e).) This appears sufficient to state a claim of "unauthorized filing" pursuant to *Safeway*.

---

[19] It appears to this Court a bit of a stretch to contend that Count VIII alleges the independent tort of "unauthorized filing of a lawsuit" because the only substantive allegation in Count VIII expressly relies on § 8a-1 of the ICAA. (R. 79, Cons. Compl. ¶ 258.) And "it is axiomatic that [a] complaint may not be amended by the briefs in opposition to a motion to dismiss." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984). Nevertheless, Plaintiff did cite *Safeway* in the complaint for the proposition that "[u]nder Illinois law, an attorney who files a lawsuit without lawful authorization from the client . . . is personally liable for all damages and expenses caused." (R. 79, Cons. Compl. ¶ 257.) The Court therefore finds it reasonable to construe Count VIII liberally as also alleging the tort of "unauthorized filing" pursuant to *Safeway*. *See Mount v. LaSalle Bank Lake View*, 926 F. Supp. 759, 763 (N.D. Ill. 1996) ("The court must construe the pleadings liberally[.]").

Because Plaintiffs do not dispute that § 2.03 of the ICAA applies to Blitt and WWR, Count VIII is dismissed in part as to any ICAA claim asserted against Blitt and WWR. The Court declines to dismiss Count VIII as to Plaintiffs' claim for "unauthorized filing" pursuant to *Safeway*.

## VIII.    Count IX – Improper Credit Reporting (FDCPA)

Count IX, captioned "FDCPA – Improper Credit Reporting," is asserted by two of the Plaintiffs (Rocco and Afuang) as representatives of the putative "FDCPA Credit" class against Defendant Transworld. (R. 79, Cons. Compl. ¶¶ 259-60.) Plaintiffs allege in Count IX that Transworld violated the FDCPA, 15 U.S.C. §§ 1692e, 1692e(2), 1692e(8), and 1692e(10), by reporting their student loan debts to credit reporting agencies without reporting that those debts were disputed by Plaintiffs. (*Id.* ¶ 261.) The complaint alleges that Rocco and Afuang "disputed" their debts in different ways. As to Rocco, the complaint alleges that in Defendants' state court debt collection lawsuit against her, she—through counsel—"appeared . . . and defended the lawsuits" and "filed answers disputing the debt." (*Id.* ¶¶ 155-156.) As to Afuang, the complaint alleges that "[b]y letter of May 18, 2015, Afuang, by counsel, notified counsel retained by Transworld that the debt was disputed." (*Id.* ¶ 133.) Plaintiffs do not allege or identify any other ways in which Rocco or Afuang allegedly "disputed" their debts.

Defendants argue that Plaintiffs' § 1692e(8) claim must be dismissed because, even accepting Plaintiffs' allegations, neither of the debts was properly "disputed" to Transworld. (R. 73, Defs.' Mem. at 26-28.) Defendants also argue that the §§ 1692e, 1692e(2), and 1692e(10) claims are predicated solely on the alleged violation of § 1692e(8) and should therefore be dismissed as well. (*Id.* at 26 n.11.) Plaintiffs do not respond to Defendants' latter argument, so the Court assumes for purposes of the present motion that the §§ 1692e, 1692e(2), and 1692e(10) claims rise and fall with the § 1692e(8) claim.

Section 1692e(8) is one of the enumerated examples of conduct that violates the more general prohibition of § 1692e. This subsection prohibits "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false," including "the failure to communicate that a disputed debt is disputed." 15 U.S.C. § 1692e(8). Section 1692e(8) "requires a debt collector who knows or should know that a given debt is disputed to disclose its disputed status to persons inquiring about a consumer's credit history." *Luxenburg v. Equifax Credit Info. Servs.*, No. 03 C 5440, 2005 WL 78947, at *5 (N.D. Ill. Jan. 12, 2005) (citation omitted); *see also Brady v. Credit Recovery Co.*, 160 F.3d 64, 67 (1st Cir. 1998) (same).

As to Plaintiff Rocco, Defendants contend that her counsel's filing of an appearance and answer in Defendants' state court debt collection lawsuit does not, in and of itself, "dispute" Rocco's debt under § 1692e(8). (R. 73, Defs.' Mem. at 26-27.) Plaintiffs respond that they rely not on the filing of an appearance and answer as such, but on statements *in* Rocco's state court answer by which she allegedly "disput[ed] the debt and assert[ed] affirmative defenses." (R. 75, Pls.' Resp. at 46-47.) The complaint does not expressly allege the contents of Rocco's state court answer, but the answer itself was attached to Plaintiffs' complaint. (*See* R. 79-2, Cons. Compl., App. 35 at 88-92.) The Court may therefore consider its contents in deciding this motion. *See Williamson*, 714 F.3d at 436. As Defendants point out, Rocco's responses in her state court answer all state, with only minor variation: "[Rocco] lacks sufficient information to admit or deny this allegation as the loan is not identified. To the extent an answer is required, [Rocco] denies all of the allegations contained in paragraph 1 of the complaint." (R. 79-2, Cons. Compl., App. 35 at 90-91.) For example, in response to the allegation that "[Rocco] . . . defaulted pursuant to the terms of the Note resulting in the balance due Plaintiff of $34,699.04," Rocco's

answer stated: "[Rocco] lacks sufficient information to admit or deny this allegation as a copy of the alleged note is not attached to this complaint. To the extent an answer is required, Defendant denies all of the allegations contained in paragraph 3 of the complaint." (*Id.* at 90.) Aside from different paragraph numbering and the explanation for why Rocco lacked sufficient information to admit or deny each allegation, the responses are all identical. (*Id.*) Rocco also asserted five purported affirmative defenses: (1) failure to comply with 815 ILL. COMP. STAT. 505/2S; (2) that the NCT plaintiff, as a trust, lacked the capacity to sue and that suit must be brought by the trustee; (3) that the NCT plaintiff lacked standing because it produced no documents showing an ownership interest in, or right to collect, the alleged debt; (4) that the note evidencing the loan was unenforceable to the extent that the original lender engaged in LIBOR manipulation; and (5) a reservation of rights to "assert other applicable affirmative defenses based on information obtained during discovery." (*Id.* at 91-92.) The answer did not include any counterclaims or prayer for relief. (*Id.*)

The FDCPA does not define "disputed debt" or explain what is required to "dispute[]" a debt so as to trigger obligations to report the debt as disputed under § 1692e(8). No U.S. Courts of Appeals have done so either, so far as this Court's research reveals. However, in a recent unpublished order in *Dixon v. RJM Acquisitions, LLC*, the U.S. Court of Appeals for the Tenth Circuit reversed a district court's grant of summary judgment to a debt collector on a § 1692e(8) claim. 640 F. App'x 793, 795 (10th Cir. 2016). The plaintiff in *Dixon* alleged that she "disputed" her purported debt for purposes of § 1692e(8) in a telephone call during which she stated "I don't agree that I owe that much, that's too much," "I don't owe that much," and "I feel that all I owe is $20." *Id.* 794-95. The court held that these statements raised a genuine fact issue of whether the debt was disputed, which precluded summary judgment for the debt collector. *Id.* A recent

decision from this District explained that "the FDCPA does not require the use of particular words to dispute a debt." *Bowse v. Portfolio Recovery Assocs., LLC*, No. 15 C 4037, --- F. Supp. 3d ---, 2016 WL 6476545, at *5 (N.D. Ill. Nov. 2, 2016). Multiple courts in this District have held, for example, that the statement "the amount reported is not accurate" is sufficient to plausibly allege a dispute within the meaning of § 1692e(8). *Id.* at *4 (collecting cases); *see also Emerson v. Fid. Capital Holdings, Inc.*, No. 15 C 3416, 2015 WL 5086458, at *2 (N.D. Ill. Aug. 14, 2015) (denying motion to dismiss § 1692e(8) claim, explaining that "[plaintiff's] statement that 'the amount reported is not accurate' evinces the intention to dispute the validity of at least a portion of the purported debt"). A court outside this District found that a plaintiff's insistence that "her insurance should have paid the debt" also constituted a "dispute." *Carter v. Credit Bureau of Carbon Cty.*, No. 1:14-cv-00873, 2015 WL 4450698, at *2-3 (D. Colo. July 20, 2015). Statements such as "I don't owe that balance" and "I don't owe that much" are also sufficient. *Irvine v. I.C. Sys., Inc.*, 176 F. Supp. 3d 1054, 1061 (D. Colo. 2016); *see also Sanchez v. Pinnacle Credit Servs., LLC*, 195 F. Supp. 3d 1184, 1190 (D. Colo. 2016) (holding that plaintiff disputed a debt under § 1692e(8) when, during a telephone call with the debt collector, she stated "[o]kay, but I don't agree with that at all, I don't know how it got that high," "[t]hat's wrong," "[o]kay, yeah, cause I don't owe that much . . . not even close," "[y]ou know I don't owe that much," and similar statements). A district court applying 15 U.S.C. § 1692g(b)—another provision of the FDCPA that involves "disputing" a debt[20]— concluded that a plaintiff's handwritten message stating "THIS DEBT IS PAID IN FULL AS PER THE SETTLEMENT AGREEMENT. DO NOT CONTACT ME AGAIN!" clearly constituted a dispute of the debt.

---

[20] Section 1692g(b) provides that "[i]f the consumer notifies the debt collector in writing . . . that the debt, or any portion thereof, *is disputed* . . . the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor." 15 U.S.C. § 1692g(b) (emphasis added).

*Burke v. Messerli & Kramer P.A.*, No. 09-1630, 2010 WL 3167403, at *3 (D. Minn. Aug. 9, 2010). These decisions helpfully illustrate what is sufficient to dispute a debt, but they do not clarify what is *necessary* to do so because none of them found a purported "dispute" insufficient.

In the absence of clear law on what is necessary to "dispute" a debt, the Court is unable to conclude at this stage that Rocco's responses in her state court answer fail to qualify as "disputing" the debt for purposes of § 1692e(8). Each response states that "[Rocco] lacks sufficient information to admit or deny" the allegation to which it responds. While this fails to take any affirmative position about the validity or amount of the debt, each response adds that "[t]o the extent an answer is required, Defendant denies all of the allegations contained in [this] paragraph . . . of the complaint." (R. 79-2, Cons. Compl., App. 35 at 90.) The Court is unable to conclude that this fails as a matter of law to "dispute" the debt for purposes of § 1692e(8).

The affirmative defenses in Rocco's state court answer, however, do not suffice as a "dispute" for purposes of § 1692e(8). In Illinois, "[a]n affirmative defense does not negate the essential elements of the plaintiff's cause of action. To the contrary, it admits the legal sufficiency of that cause of action [and] *assumes that the defendant would otherwise be liable* . . . but asserts new matter by which the plaintiff's apparent right to recovery is defeated." *Vroegh v. J & M Forklift*, 651 N.E.2d 121, 125-26 (Ill. 1995) (emphasis added, internal citation omitted). Thus, as a matter of law, the affirmative defenses asserted in Rocco's state court answer did not

dispute the validity or amount of Rocco's debts.[21] However, the responses to each allegation in her state court answer could suffice as a "dispute," because they "den[y] all of the allegations contained in" each paragraph. Consequently, Plaintiffs have stated a claim under § 1692e(8) as to Rocco, and the Court declines to dismiss Count IX as to her.

As to Plaintiff Afuang, Defendants do not argue that his May 2015 letter sent to Defendants' collection counsel (Defendant Blitt) failed to "dispute" the debt under § 1692e(8). Defendants argue instead that the letter was not sufficient "notice" to Transworld because it was sent only to Blitt, the law firm retained by Defendants to pursue state court debt collection litigation. (R. 73, Defs.' Mem. at 27-28.) To be clear, there is no "notice" requirement in § 1692e(8); the relevant question is whether Plaintiffs have plausibly alleged that Transworld knew or should have known that Afuang disputed the debt. *See Luxenburg*, 2005 WL 78947, at *5; *Brady*, 160 F.3d at 67. As Defendants accurately observe, Plaintiffs have not alleged that Transworld had direct knowledge that Afuang disputed his debt, nor do Plaintiffs allege that it otherwise should have known the debt was disputed. (R. 73, Defs.' Mem. at 27-28.) Plaintiffs allege only that Afuang disputed his debt in a May 2015 letter sent to Blitt, and they argue that knowledge of the letter can be imputed to Transworld because Blitt was Transworld's agent. (R. 75, Pls.' Resp. at 47.)

---

[21] This conclusion is also consistent with and compelled by other principles governing affirmative defenses to debt. For example, it is clear that "the expiration of the statute of limitations period does not extinguish the underlying debt." *Owens v. LVNV Funding, LLC*, 832 F.3d 726, 731 (7th Cir. 2016); *accord Fleming v. Yeazel*, 40 N.E.2d 507, 508 (Ill. 1942) ("[T]he statute of limitations controls the remedy for recovery of the debt, but the debt remains the same as before, excepting that the remedy for enforcement is gone."). Thus, asserting the affirmative defense that a statute of limitations has run on a debt does not dispute the validity of the debt; it "merely renders [the debt] unenforceable" in court. *Huertas v. Galaxy Asset Mgmt.*, 641 F.3d 28, 32-33 (3d Cir. 2011) (noting that "the FDCPA permits a debt collector to seek voluntary repayment of [a] time-barred debt").

"In general, the knowledge and conduct of agents are imputed to their principals."

*Lansing v. Carroll*, No. 11 CV 4153, 2016 WL 4045410, at *21 n.21 (N.D. Ill. July 28, 2016);

*see also* RESTATEMENT (THIRD) OF AGENCY § 5.03 (AM. LAW. INST. 2006) ("For purposes of

determining a principal's legal relations with a third party, notice of a fact that an agent knows or

has reason to know is imputed to the principal if knowledge of the fact is material to the agent's

duties to the principal, unless the agent (a) acts adversely to the principal . . . or (b) is subject to a

duty to another not to disclose the fact to the principal."). The Court concludes that Plaintiffs

have plausibly alleged that Blitt acted as an agent for Transworld, such that knowledge of

Afuang's May 2015 dispute letter could be imputed to Transworld. "The test of agency is

whether the alleged principal has the right to control the manner and method in which work is

carried out by the alleged agent and whether the alleged agent can affect the legal relationships

of the principal." *Chemtool, Inc. v. Lubrication Techs., Inc.*, 148 F.3d 742, 745 (7th Cir. 1998)

(citation omitted). And "[o]rdinarily, the question of whether an agency relationship existed is a

question of fact that is not properly resolved on a motion to dismiss." *Johnke v. Espinal-Quiroz*,

No. 14-cv-6992, 2016 WL 454333, at *9 (N.D. Ill. Feb. 5, 2016). Plaintiffs have alleged that "the

collection attorneys filing collection cases, including defendants Blitt and WWR, are part of the

NCO/Transworld Attorney Networks" that Transworld relies on to prosecute debt collection

litigation. (*Id.* ¶ 67.) Plaintiffs have also alleged that Transworld selected and closely supervised

Blitt in the prosecution of debt collection suits against Plaintiffs such as Afuang. (R. 79, Cons.

Compl. ¶ 69 (alleging that "Transworld selects counsel, communicates with counsel, and

instructs counsel").) Plaintiffs have also alleged that "network firms" such as Blitt are "required

to follow [Transworld's] Network Attorney Standard Operating Procedures." (*Id.* ¶ 68.) These

allegations are sufficient to allow a plausible inference that Blitt acted as Transworld's agent

such that knowledge of Afuang's May 2015 dispute letter could be imputed to Transworld. Plaintiffs have stated a claim under § 1692e(8) as to Afuang and the Court declines to dismiss Count IX as to him.

As noted, because Plaintiffs did not respond to Defendants' contention regarding the claims under §§ 1692e, 1692e(2), and 1692e(10), the Court assumes for purposes of the present motion that these claims rise and fall with the § 1692e(8) claim. Consequently, Count IX is further dismissed in part as to any claim by Plaintiff Rocco under §§ 1692e, 1692e(2), or 1692e(10). For the same reason, the Court declines to dismiss Count IX as to any claims by Plaintiff Afuang under §§ 1692e, 1692e(2), or 1692e(10).

## IX.    Count X – Cosigner Notification (FDCPA)

Count X, captioned "FDCPA – Cosigner Notification," is asserted by four of the Plaintiffs (Eul, Knox, McCool, and Esther Castano) as representatives of the putative "FDCPA 2S" class against Defendants NCO, Transworld, Blitt, and WWR. (R. 79, Cons. Compl. ¶¶ 263-64.) These Plaintiffs allege that they are cosigners on loans that Defendants sued them in state court to collect. (*Id.* ¶¶ 167, 171, 173, 177, 181, 183.) They allege that Defendants violated §§ 1692e and 1692f of the FDCPA by failing to provide the notice required by § 2S of the ICFA ("§ 2S notice") before filing suit against them. (*Id.* ¶ 265-66.) Section 2S provides, in relevant part:

> No person may . . . take any collection action regarding a cosigner of an obligation unless prior thereto, such person has *notified the cosigner by first class mail* that the primary obligor has become delinquent or defaulted on the loan, that the cosigner is responsible for the payment of the obligation and that the cosigner must, within 15 days from the date such notice was sent, either pay the amount due under the obligation or make arrangements for payment of the obligation.

815 Ill. Comp. Stat. 505/2S (emphasis added).

Defendants argue that Count X fails to state a claim under either § 1692e or § 1692f because Plaintiffs are improperly using the FDCPA as an enforcement mechanism for state law—the state law in this case being the notice requirement under § 2S of the ICFA. (R. 73, Defs.' Mem. at 28.) As discussed previously, it is well-established that the FDCPA is not an enforcement mechanism for matters governed by state law. *See Bentrud*, 794 F.3d at 875; *Evory*, 505 F.3d at 778; *Beler*, 480 F.3d at 473-74; *Butler*, 2016 WL 1298780, at *6; *Fick*, 2012 WL 1074288, at *3; *Washington*, 2008 WL 4280139, at *2. As also previously noted, however, the Seventh Circuit has applied this principle only in the context of § 1692f claims—not, so far as this Court is aware, to § 1692e claims. *See Bentrud*, 794 F.3d at 874-876; *Beler*, 480 F.3d at 473-74. The Court therefore declines to extend the application of this principle to a § 1692e claim. Count X is expressly and solely premised on Defendants' alleged violation of the § 2S notice requirement in the ICFA. Section 1692f cannot be used as an enforcement mechanism for this state law. *See Beler*, 480 F.3d at 473-74. Plaintiffs therefore fail to state a claim under § 1692f.

Defendants also argue that Plaintiffs have failed to state a claim under § 1692e because they have not alleged that Defendants used any false, deceptive, or misleading representations or means of collecting debt. (R. 73, Defs.' Mem. at 28.) Section 1692e, as previously noted, prohibits a debt collector's use of any "false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Plaintiffs respond that they have plausibly alleged a violation of § 1692e, namely: Defendants' debt collection lawsuits against them. (R. 75, Pls.' Resp. at 48-49.) Plaintiffs contend that when Defendants failed to provide § 2S notice before filing suit, Plaintiffs were "released" and "discharged" from any liability that they may have had as cosigners on the loans. (*Id.* at 3, 7, 49, 51-54.) As a result, Plaintiffs argue, the collection lawsuits against them were prohibited and actionable under § 1692e, because filing

the lawsuits "falsely implied" that they were still liable. (*Id.* at 48-49.) Plaintiffs analogize the suits against them to debt collection lawsuits barred by a statute of limitations, which are actionable under § 1692e because such suits falsely imply that the debt collector has legal recourse to collect the debt. *See Phillips*, 736 F.3d at 1079; *see also Lena v. Cach, LLC*, No. 14 C 01805, 2015 WL 4692443, at \*5 (N.D. Ill. Aug. 6, 2015) (explaining that a time-barred lawsuit to collect debt violates § 1692e because such a suit "falsely implies that the debt collector has legal recourse to collect the debt" (citation and internal quotation marks omitted)).

This analogy—and Plaintiffs' § 1692e claim—fails for a simple reason: it is not true that Plaintiffs were legally "released" or "discharged" from liability by Defendants' alleged failure to provide § 2S notice. The ICFA expressly provides that Plaintiffs' remedy for such a failure is "a civil action for actual damages of up to $250 plus reasonable attorney's fees." 815 ILL. COMP. STAT. 505/2S. Nowhere does § 2S state that a cosigner is released from liability upon a creditor's failure to provide the required notice. Plaintiffs cite no provision of the ICFA or any other statute for that proposition, and the Court's research reveals no support for it.[22] Instead, Plaintiffs rely on *Watkins Products, Inc. v. Walter*, 296 N.E.2d 859 (Ill. App. Ct. 1973), and *Mountrail County v. Farmers' State Bank*, 208 N.W. 380 (N.D. 1926), for the proposition that, at common law, "if the contract of a surety or guarantor mandates notice of the default of the principal debtor, failure to provide such notice releases the surety or guarantor." (R. 75, Pls.' Resp. at 49, 52.) But neither *Watkins* nor *Mountrail* interpreted or applied § 2S, so they are inapposite. *Mountrail* is particularly irrelevant because it is a North Dakota Supreme Court decision predating the

---

[22] The Court has found only one decision that has ever interpreted or applied § 2S of the ICFA—*Qualkenbush v. Harris Trust & Savings Bank*, 219 F. Supp. 2d 935 (N.D. Ill. 2002)—but *Qualkenbush* did not address remedies for violating § 2S.

enactment of § 2S by over 60 years.[23] In any event, neither case supports Plaintiffs' proposition. *Watkins* was a suit to collect from a gratuitous surety after the principal obligor defaulted on a line of credit. 296 N.E.2d at 860-61. The express terms of the credit agreement required the creditor to purchase a bond—essentially an insurance policy—to fully cover the debt in case the principal obligor defaulted. *Id.* at 861. The creditor "wilfully failed or refused" to do so, and after the principal obligor defaulted, the creditor sued the surety to collect. *Id.* The court explained that the surety was "made to believe that there was no problem with signing as a surety since she would be covered by" the bond, and explained further that the creditor's refusal to buy the required bond "demonstrate[d] a complete lack of good faith on [its] part and significantly increased the risk of [the surety] and deprived her of the protection she ha[d] a right to have." *Id.* The court concluded that the creditor's conduct constituted a "callous disregard for the suret[y] and a complete lack of good faith" and was therefore "sufficient in and of itself to warrant release of the surety." *Id.* The *Watkins* court did note that the creditor failed to notify the surety of the principal obligor's default, but did not base its conclusion on that fact. *Watkins* does not support Plaintiffs' argument that a lack of notice under § 2S releases or discharges cosigners. Neither does *Mountrail*. *Mountrail* dealt with a bond that expressly required, as a condition precedent to collecting from the surety, notification that the primary obligor had defaulted. *Mountrail*, 208 N.W. at 380-82. The court applied contract law to conclude that the failure to satisfy a condition precedent released the surety from its obligations. *Id.* Neither *Watkins* nor *Mountrail* support a conclusion that the ICFA—contrary to expressly identified statutory remedies—releases or discharges loan cosigners from liability when § 2S notice is not given.

---

[23] Section 2S appears to have been originally added to the ICFA as § 2R by Public Act 85-627, effective January 1, 1988.

Because Defendants' alleged failure to provide § 2S notice does not release or discharge Plaintiffs as cosigners, Defendants' lawsuits seeking to collect from Plaintiffs did not "falsely imply" that Plaintiffs were liable for the debt. Plaintiffs *were* still liable as cosigners, notwithstanding the failure to provide § 2S notice. Besides these lawsuits, Plaintiffs allege no other "false, deceptive, or misleading representations or means" in Count X. Since the suits did not "falsely imply" that Plaintiffs were liable for the debt, Plaintiffs have failed to state a claim under § 1692e and Count X is dismissed in its entirety.

## X.    Count XI – Cosigner Notification (ICFA)

Count XI, captioned "Illinois Consumer Fraud Act – Cosigner Notification," is asserted by five of the Plaintiffs (Eul, Knox, McCool, Esther Castano, and Yvonne Thomas) as representatives of the putative "ICFA 2S" class against Defendants NCO and Transworld. (R. 79, Cons. Compl. ¶¶ 268-69.) The Plaintiffs' allegation in Count XI is essentially the same as in Count X: that they are cosigners on loans and Defendants filed collection lawsuits against them without giving the required notice under § 2S of the ICFA. (*Id.* ¶ 270.) In Count X, however, Plaintiffs asserted an FDCPA violation based on these allegations, whereas in Count XI they assert a direct violation of the ICFA. (*Id.*) Plaintiffs allege that they were harmed as a result of Defendants' failure to give the required § 2S notice by "having to retain an attorney and file an appearance in order to defend the action." (*Id.* ¶ 273.)

As noted above as to Count X, § 2S of the ICFA provides that prior to taking collection action against a cosigner on a loan, the cosigner must be:

> notified . . . that the primary obligor has become delinquent or defaulted on the loan, that the cosigner is responsible for the payment of the obligation and that the cosigner must, within 15 days from the date such notice was sent, either pay the amount due under the obligation or make arrangements for payment of the obligation.

815 Ill. Comp. Stat. 505/2S. Taking collection action without providing the required § 2S notice gives rise to liability "in a civil action for actual damages of up to $250 plus reasonable attorney's fees." *Id.* Defendants argue that Count XI must be dismissed for two reasons; each is addressed in turn below.

### A.     Article III Standing

First, Defendants argue that Plaintiffs lack Article III standing to assert this claim because they have failed to allege that they were injured or harmed in any way. (R. 73, Defs.' Mem. at 29.) Defendants contend that Plaintiffs' only alleged injury—having to pay appearance costs and attorneys' fees in defending against Defendants' state court debt collection lawsuits—does not qualify as an injury in fact for purposes of Article III standing. (*Id.*) To establish Article III standing, a plaintiff must allege: (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The requirement of Article III standing "enforces the Constitution's case-or-controversy requirement." *Winkler v. Gates*, 481 F.3d 977, 979 (7th Cir. 2007). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," because on a motion to dismiss a court must presume that general allegations "embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (citation omitted).

As noted, Plaintiffs allege that they were harmed as a result of Defendants' failure to provide § 2S notice by "having to retain an attorney and file an appearance in order to defend the action." (R. 79, Cons. Compl. ¶ 273.) Defendants argue that the U.S. Supreme Court has squarely rejected the proposition that having paid attorneys' fees qualifies as an injury that confers Article III standing, in cases such as *Lewis v. Continental Bank Corp.*, 494 U.S. 472 (1990), and *Steel Co. v. Citizens for a Better Environment* ("*Citizens*"), 523 U.S. 83 (1998). (R.

73, Defs.' Mem. at 29.) *Lewis* and *Citizens* plainly do not stand for that proposition. Rather, the

import of those cases is that an interest in the award of costs or attorneys' fees *in the present*

*suit*—for example, where the statute sued upon authorizes such an award to the prevailing

party—is "insufficient to create an Article III case or controversy where *none exists on the merits*

*of the underlying claim.*" *Lewis*, 494 U.S. at 480 (emphasis added); *see also Citizens*, 523 U.S. at

107 ("[A] plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the

cost of bringing suit."). In other words, "[t]he litigation must give the plaintiff some other benefit

besides *reimbursement of costs that are a byproduct of the litigation itself.*" *Citizens*, 523 U.S. at

107 (emphasis added). A litigant cannot, for example, premise Article III standing solely on the

"injury" of having to pay an award of attorneys' fees to its adversary in the very case where it is

required to establish standing. *See Diamond v. Charles*, 476 U.S. 54, 69-70 (1986) ("Diamond is

claiming that an award of fees entered [against him] after a decision on the merits . . . gives him

[standing] . . . . [B]ecause Diamond stands to lose the amount of the fee unless the State's

regulations . . . are reinstated, he claims he has been injured by the invalidation of those

regulations. . . . But the mere fact that continued adjudication would provide a remedy for an

injury that is only a byproduct of the suit itself does not mean that the injury is cognizable under

Art. III.").[24]

Plaintiffs' alleged injury here, however, is not an unsatisfied wish for the "reasonable

attorney's fees" statutorily authorized for a violation of § 2S; it is rather the attorneys' fees and

---

[24] The facts of *Diamond* are unusual in that the sole appellant at the Supreme Court was an intervenor in the case; the original defendant (the State of Illinois) declined to appeal the injunction entered against it, and Diamond (who had intervened on the State's side) appealed alone. *Diamond*, 476 U.S. at 61. Because an intervenor's right to continue a suit in such circumstances depends on the intervenor having independent Article III standing, *id.* at 68, the Supreme Court considered whether Diamond himself possessed Article III standing. The Supreme Court rejected the argument that Diamond had standing because attorneys' fees had been assessed against him by the district court.

litigation costs already incurred when Plaintiffs appeared and defended themselves in

Defendants' *prior* state court debt collection litigation. (R. 79, Cons. Compl. ¶¶ 152(a), 175, 185,

273.) That is different from predicating Article III standing solely on the prospect of an award of

attorneys' fees in *this* case. The Seventh Circuit made this precise point in *Citizens for a Better*

*Environment v. Steel Co.*, 230 F.3d 923 (7th Cir. 2000), a decision on remand from the Supreme

Court *Citizens* decision that Defendants cite. *Id.* at 926 ("Suppose a federal statute established

the right to recover for loss caused by 'wrongful invocation of federal jurisdiction,' affording

compensatory damages to defendants who have been dragged pointlessly through federal court.

The constitutionality of such a provision could not be doubted, nor would anyone deny that *the*

*aggrieved former defendant has standing to avail itself of the federal right so created*."

(emphasis added)).

This injury is also "fairly traceable" to Defendants' alleged failure to provide § 2S notice.

*Lujan*, 504 U.S. at 590 (citation omitted). It is at least plausible to infer from Plaintiffs'

allegations that, had they received the requisite § 2S notice, they might have made other

arrangements to satisfy the debt and thereby avoided attorneys' fees and litigation costs. For

these reasons, the Court concludes that Plaintiffs have demonstrated an "injury in fact" for

purposes of Article III standing.

### B.     Statutory Standing

Defendants also argue that Count XI must be dismissed because Plaintiffs are not

"consumers" within the meaning of the ICFA and therefore lack statutory standing to pursue an

ICFA claim. (R. 73, Defs.' Mem. at 30.) (*Id.*) Statutory standing is the issue of "whether a cause

of action exists under a particular law" for this plaintiff. *Schuster v. U.S. Postal Serv.*, 182 F.3d

922 (7th Cir. 1999).[25] "[T]he question it asks is whether [the legislature] has accorded *this* injured plaintiff the right to sue the defendant to redress his injury." *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 295 (3d Cir. 2007).

Defendants argue broadly that only consumers have standing to sue under the ICFA, and that Plaintiffs do not qualify as "consumers" in relation to the Defendants. (R. 73, Defs.' Mem. at 30; R. 76, Defs.' Reply at 29-30.) The ICFA defines a consumer as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." 815 ILL. COMP. STAT. 505/1(e). As this Court as well as other courts in this District have recognized, "Illinois courts are split on th[e] issue" of whether only consumers have standing to sue under the ICFA. *Thrasher-Lyon*, 861 F. Supp. 2d at 911 (collecting cases). Likewise, in *Bank One Milwaukee v. Sanchez*, 783 N.E.2d 217 (Ill. App. Ct. 2003), the Illinois Appellate Court acknowledged both "a line of cases denying [ICFA] standing to plaintiffs where it was determined that they were not consumers" and "another line of cases . . . that allows a plaintiff to maintain a cause of action under the [ICFA] despite the fact that the plaintiff is not a consumer as defined by the Act." *Id.* at 220. As this Court has previously noted, courts in this District have rejected the general proposition that only consumers may bring ICFA actions. *Thrasher-Lyon*, 861 F. Supp. 2d at 911 (collecting cases). Notably, all of the cases dealing with statutory standing to sue under the ICFA have dealt with other provisions of the ICFA; no case has directly addressed this issue with respect to § 2S.

---

[25] *See also Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) ("The term 'statutory standing' is found in many cases, . . . but it is a confusing usage. It usually refers to a situation in which, although the plaintiff has been injured and would benefit from a favorable judgment and so has standing in the Article III sense, he is suing under a statute that was not intended to give him a right to sue; he is not within the class intended to be protected by it.").

The Court need not peer any further into this rift in authorities because the text of § 2S alone is dispositive. The Illinois Supreme Court has explained that to determine whether statutory standing exists, "courts must look to the statute in order to determine which persons are entitled to seek the relief provided for" by the legislature. *People v. $1,124,905 U.S. Currency & One 1988 Chevrolet Astro Van*, 685 N.E.2d 1370, 1385 (Ill. 1997). And it is well established that "[i]f the language in [a] statute is clear and unambiguous, our inquiry ends there." *Champaign Twp. v. Cty. of Champaign*, 772 N.E.2d 315, 319 (Ill. App. Ct. 2002). Section 2S reads, in full:

> No person may report adverse information to a consumer reporting agency, provide information to a collection agency or take any collection action regarding *a cosigner* of an obligation unless prior thereto, such person has notified *the cosigner* by first class mail that the primary obligor has become delinquent or defaulted on the loan, that *the cosigner* is responsible for the payment of the obligation and that *the cosigner* must, within 15 days from the date such notice was sent, either pay the amount due under the obligation or make arrangements for payment of the obligation. In the event that *the cosigner* pays or makes arrangements to pay the obligation, no adverse information shall be reported regarding the cosigner.

> Any person violating this Section commits an unlawful practice within the meaning of this Act and, in addition, is liable in a civil action for actual damages of up to $250 plus reasonable attorney's fees.

815 ILL. COMP. STAT. 505/2S (emphases added). As Plaintiffs point out, § 2S expressly identifies the remedy when a person fails to give required notice to a cosigner: "a civil action for actual damages of up to $250 plus reasonable attorney's fees." *Id.* It does not explicitly say *who* may bring such an action, but the answer is clear from the remainder of § 2S and in particular the authorization to seek "actual damages." When a person improperly "report[s] adverse information to a consumer reporting agency . . . regarding a cosigner," improperly "provide[s] information to a collection agency . . . regarding a cosigner," or improperly "take[s] . . . collection action regarding a cosigner" in violation of § 2S, the damage is to the cosigner and only the cosigner. Thus, when § 2S provides that a violator "is liable in a civil action for actual

64

damages," it clearly contemplates that the aggrieved cosigner would be the one to file suit. The statute identifies no other party who might suffer the "actual damages" authorized as a remedy, and thus contemplates nobody else who may file suit. The Court's conclusion here—and the only conclusion allowed by the text—is that aggrieved cosigners have statutory standing to sue for violations of § 2S. *See Qualkenbush v. Harris Trust & Sav. Bank*, 219 F. Supp. 2d 935, 941 (N.D. Ill. 2002) (finding that a plaintiff "adequately pleads that he was a co[]signer" and was therefore "entitled to Section 2S protections").

Because Plaintiffs have plausibly alleged injury in fact to confer Article III standing and have statutory standing to pursue a violation of § 2S of the ICFA, the Court declines to dismiss Count XI.

## XI. Count XII – Cosigner Notification (ICAA)

Count XII, captioned "Illinois Collection Agency Act – Cosigner Notification," is asserted by five of the Plaintiffs (Eul, Knox, McCool, Esther Castano, and Yvonne Thomas) as representatives of the putative "ICAA 2S" class against Defendants NCO and Transworld. (R. 79, Cons. Compl. ¶¶ 275-76.) Count XII alleges that Defendants violated § 9 of the ICAA, 225 ILL. COMP. STAT. 425/9, (*id.* ¶ 278), but does not identify what Defendants did that allegedly violated § 9. Defendants argue that Count XII must be dismissed principally for this reason. (R. 73, Defs.' Mem. at 33.) The Court agrees. Plaintiffs' only substantive allegation in Count XII is that:

278. Defendant violated the following provisions of 225 ILCS 425/9:

**. . . (20) Attempting or threatening to enforce a right or remedy with knowledge or reason to know that the right or remedy does not exist. . . .**

**. . . (26) Misrepresenting the amount of the claim or debt alleged to be owed.**

(R. 79, Cons. Compl. ¶ 278 (emphasis in original).) The other allegations in Count XII merely identify which Plaintiffs are asserting Count XII and which Defendants it is asserted against. (*Id.* ¶ 275-76.) Plaintiffs neither allege nor identify any predicate factual content. It is not sufficient for the complaint to merely allege that Defendants violated a particular provision of the ICAA, because "[l]egal conclusions or bare and conclusory allegations . . . are insufficient to state a claim." *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 589 (7th Cir. 2016). Rather, a complaint must "give the defendant fair notice of what the . . . claim is and *the grounds upon which it rests*." *Twombly*, 550 U.S. at 555 (emphasis added, citation omitted). While Plaintiffs do "incorporate paragraphs 1-215" of their complaint by reference, (R. 79, Cons. Compl. ¶ 275), they do not particularly identify any of those more than 200 paragraphs in Count XII or in their briefs. Plaintiffs no doubt believe they have alleged, somewhere in those 215 paragraphs, predicate conduct by which Defendants violated § 9 of the ICAA. But it is not this Court's task to "sift through a complaint to extract some merit when the attorney who drafted it has failed to do so himself." *Stanard*, 658 F.3d at 800. Rather, "[u]nder Rule 8, a complaint must be presented with intelligibility sufficient for a court . . . to understand whether a valid claim is alleged and if so what it is." *Vicom*, 20 F.3d at 775 (citation and internal quotation marks omitted). The Court is unable to discern what, if any, factual allegations support the bare legal conclusion that "Defendant[s] violated" 225 ILL. COMP. STAT. 425/9. Count XII is therefore dismissed without prejudice. *See Twombly*, 550 U.S. at 555; *Diedrich*, 839 F.3d at 589.

## XII.    Count XIII – Creditor Identification (FDCPA)

Count XIII, captioned "FDCPA – Creditor Identification," is asserted by Plaintiff O'Neill as a representative of the putative "FDCPA Letter" class against Defendant Transworld. (R. 79, Cons. Compl. ¶¶ 280, 286.) Count XIII alleges that Transworld violated § 1692e of the FDCPA by inaccurately identifying the creditor as "National Collegiate Trust" in letters sent to these

Plaintiffs. (*Id.* ¶ 285.) Specifically, as to Plaintiff O'Neill, the complaint alleges that Transworld

sent her five letters between January and May 2015 in which it identified the creditor simply as

"National Collegiate Trust." (*Id.* ¶¶ 190-207; R. 79-1, Cons. Compl., Apps. 39-43 at 119-33.)

Plaintiffs further allege that "[a] search of the Delaware Secretary of State website" reveals over

75 trusts whose names include the phrase "National Collegiate," that each of these trusts are

"different legal entities," that only one of these entities is actually named "The National

Collegiate Trust," but that this entity is not the one that actually holds title to Plaintiffs' loans.

(*Id.* ¶¶ 281-83.) As noted, § 1692e of the FDCPA prohibits a debt collector from using "any

false, deceptive, or misleading representation or means in connection with the collection of any

debt." 15 U.S.C. § 1692e. Plaintiffs' claim is that generally identifying the creditor as "National

Collegiate Trust"—rather than identifying the particular NCT entity that held the recipient's

loan(s) by its precise and full legal entity name, for example, "National Collegiate Student Loan

Trust 2003-1"—was false, deceptive, and misleading, and consequently violated § 1692e. (R. 79,

Cons. Compl. ¶ 286.) Defendants argue that Count XIII must be dismissed for two reasons: first,

that the reference to "National Collegiate Trust" as the creditor was not false or misleading as a

matter of law; and second, that even if the reference was technically false, it was not material.

(R. 73, Defs.' Mem. at 33-35.)

When assessing whether Plaintiffs state a claim under § 1692e, the Court must view the

claim "through the eyes of the 'unsophisticated consumer.'" *Wahl v. Midland Credit Mgmt., Inc.*,

556 F.3d 643, 645 (7th Cir. 2009). "The unsophisticated consumer may be uninformed, naïve,

and trusting, but is not a dimwit, has rudimentary knowledge about the financial world, and is

capable of making basic logical deductions and inferences." *Lox v. CDA, Ltd.*, 689 F.3d 818, 822

(7th Cir. 2012) (internal alterations, citations, and quotation marks omitted). This standard

"protects the consumer who is uninformed, naive, or trusting, yet . . . admits an objective element of reasonableness." *Gammon v. GC Servs. Ltd. P'ship*, 27 F.3d 1254, 1257 (7th Cir. 1994). The Seventh Circuit has cautioned that "a district court must tread carefully before holding that a letter is not confusing as a matter of law when ruling on a Rule 12(b)(6) motion because district judges are not good proxies for the 'unsophisticated consumer' whose interest the statute protects." *McMillan v. Collection Prof'ls Inc.*, 455 F.3d 754, 759 (7th Cir. 2006) (citation and internal quotation marks omitted). This is so because "[w]hat seems pellucid to a judge, a legally sophisticated reader, may be opaque to the unsophisticated consumer." *Id.* (citation and internal quotation marks omitted). "Nevertheless, a plaintiff fails to state a claim and dismissal is appropriate as a matter of law when it is apparent from a reading of the letter that not even a significant fraction of the population would be misled by it." *Zemeckis v. Glob. Credit & Collection Corp.*, 679 F.3d 632, 636 (7th Cir. 2012) (citation and internal quotation marks omitted). In addition, a plaintiff fails to state a § 1692e claim when it is based on a "bizarre, peculiar, or idiosyncratic interpretation of a collection letter." *McMillan*, 455 F.3d at 758.

An allegedly misleading statement under § 1692e must also be material, in the sense that it has "the ability to influence a consumer's decision." *Lox*, 689 F.3d at 826 (emphasis and citation omitted). "A statement cannot mislead unless it is material, so a false but non-material statement is not actionable." *Hahn v. Triumph P'ships LLC*, 557 F.3d 755, 758 (7th Cir. 2009) (citation omitted). "[Section 1692e] is designed to provide information that helps consumers to choose intelligently, and by definition immaterial information neither contributes to that objective . . . nor undermines it[.]" *Id.* at 757-58. To assess materiality, a court looks at the "allegedly false or misleading statements to determine whether they could have any practical impact on a consumer's rights or decision-making process—that is, whether they represent the

kind of conduct the Act was intended to eliminate." *Janetos v. Fulton Friedman & Gullace, LLP*, 825 F.3d 317, 324 (7th Cir. 2016).

The Court has no difficulty concluding that the letters' identification of the creditor generally as "National Collegiate Trust" was not false or misleading as a matter of law. Numerous courts have dismissed similar claims, concluding that a failure to identify the creditor by its precise and full legal entity name is not false or misleading under the FDCPA. For example, in *Leonard v. Zwicker & Associates, P.C.*, No. 16-cv-14326, 2016 WL 7388645 (S.D. Fla. Dec. 14, 2016), *appeal filed*, No. 17-10174 (11th Cir. Jan. 10, 2017), a plaintiff in Florida alleged that a debt collector's letter identifying "American Express" generally as the creditor was false and misleading under § 1692e. *Id.* at *1. The actual creditor for the plaintiff's credit card debt allegedly was either "American Express Centurion Bank," the card's issuing bank, or "American Express Receivables Financing Corporation III LLC," a separate entity to which the bank sold credit card receivables. *Id.* The plaintiff alleged that the letter's failure to identify the creditor by its full business name was false and misleading, because "there [were] numerous different entities that identify themselves as 'American Express,' including over fifty business entities whose names begin with 'American Express' in Florida" alone. *Id.* The court granted the defendant's motion to dismiss, reasoning that "[i]n light of the FDCPA's purpose, requiring a creditor be identified by its full business name, rather than the name by which it is commonly referred, could serve only to increase confusion for the least sophisticated consumer, who may be more familiar with the creditor's common name." *Id.* at *3. Similarly, in *Campbell v. American Recovery Services Inc.*, No. 2:15-cv-9079, 2016 WL 3219866 (C.D. Cal. June 8, 2016), the plaintiff alleged that a letter he received that identified the creditor merely as "American Express" was "susceptible to an inaccurate reading and [was] thus deceptive" under § 1692e. *Id.*

at *3. The court granted the defendant's motion to dismiss, reasoning that "[u]nder the FDCPA it is sufficient to avoid confusion if the debt collector uses the full business name of the creditor, the name under which it usually transacts business, or a commonly-used acronym." *Id.* (emphasis omitted). Likewise, in *Hammett v. AllianceOne Receivables Management, Inc.*, No. 11-3172, 2011 WL 3819848 (E.D. Pa. Aug. 30, 2011), the plaintiff alleged that a debt collector's letter violated § 1692e because it identified the original creditor only as "PNC Bank." *Id.* at *4. The plaintiff contended that "PNC Bank has many business affiliates, such as 'PNC Bank, National Association' and 'PNC Insurance Services, LLC,'" and that as a result, he was "unable to determine which entity held his debt." *Id.* at *5. The court granted the defendant's motion to dismiss, rejecting the plaintiff's argument that the letter was misleading because it "failed to provide PNC Bank's full corporate name." *Id.* at *4.

The Court also finds the Federal Trade Commission's ("FTC") Staff Commentary on subsection (14) of § 1692e persuasive. Subsection (14) generally prohibits a debt collector from using "any business, company, or organization name other than the true name of the debt collector's business, company, or organization." 15 U.S.C. § 1692e(14). The FTC's Staff Commentary explains, however, that "[a] debt collector *may* use . . . its full business name, the name under which it usually transacts business, or a commonly-used acronym." Federal Trade Commission, Statements of General Policy or Interpretation Staff Commentary on the Fair Debt Collection Practices Act, 53 Fed. Reg. 50,097, 50,107 (Dec. 13, 1988) (emphasis added). This Staff Commentary reinforces the conclusion that a creditor need not always be identified by its full legal entity name. In addition, according to the Staff Commentary "[w]hen the collector uses multiple names in its various affairs, it *does not violate this subsection* if it consistently uses the same name when dealing with a particular consumer." *Id.* (emphasis added). In all five of the

allegedly deceptive letters to O'Neill, the creditor is consistently identified as "National Collegiate Trust." (R. 79, Cons. Compl. ¶¶ 190-207; R. 79-1, Cons. Compl., Apps. 39-43 at 119-33.) The Court concludes as a matter of law that the letters' creditor identification was not false or misleading, and Count XIII therefore fails to state a claim.[26]

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (R. 72) is GRANTED in part and DENIED in part as follows: Count I is dismissed with prejudice as to any claim under 15 U.S.C. § 1692f; Count III is dismissed with prejudice in its entirety; Count V is dismissed with prejudice as to any claim under 15 U.S.C. § 1692e(5) and any FDCPA claim that is derivative of violations of the ICAA; Count VI is dismissed with prejudice in its entirety; Count VII is dismissed without prejudice; Count VIII is dismissed with prejudice as to any ICAA claim against Blitt and WWR; Count X is dismissed with prejudice in its entirety; Count XII is dismissed without prejudice; and Count XIII is dismissed with prejudice in its entirety. Defendants' motion is DENIED in all other respects.

---

[26] Because the Court concludes, as a matter of law, that the letters were not false or misleading, the Court need not reach Defendants' second argument that any "technical" falsity was immaterial.

Pursuant to the Court's prior order granting the parties' joint motion to stay proceedings pending private JAMS mediation (R. 92), this case is hereby STAYED. Because Counts VII and XII are dismissed without prejudice, the Court will grant Plaintiffs leave to amend and replead those counts, if and when the Court's stay of this case is lifted. The parties shall appear for a status hearing on May 24, 2017 at 9:45am to advise the Court on the status of the JAMS mediation.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: March 30, 2017**